PETER D. KEISLER
Assistant Attorney General

SCOTT N. SCHOOLS
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone:     (202) 514-3953
Facsimile:     (202) 616-8470
Email:  peter.robbins@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CRUZ, et al. | Case No. C 07-2888 MJJ |
| Plaintiffs, | **DEFENDANT'S MOTION AND NOTICE OF MOTION TO DISMISS AND MEMORANDUM IN SUPPORT THEREOF** |
| v. | |
| MICHAEL O. LEAVITT, | Date:  November 27, 2007 |
| Defendant. | Time:  9:30 a.m.
Place:  Courtroom 11, 19th Floor |

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ

**Table of Contents**

NOTICE AND MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Medicare Claims Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  The Physician "Fee Schedule" and the Preclusion of Judicial Review. . . . . . . . . . . . . . . 2

    C.  Geographic Adjustment Factors and the Fee Schedule Areas. . . . . . . . . . . . . . . . . . . 3

    D.  The Historical Development of Fee Schedule Areas. . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E.  The GAO Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.  The Secretary's Response to the GAO Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    G.  The California Proposals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE
      CONGRESS HAS PRECLUDED JUDICIAL REVIEW OF THE
      CONFIGURATION OF FEE SCHEDULE AREAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   IF THE CONFIGURATION OF FEE SCHEDULE AREAS WERE REVIEWABLE,
      SUBJECT-MATTER JURISDICTION WOULD BE LACKING BECAUSE
      PLAINTIFFS HAVE NOT EXHAUSTED THE MEDICARE CLAIMS PROCESS. . . 16

III.  JUDICIAL REVIEW OF FEE SCHEDULE AREAS IS NOT AVAILABLE
      UNDER THE ADMINISTRATIVE PROCEDURE ACT. . . . . . . . . . . . . . . . . . . . . . 18

IV.  PLAINTIFFS' APA AND STATUTORY CLAIMS LACK SUBSTANTIVE MERIT. . 20

V.   PLAINTIFFS' CONSTITUTIONAL CLAIMS LACK MERIT. . . . . . . . . . . . . . . . . . 22

VI.  THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY
      TO BE SUED FOR DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII. SOME OF THE PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT
      SUPPLIERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## Table of Authorities

2

**Cases**

3

Abbey v. Sullivan,
978 F.2d 37 (2d Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4

AMA v. Thompson,
2001 WL 619510 (N.D. Ill. May 29, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

5

Am. Acad. of Dermatology v. HHS,
118 F.3d 1495 (11th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6

7

Am. Soc'y of Anesthesiologists v. Shalala,
90 F. Supp. 2d 973 (N.D. Ill. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

8

Am. Soc'y of Cataract & Refractive Surgery v. Thompson,
279 F.3d 447 (7th Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

9

10

Am. Soc'y of Dermatology v. Shalala,
962 F. Supp. 141 (D.D.C. 1996), aff'd, 116 F.3d 941 (1997). . . . . . . . . . . . . . . . . . . . . 14, 15, 24

11

Ariz. Power Auth. v. Morton,
549 F.2d 1231 (9th Cir. 1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

12

13

Ariz. State Dep't of Pub. Welfare v. HEW,
449 F.2d 456 (9th Cir. 1971).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14

Bd. of Regents v. Roth,
408 U.S. 564 (1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15

16

Bowen v. Mich. Acad. of Family Physicians,
476 U.S. 667 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17

Butte City Water Co. v. Baker,
196 U.S. 119 (1905).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18

19

Buttfield v. Stranahan,
192 U.S. 470 (1904).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

20

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21

22

City of Los Angeles v. David,
538 U.S. 715 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

23

City of Santa Clara v. Andrus,
572 F.2d 660 (9th Cir. 1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

24

25

Clementson v. Brock,
806 F.2d 1402 (9th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26

Cospito v. Heckler,
742 F.2d 72 (3d Cir. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

27

28

Cruz v. United States,
387 F. Supp. 2d 1057 (N.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ctr. for Biological Diversity v. Veneman,
394 F.3d 1108 (9th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Currin v. Wallace,
306 U.S. 1 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Dubbs v. CIA,
866 F.2d 1114 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

EMR Network v. FCC,
391 F.3d 269 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Farkas v. Blue Cross & Blue Shield,
24 F.3d 853 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FCC v. Beach Commc'ns., Inc.,
508 U.S. 307 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ferry v. Udall,
336 F.2d 706 (9th Cir. 1964).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Franconia Assocs. v. United States,
536 U.S. 129 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Furlong v. Shalala,
1996 WL 393526 (S.D.N.Y. July 12, 1996),
aff'd in part, rev'd in part on other grounds, 156 F.3d 384 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . 15

Gros Ventre Tribe v. United States,
469 F.3d 801 (9th Cir. 2006), cert. denied,, 2007 WL 1768286 (Oct. 1, 2007). . . . . . . . . . . . . . . 21

Heckler v. Chaney,
470 U.S. 821 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Heckler v. Ringer,
466 U.S. 602 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Helgeson v. BIA,
153 F.3d 1000 (9th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Heller v. Doe,
509 U.S. 312 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ICC v. N.Y., N.H. & H.R. Co.,
287 U.S. 178 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

INS v. Yang,
519 U.S. 26 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Johnson Oyster Co. v. Baldridge,
704 F.2d 1060 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kendall v. United States ex rel. Stokes
37 U.S. (12 Pet.) 524 (1838). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Lifestar Ambulance Serv., Inc. v. United States,
365 F.3d 1293 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lincoln v. Vigil,
508 U.S. 182 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lujan v. Nat'l Wildlife Fed'n,
497 U.S. 871 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Mathews v. Eldridge,
424 U.S. 319 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

McDonnell v. Peterson,
1992 WL 477014 (N.D. Cal. Dec. 23, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Methodist Hosp. v. Shalala,
38 F.3d 1225 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mounkam v. Way,
2007 WL 974102 (D. Ariz. Mar. 30, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

NARUC v. FCC,
737 F.2d 1095 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Nat'l Kidney Patients Ass'n v. Sullivan,
958 F.2d 1127 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Ness Inv. Corp. v. USDA,
512 F.2d 706 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Nevada v. Watkins,
914 F.2d 1545 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Nordlinger v. Hahn,
505 U.S. 1(1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Norton v. Southern Utah Wilderness Alliance,
542 U.S. 55 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Or. Natural Res. Council v. Thomas,
92 F.3d 792 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Painter v. Shalala,
97 F.3d 1351 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 22

Premo v. Martin,
119 F.3d 764 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                    -iv-

Rank v. Nimmo,
677 F.2d 692 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Shalala v. Illinois Council on Long Term Care, Inc.,
529 U.S. 1 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

South Carolina v. Katzenbach,
383 U.S. 301 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

St. Louis, Iron Mountain, & S. Ry. v. Taylor,
210 U.S. 281 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Strickland v. Morton,
519 F.2d 467 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sunshine Anthracite Coal. Co. v. Adkins,
310 U.S. 381 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Three Lower Counties Cmty. Health Servs., Inc. v. HHS,
2007 WL 2932767 (D.D.C. Oct. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States ex rel. Dunlap v. Black,
128 U.S. 40 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Rock Royal Co-Op, Inc.,
307 U.S. 533 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Webster v. Doe,
486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Weinberger v. Salfi,
422 U.S. 749 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Constitution**

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Statutes**

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

5 U.S.C. § 701(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 24

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 24

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21, 24

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

1  5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20, 24

2  5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

3  5 U.S.C. § 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 24

4  28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

5  28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

6  42 U.S.C. § 405(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

7  42 U.S.C. § 405(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

8  42 U.S.C. § 1395 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

9  42 U.S.C. § 1395c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10  42 U.S.C. § 1395i-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11  42 U.S.C. § 1395j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

12  42 U.S.C. § 1395l(a)(1) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

13  42 U.S.C. § 1395u . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

14  42 U.S.C. § 1395u(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15  42 U.S.C. § 1395u(b)(3)(L) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16  42 U.S.C. § 1395u(b)(4)(A)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17  42 U.S.C. § 1395u(b)(7)(B)(ii)(III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18  42 U.S.C. 1395u(b)(7)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

19  42 U.S.C. § 1395u(b)(8)(B)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20  42 U.S.C. § 1395u(b)(8)(B)(ii)(VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21  42 U.S.C. § 1395u(b)(8)(B)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22  42 U.S.C. § 1395u(b)(10)(A)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

23  42 U.S.C. § 1395u(b)(10)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24  42 U.S.C. § 1395u(b)(11)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25  42 U.S.C. § 1395u(b)(14)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26  42 U.S.C. § 1395u(b)(14)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27  42 U.S.C. § 1395u(b)(14)(B)(i)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28

42 U.S.C. § 1395u(b)(14)(B)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395u(b)(14)(B)(iii)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395u(b)(14)(C)(iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395u(h)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395u(j)(1)(C)(v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395u(q)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1395w-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

42 U.S.C. § 1395w-4(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1395w-4(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1395w-4(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1395w-4(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18

42 U.S.C. § 1395w-4(e)(1)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18

42 U.S.C. § 1395w-4(e)(1)(A)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18

42 U.S.C. § 1395w-4(e)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18

42 U.S.C. § 1395w-4(e)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

42 U.S.C. § 1395w-4(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(i)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

42 U.S.C. § 1395w-4(i)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

42 U.S.C. § 1395w-4(i)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

42 U.S.C. § 1395w-4(i)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(j)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395x(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1395ff(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1

42 U.S.C. § 1395ff(a)(3)(B)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2

42 U.S.C. § 1395ff(a)(3)(C)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

42 U.S.C. § 1395ff(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

4

42 U.S.C. § 1395ff(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

42 U.S.C. § 1395ff(d)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

42 U.S.C. § 1395ff(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7

42 U.S.C. § 1395ii. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

8

9

**Session Laws**

10

Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4117
104 Stat. 1388, 1388-65 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6102(a),
103 Stat. 2106, 2169-84 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

12

13

**Legislative Materials**

14

H.R. Rep. No. 108-636 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15

H.R. Rep. No. 101-386 (Conf. Rep.) (1989), <u>reprinted in</u> 1989 U.S.C.C.A.N. 3018. . . . . . . . 3, 18

16

135 Cong. Rec. S13,911 (Oct. 24, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17

18

**Judicial Rules**

19

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

20

21

**Administrative Rules**

22

42 C.F.R. § 400.202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

23

42 C.F.R. § 405.902. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

24

42 C.F.R. § 405.906(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

25

42 C.F.R. § 405.1100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

26

42 C.F.R. § 405.1140. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

27

42 C.F.R. § 414.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28

42 C.F.R. § 414.4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. § 424.55. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 C.F.R. § 424.56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Federal Register Notices**

72 Fed. Reg. 38,122 (July 12, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

71 Fed. Reg. 69,624 (Dec. 1, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

71 Fed. Reg. 48,982(Aug. 22, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

70 Fed. Reg. 70,116 (Nov. 21, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

70 Fed. Reg. 45,764 (Aug. 8, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

69 Fed. Reg. 66,236 (Nov. 15, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

69 Fed. Reg. 47,488 (Aug. 5, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

68 Fed. Reg. 63,196 (Nov. 7, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

68 Fed. Reg. 49,030 (Aug. 15, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

61 Fed. Reg. 59,490 (Nov. 22, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

61 Fed. Reg. 34,614 (July 2, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

59 Fed. Reg. 63,410 (Dec. 8, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

58 Fed. Reg. 63,626 (Dec. 2, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

56 Fed. Reg. 25,792 (June 5, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

56 Fed Reg. 59,502 (Nov. 25, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Materials**

Attorney General, <u>Manual on the Administrative Procedure Act</u> (1947). . . . . . . . . . . . . . . . 21

CMS, <u>Medicare Claims Processing Manual</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

GAO, <u>Medicare: Geographic Areas Used to Adjust Physician Payments for Variation in Practice Costs Should Be Revised</u> (07-466 June 2007). . . . . . . . . . . . . . . . . 8-12

MedPAC, <u>Issues in a Modernized Medicare Program: Report to Congress</u> (June 2005). . . . . . . 12

1

## NOTICE AND MOTION

In this action, seven counties in California ask this Court to exercise jurisdiction it does not have to force the Secretary of Health and Human Services to revise the Medicare program nationwide in a way that he is not required by law to do.  Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendant respectfully moves to dismiss the complaint on the grounds of lack of subject-matter jurisdiction, failure to exhaust administrative remedies, and failure to state a claim.  The motion is noticed for November 27, 2007 at 9:30 a.m. before the Honorable Martin J. Jenkins in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, California.

## MEMORANDUM OF POINTS AND AUTHORITIES

## BACKGROUND

**A.  The Medicare Claims Process**

Title XVIII of the Social Security Act, commonly known as the Medicare Act, establishes a program of health insurance for the elderly and disabled.  42 U.S.C. §§ 1395, et seq.  Medicare Part A pays for inpatient hospital services and other institutional care.  42 U.S.C. §§ 1395c-1395i-5.  Part B is a supplemental program that pays for physician and outpatient services.  42 U.S.C. § 1395j-1395w-4.  Suppliers of Part B services, such as physicians and certain health-care facilities, 42 U.S.C. § 1395x(d), may take an assignment of the Medicare beneficiary's claim.  42 C.F.R. §§ 400.202, 405.906(a)(2), 424.55, 424.56.

A claim for Part B reimbursement is first submitted to a contractor, 42 U.S.C. § 1395u, which makes an initial determination on behalf of the Secretary as to whether it should be paid and, if so, in what amount.  42 U.S.C. § 1395ff(a)(1).  If the supplier wishes to challenge the contractor's determination, it must submit a request for a redetermination within 120 days of receiving the initial determination.  42 U.S.C. § 1395ff(a)(3)(C)(i).  Failure to meet this deadline renders the initial determination final and unappealable.  42 U.S.C. § 1395ff(a)(3)(B)(i).  If the supplier is dissatisfied with the redetermination decision, it is then entitled to reconsideration by a different contractor, 42 U.S.C. § 1395ff(c)(2), a hearing before an administrative law judge, 42 U.S.C. § 1395ff(d)(1)(A), and an appeal to the Medicare Appeals Council of the Departmental Appeals

1  Board.  42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.902, 405.1100-1140.  The "final decision" of

2  the Secretary may then be challenged in district court.  42 U.S.C. § 1395ff(b)(1)(A)

3  (incorporating 42 U.S.C. § 405(g)).  The Medicare appeals process is the exclusive avenue

4  available for challenging determinations regarding Part B claims.  Federal-question jurisdiction

5  under 28 U.S.C. § 1331 is precluded.  42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)).

6  **B.  The Physician "Fee Schedule" and the Preclusion of Judicial Review**

7  Payment for physician services under Part B is made according to a "fee schedule" published

8  once a year.  42 U.S.C. § 1395w-4.  The fee schedule methodology went into effect in 1992 and

9  was phased into full operation over a four-year transition period.  Omnibus Budget

10  Reconciliation Act of 1989, Pub. L. No. 101-239, § 6102(a), 103 Stat. 2106, 2169-84 (1989).

11  Under the fee schedule, the amount that Medicare pays for a particular type of physician's service

12  is not uniform throughout the country.  Rather, payment rates are adjusted for geographic

13  variations in the costs and resources required to furnish medical items and services.

14  Three basic elements of information are used to determine fee-schedule rates.  42 U.S.C.

15  § 1395w-4(b)(1).  The first element attaches a "relative value" to each covered service.  42

16  U.S.C. § 1395w-4(c).  The second element is a "conversion factor" that converts the relative

17  value into a dollar amount.  42 U.S.C. § 1395w-4(d).  The third element is a "geographic

18  adjustment factor."  42 U.S.C. § 1395w-4(e).  Each of these elements is determined according to

19  an extremely complicated formula that requires a significant degree of judgment on the part of

20  the Secretary.  In recognition of this need for an extraordinary degree of discretion, Congress

21  expressly provided that "[t]here shall be no administrative or judicial review" of any aspect of the

22  fee schedule, 42 U.S.C. § 1395w-4(i)(1), including the determination of relative values, 42

23  U.S.C. § 1395w-4(i)(1)(B), the calculation of the conversion factor, 42 U.S.C. § 1395w-

24  4(i)(1)(C), and "the establishment of geographic adjustment factors."  42 U.S.C. § 1395w-

25  4(i)(1)(D).  This action impermissibly seeks judicial review of one aspect of the establishment of

26  the geographic adjustment factor.

27

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                    -2-

**C. Geographic Adjustment Factors and the Fee Schedule Areas**

A geographic adjustment factor is established for every "fee schedule area" in the United States, 42 U.S.C. §§ 1395w-4(e)(2)-(5), on the basis of the relative costs of practicing medicine, the relative costs of malpractice insurance, and the relative value of physician work effort in "the different fee schedule areas," 42 U.S.C. §§ 1395w-4(e)(1)(A)(i), (ii), (iii), compared with national averages. Every three years, the Secretary is required to "review" the various indexes and index values that go into the geographic adjustment factors "for all fee schedule areas." 42 U.S.C. § 1395w-4(e)(1)(C). On the basis of such review, the Secretary is authorized, but not required, to "revise" the various indexes and index values used in the calculation. Id. The Secretary is not required to review or revise the boundaries of "fee schedule areas," either on the basis of time intervals or on the basis of any particular set of economic or demographic changes.

The term "fee schedule area" is defined as "a locality" used "for purposes of computing payment amounts for physicians' services," 42 U.S.C. § 1395w-4(j)(2), under the payment regime that was replaced by the fee schedule. See H.R. Rep. No. 101-386 at 743 (Conf. Rep.) (1989), reprinted in 1989 U.S.C.C.A.N. 3018, 3346 (the "[f]ee schedule areas are the same as localities currently used for payment purposes"). Under the system that existed immediately before the fee-schedule regime, physician payments under Part B were determined by a method that used "reasonable charges" as a benchmark. 42 U.S.C. § 1395l(a)(1) (1988). This required the contractors that initially process Part B claims to make evaluative judgments about the "prevailing charges for services" in the various "localities" of the country. 56 Fed Reg. 59,502, 59,514 (Nov. 25, 1991). Although the statute that set forth the contractors' responsibilities, 42 U.S.C. § 1395u(b), used the terms "locality" and "localities" repeatedly,[1] the words were not defined by Congress in a statute nor by the Secretary in a regulation. Rather, the boundaries of

---

[1] See 42 U.S.C. §§ 1395u(b)(3)(L), 1395u(b)(4)(A)(vi), 1395u(b)(7)(B)(ii)(III), 1395u(b)(7)(B)(iii), 1395u(b)(8)(B)(ii)(I), 1395u(b)(8)(B)(ii)(VI), 1395u(b)(8)(B)(v), 1395u(b)(10)(A)(ii)(I), 1395u(b)(10)(A)(iii), 1395u(b)(11)(B)(ii), 1395u(b)(14)(A), 1395u(b)(14)(B)(i), 1395u(b)(14)(B)(i)(II), 1395u(b)(14)(B)(iii), 1395u(b)(14)(B)(iii)(I), 1395u(b)(14)(C)(iv), 1395u(h)(4), 1395u(j)(1)(C)(v), 1395u(q)(1).

1  localities "were developed by carriers" themselves "based on their knowledge of local medical

2  practice and economic conditions."  56 Fed. Reg. at 59,514.

3      At the time the fee schedule was first established in 1992, the Secretary noted that there was

4  some "lack of consistency" with respect to the way localities had been defined by the contractors

5  over the years.  56 Fed. Reg. 25,792, 25,832 (June 5, 1991).  Some localities reflected "political

6  boundaries, such as counties or cities."  Id.  Others reflected "zip code areas or metropolitan

7  areas."  Id.  Some were "as small as parts of cities," while others were "as large as States."  Id.

8  Many localities were "noncontiguous areas that [were] treated as a single locality because the

9  areas share[d] common characteristics."  Id.

10      The Secretary interpreted the term "fee schedule areas" in 42 U.S.C. § 1395w-4(j)(2) as

11  requiring him to "establish[] physician fee schedule areas that generally conform to the

12  geographic localities in existence before January 1, 1992."  42 C.F.R. § 414.4(a).  But he also

13  construed the statute as authorizing him to make "changes to fee schedule areas" as he deems

14  appropriate.  42 C.F.R. § 414.4(b).  Under this interpretation, 42 U.S.C. § 1395w-4(j)(2) was

15  deemed to carry over not only the same physical boundaries of localities that had been created by

16  contractors under 42 U.S.C. § 1395u(b), but also the same discretion that had existed under 42

17  U.S.C. § 1395u(b) to redefine locality boundaries as appropriate.  This approach was consistent

18  with the legislative history.  135 Cong. Rec. S13,911, S14,002 (Oct. 24, 1989) (remarks of

19  Senator Durenberger) ("Initially, the geographic units used for this adjustment would be the

20  payment localities currently used by part B carriers.  The Secretary would be permitted to apply

21  different geographic units after conducting a study to determine the appropriateness of alternative

22  approaches.").

23  **D.  The Historical Development of Fee Schedule Areas**

24      In accordance with the Secretary's statutory interpretation, the first fee schedule areas

25  established in 1992 largely copied the localities that had previously been developed by Medicare

26  contractors on the basis of their "knowledge of local medical practice and economic conditions"

27  gained in connection with their processing of Part B claims under the reasonable-charges regime.

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                    -4-

56 Fed. Reg. at 59,514.  Between 1992 and 1996, however, the Secretary converted multiple-intrastate fee schedule areas into single-statewide fee schedule areas in six states.  59 Fed. Reg. 63,410, 63,416 (Dec. 8, 1994); 58 Fed. Reg. 63,626, 63,637-38 (Dec. 2, 1993); 56 Fed. Reg. at 59,514.  These changes were made after physicians in the affected states demonstrated what the Secretary deemed to be a consensus as to what changes should be made.  59 Fed. Reg. at 63,416; 58 Fed. Reg. at 63,637-68; 56 Fed. Reg. at 59,514.

In making these revisions, the Secretary emphasized that "Statewide localities are generally desirable, because they reduce the number of localities, thereby simplifying program administration, and they tend to increase payments in rural areas."  56 Fed. Reg. at 59,514. While he did not "rule[] out the possibility," the Secretary indicated that other kinds of changes – such as having "cities, towns, and counties" moved "out of the current locality into another" – were unlikely to occur during the four-year transition period because they presented significant problems.  Id.  He also indicated that more "large-scale changes" – such as a nationwide reconfiguration – required further study and were unlikely to be implemented during the transition period.  58 Fed. Reg. at 63,637.

In 1996, the Secretary undertook the first major revision of the fee schedule areas. Significantly, the changes were not undertaken because of any perception on the part of the Secretary that the existing fee schedule areas were unlawfully configured.  Nor were they based on any perception that a change was needed to meet a deadline.  Nor were they undertaken because the Secretary thought that a legal obligation to change the fee schedule areas had been triggered by the emergence of some set of demographic or economic changes.  Rather, the revision was undertaken because, "[o]ver the years, we have heard complaints from physicians that, since the current localities were established, changing economic and demographic conditions warrant a comprehensive review and revision of payment localities."  61 Fed. Reg. 59,490, 59,494 (Nov. 22, 1996).  In other words, the revision was undertaken simply because the Secretary, in the exercise of his informed discretion, thought it was a good idea to give the matter a fresh look.

1    In 22 states where fee schedule areas were statewide in size, the Secretary made no changes.

2    Id.  In the remaining states, he made two types of changes.  First, each fee schedule area that was

3    smaller than a county was turned into a fee schedule area that was as large as a county.  Id.  Then

4    the Secretary employed a "5-percent iterative" method to reconfigure the areas.  Id.  New fee

5    schedule areas were created by "comparing the area cost differences as represented by the locality

6    [geographic adjustment factors] within a State."  Id.  Localities within a state were ranked from

7    highest to lowest geographic adjustment factor.  Id.  If the difference between the highest

8    geographic adjustment factor and the weighted average geographic adjustment factors of all

9    lower-price localities was 5 percent or less, the localities were merged into a single, statewide fee

10   schedule area.  Id.  If the difference between the highest factor and the weighted average

11   geographic adjustment factor of all lower-price localities was more than 5 percent, the highest-

12   ranked locality became a separate fee schedule area.  Id.  If the difference between the second-

13   highest geographic adjustment factor and the weighted average geographic adjustment factor of

14   all lower-price localities was more than 5 percent, the second-highest also became a separate

15   locality, and so on.  Id.  When the difference became 5 percent or less, the "rest-of-State" became

16   a single fee schedule area of its own.  Id.

17       Before employing the "5-percent iterative" method, the Secretary considered "numerous

18   possibilities for realigning payment localities," 61 Fed. Reg. 34,614, 34,616 (July 2, 1996), three

19   of which were selected for intensive evaluation.  Id. at 34,616-18.  The "5-percent iterative"

20   method was chosen not because it was required by law, but because, in the Secretary's informed

21   judgment, "[t]his option provided the best combination" of "simplicity," reduction of "payment

22   differences" between adjoining locations, and accuracy in "tracking area cost differences."  61

23   Fed. Reg. at 59,497.

24       The 1996 changes had several advantages.  First, they simplified "program administration" by

25   reducing the number of fee schedule areas from 210 to 89.  Id. at 59,494.  Second, they provided

26   "a more rational and understandable basis for localities."  Id.  Third, they reduced "urban/rural

27   payment differences."  Id.  Fourth, they maintained "separate payment areas" for "relatively high-

28

priced" counties containing cities with large and mid-sized populations.  Id.  Although some parts of the country experienced "slight increases" in Part B payments and some experienced "slight decreases," id. at 59,495, the effect on Part B payment amounts in "most localities" was "minimal."  Id. at 59,494.  In addition, the "single largest number" of public comments emphasized that the revisions "would help in the recruitment and retention of physicians in underserved rural areas" and thereby improve access to health care in parts of the country that "tend to have an unusually large percentage of the Medicare population."  Id.

In response to a public comment asking whether he "planned to change localities on a periodic basis to recognize future cost changes," id., the Secretary replied that he did not plan to "routinely revise payment areas," id., either on a periodic basis or on the basis of any particular set of changes in demographic or economic conditions.  On the contrary, he emphasized that, "on numerous occasions," he had stated that he favored "statewide localities because of their understandability, simplicity, and ease of administration," as well as because "they reduce urban/rural payment differences."  Id.  The Secretary also reiterated that he did "not generally favor fragmenting existing payment areas into smaller areas," but added that he would "review" the fee schedule areas in states with multiple localities "if the newer [geographic practice cost index] data indicate[d] dramatic relative cost changes among areas."  Id.

The Secretary is currently considering whether the fee schedule areas should be revised again and has asked interested parties to submit comments and proposals.[2]  During this process, the Secretary has "considered alternatives," but has not yet been able to "establish a policy and criteria that would satisfactorily apply to all situations."  69 Fed. Reg. at 66,263.  He has emphasized that the "issue of payment locality designation in light of changing economic and population trends will be of importance to us for the foreseeable future," and he remains

---

[2] 72 Fed. Reg. 38,122, 38,139 (July 12, 2007); 71 Fed. Reg. 69,624, 69,655 (Dec. 1, 2006); 71 Fed. Reg. 48,982, 48,993 (Aug. 22, 2006); 70 Fed. Reg. 70,116, 70,152-53 (Nov. 21, 2005); 70 Fed. Reg. 45,764, 45,783-84 (Aug. 8, 2005); 69 Fed. Reg. 66,236, 66,263 (Nov. 15, 2004); 69 Fed. Reg. 47,488, 47,504 (Aug. 5, 2004); 68 Fed. Reg. 63,196, 63,214 (Nov. 7, 2003); 68 Fed. Reg. 49,030, 49,044 (Aug. 15, 2003).

1

2    "interested in other solutions to the problem, and will work with anyone who presents an idea or

3    makes a suggestion that will help resolve the problems associated with the designation and

     revision of payment localities."  70 Fed. Reg. at 45,784.

4        The Secretary has explained the difficulties in undertaking a second, nationwide

5    reconfiguration as follows:

6        We stated [in 1996] that our major goals were to simplify payment areas and payment
         differences among adjacent geographic areas while maintaining accuracy in tracking input
7        price differences among areas.  There is an inherent trade-off between these two goals.
         Thus, at one extreme is a set of Statewide localities with no intra-state geographic
8        adjustments; very simple, but less descriptive of input price differences.  At the other
         extreme is a separate locality for each county; maximum input price adjustment for
9        geographic variation, but operationally very cumbersome, expensive to develop and
         maintain, and potentially very confusing for providers.

10   70 Fed. Reg. at 70,152.  While the Secretary does "not disagree with the view that a

11   comprehensive evaluation of the current payment localities is due" from a policy standpoint, he

12   has also emphasized that it is necessary to carefully examine "all viable options that will meet the

13   general objectives."  Id. at 70,152-53.  Noting that the Medicare Payment Advisory Commission

14   ("MedPAC") and the Government Accountability Office ("GAO") were working on the problem,

15   he has stated that he "intends to work with both groups to study our current methodology and

16   develop alternative options."  71 Fed. Reg. at 48,993.

17       **E.  The GAO Report**

18       A report subsequently published by the GAO in June 2007 underscored the enormously

19   complicated nature of the issues involved.  The report made two recommendations, neither of

20   which the GAO identified as being required by law.  The first recommendation was to "examine

21   and, if necessary, update the physician payment localities on a periodic basis, with no more than

22   10 years between updates."  Medicare: Geographic Areas Used to Adjust Physician Payments for

23   Variation in Practice Costs Should Be Revised ("GAO Report") 40 (GAO 07-466 June 2007).

24   The second was to "examine and revise the physician payment localities using an approach that is

25   uniformly applied to all states and based on the most current data."  Id. at 40.  The report did not

26   assert that the Secretary would be in violation of any legal mandate if he failed to adopt either

27

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                    -8-

1    suggestion. Rather, the GAO report presumed that the issues were committed to the discretion of

2    the Secretary and merely sought to influence those policy choices.

3        With respect to the second recommendation, the report emphasized that "[m]any alternative

4    approaches could be used to revise the geographic boundaries of the current payment localities."

5    Id. The GAO chose to study only "five possible approaches" by way of examples, id. at 5, and

6    discussed advantages and disadvantages of each highly technical approach. Id. at 23-39, 45-72.

7    The first of these approaches was to do a nationwide revision of fee schedule areas using a

8    variation of the state-based 5-percent iterative method employed in the 1996 revision, but

9    beginning with countywide payment localities as the initial point of reference. Id. at 23. Five

10   percent was chosen solely because it had been used in 1996. Id. at 25. The GAO made no

11   attempt to determine if such a benchmark is currently the best available one. Id. The other

12   alternatives examined by the GAO included a method under which counties were grouped into

13   ranges of geographic adjustment factors; a method that relied on metropolitan statistical areas as

14   the focus of analysis; a method that converted all fee schedule areas into statewide localities; and

15   a method that classified groups of counties within a state having unique geographic adjustment

16   factors into distinct payment localities. Id. at 23-25. Although the report indicated that any

17   nationwide change "is likely to have a large redistributive effect on the payment localities," id., at

18   25, a bureaucratic way of saying that rural physicians would lose and urban physicians would

19   gain, the GAO concluded that three of the methods studied might "improve payment accuracy"

20   while imposing what the GAO deemed to be a "minimal amount of additional administrative

21   burden." Id. at 5.

22       **F.  The Secretary's Response to the GAO Report**

23       Although the Secretary took the GAO's first recommendation – to revise fee schedules every

24   10 years – under advisement, he indicated that he believed a "more flexible and efficient

25   approach" was superior to a pre-determined time frame. Id. at 77. With respect to the GAO's

26   second recommendation, the Secretary reiterated his promise to "evaluate and consider applying

27   changes uniformly to the locality structure across all the states," but cautioned that "full

28

consideration" must be given both to "the redistributive impacts" of a nationwide revision and to the "administrative burdens of such an approach." Id. at 76. The Secretary's comments on the draft report also identified several aspects of the GAO's analysis that were problematic.

For example, he pointed out serious deficiencies in the means by which the GAO purported to measure the degree to which current physician payment localities "accurately" reflect variations in physicians' costs of providing care. Id. The Secretary noted that the GAO had no direct data on actual costs, but relied only on proxies for those costs. Id. He also stressed that, although the GAO assessments of payment "accuracy" purported to calculate actual costs by county, the data proxies on which it relied for this purpose were not even available on a county-by-county basis for more than 90 percent of the counties in the country. Id. Much of the GAO analysis was predicated on the resulting calculations. While conceding both points, id. at 3-4, the GAO merely responded that it found the data "suitable for our purposes." Id. at 4.

The Secretary also noted that the GAO draft was less than specific about the manner in which its recommendations would produce "winners" and "losers" among physician populations.

> [I]f we make changes that increase payments to physicians in some counties in a State, those same changes will reduce payments to physicians in other counties in the State. This report does not sufficiently convey the extent to which physician payments in certain areas would be reduced under the various options. We are concerned that neither the summary of "What GAO Found" nor the "Conclusion" makes clear that any change to increase payments in some areas would result in significant reductions in payments in others. We believe that the report should be transparent about the nature and extent of the payment reductions that would occur, particularly at the county level, under the options analyzed. We believe it would be particularly important to point out the impact of reductions in rural areas, i.e., the urban-rural payment differences that would result in rural states that are currently statewide localities. Since GAO uses the county as the basis for analysis, GAO should have the data to determine and discuss the changes that would occur at the county level for both counties that would receive higher and lower payments.

Id. at 75. The Secretary therefore recommended that the report "should present both state and county level impacts of the options analyzed." Id.

With respect to administrative burdens, the GAO took a curious position of admitting, but then downplaying, the costs involved in a nationwide reconfiguration of fee schedule areas. The report began by acknowledging that the Medicare program "would experience onetime upfront

1    costs if the current payment localities were modified, regardless of the number of localities

2    generated by the approach chosen." <u>Id</u>. at 37. "Specifically," it stated,

3        CMS creates a distinct physician fee schedule for each payment locality and would have
         to perform data reliability checks on the localities' physician fee schedules to ensure their
4        accuracy.  Agency officials stated that they would have to reprogram CMS systems,
         update its files that assign carriers and physicians to a payment locality, and provide
5        physicians with extensive education on the payment locality modifications.

6    <u>Id</u>.  In minimizing these problems, however, the GAO represented that, when its staff "spoke"

7    with an unspecified number of "CMS officials" of unspecified rank, these "CMS officials stated

8    that they did not anticipate that significant modifications to the payment localities would require

9    a substantial amount of additional ongoing administrative burden." <u>Id</u>.  The GAO also stated that

10   its staff "spoke" with five (unidentified) Medicare contractors, who reported that "modifying the

11   payment localities would cause onetime transitional costs" necessary "to create new data files"

12   and "also indicated that an increase in the number of payment localities would increase their

13   ongoing operational costs." <u>Id</u>.  Apparently solely on the basis of their conversations with these

14   unidentified CMS personnel, the GAO concluded that these administrative burdens would be

15   neither "significant" nor "substantial." <u>Id</u>. at 37.[3]

16       The Secretary identified numerous deficiencies in the GAO's analysis of administrative

17   burdens.  Not the least of these was the fact that the GAO's conclusion that some of the

18   alternative methodologies it studied would pose no more than "a one time, minimal

19   administrative burden" was based on nothing more substantial than an apparent handful of non-

20   random "telephone conversations that GAO staff had with carrier and CMS staff." <u>Id</u>. at 75.  The

21   <u>official</u> view of the Secretary, which the text of the GAO final report did not even acknowledge

22   <u>existed</u>, stated as follows:

23

24       [3] With respect to the separate administrative burdens that might be imposed on
     physicians, the GAO acknowledged that the American Medical Association "expressed concern
25   that transitioning to new reimbursement rates could be burdensome to physicians."  GAO Report
     at 38.  The report, however, chose to disbelieve the AMA view because an unspecified number
26   "physicians in California we spoke with stated that if the current localities were modified, they
     would not experience an increase in administrative burden and would complete the same
27   paperwork as they currently do." <u>Id</u>.  The GAO added that an unspecified number of "CMS
     officials we spoke with agreed." <u>Id</u>.
28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                          -11-

CMS believes that the burden would be more significant than what is presented in this draft report. Changing localities requires reprogramming systems and extensive provider education, both of which are expensive and burdensome administrative activities that can last for a significant period of time. Because we receive claims for payment that cross calendar years, carriers must maintain payment files for the two different years. Locality changes present administrative challenges to ensure that the pricing file for the correct locality for a physician in each year is used to make payment.

In addition, the GAO report does not point out the potential implications of an increased number of localities. In contrast to an institutional provider that furnishes services in a fixed location, physicians (and other health care professionals paid under the physician fee schedule) often practice in multiple locations. Thus, there are different considerations when evaluating the effect of locality changes for physicians than for institutional providers. The more localities that exist, the more borders exist. Physicians often practice in multiple office settings which often cross localities. The more localities, the more opportunities exist to inappropriately submit bills with the place of service being the higher paid locality. Consider an ophthalmologist who works in three different offices on different days of the week. If the different offices are located in three different payment localities, each claim should be filed based on the specific location where the service is furnished. Thus, a physician with an office in each of three different localities should be filing claims based on three different localities. An increase in the number of localities will increase the likelihood of this scenario, thereby increasing administrative costs for physicians, especially if they have a single billing function for their practice. Even if a physician tried to bill properly, locality changes and an increased number of localities could increase administrative costs and lead to more incorrect billings. It would be difficult for carriers to monitor and audit the accuracy of payment based on the specific branch of a physician's office in which each service is furnished. Thus, creation of a larger number of localities creates more opportunities for erroneous billing, unintended or intended. We believe it is important for the report to point out these potential on-going administrative expenses.

Id. at 75-76. The final GAO report did not respond to any of these points.[4]

## G. The California Proposals

The Secretary also has addressed two suggestions for ad-hoc revisions in fee schedule areas related exclusively to the State of California. In 2005, he invited public comments on a proposal that two California counties – Santa Cruz and Sonoma – be removed from the "Rest of California" locality and be placed in separate localities of their own. 70 Fed. Reg. at 45,784. The proposal was opposed by "numerous providers and medical associations in the current Rest of California payment locality," along with several members of Congress. 70 Fed. Reg. at

---

[4] In a one-page section of a report issued to Congress in 2005, the Medicare Payment Advisory Commission also opined that "it may be time to revisit the boundaries of payment localities, at least in those states that do not have statewide localities." MedPAC, Issues in a Modernized Medicare Program: Report to Congress 204 (June 2005) (emphasis added). The commission promised to make such recommendations in a future report. Id.

70,152.  It also lacked the support of the California Medical Association ("CMA").  Id.  Because of the seriously "negative payment impact" posed to physicians and suppliers in the Rest-of-California locality and "the nearly complete lack of support for this proposal outside the two positively impacted counties," the Secretary withdrew it.  Id.[5]  In addition, the Secretary declined to implement a CMA proposal to reconfigure localities within California using an ad-hoc variation on the 5-percent iterative approach used in the 1996 revisions.  69 Fed. Reg. at 66,263.

### STATEMENT OF THE CASE

Plaintiffs in this action are seven California counties which allege that they are suppliers of Part B services, Class Action Complaint ("Compl.") at ¶ 22, that they accept assignments of Part B claims from Medicare beneficiaries, id. at ¶ 23, and that their standing to sue arises exclusively "from their status as assignees."  Id. at ¶ 24.  The 367-paragraph complaint appears to allege that, when in 1996 the Secretary indicated that he intended to "review" fee schedule areas if "dramatic relative cost changes among areas" occurred, 61 Fed. Reg. at 59,497, he somehow created a legally binding obligation to revise fee schedule areas whenever what plaintiffs conceive to be "dramatic" changes have taken place.  See Compl. at ¶ 5.  Declaring that they believe "[i]t is time for a nationwide re-evaluation of how payment localities are drawn," Compl. at ¶ 12(d) (citation omitted), plaintiffs essentially ask this Court to turn their policy opinion into a law.  Although the complaint is not a model of clarity, plaintiffs appear to be arguing that the Secretary should reconfigure all localities by applying the 5-percent iterative method "uniformly" to all counties in the country, rather than to existing fee schedule areas within a state.  See Compl. at ¶¶ 338, 345.  Plaintiffs purport to bring their claims under the Medicare Act, 42 U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. § 405(g)), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the due-process and equal-protection components of the Fifth Amendment, and the so-called "non-delegation" doctrine.

---

[5] In a subsequent report on the annual appropriations bill for the Department of Health and Human Services, a House committee expressed "concern[]" about the situation in Santa Cruz, Sonoma, Santa Barbara and San Diego counties, and it asked the Secretary to submit a plan to "correct" what the committee perceived as a problem.  H.R. Rep. No. 108-636 at 126 (2004).

1

## ARGUMENT

2       Plaintiffs' complaint is merely the latest in a series of unsuccessful attempts to secure judicial

3   intervention in matters concerning the physician fee schedule that have been committed to the

4   Secretary's discretion by Congress.  See Am. Soc'y of Cataract & Refractive Surgery v.

5   Thompson, 279 F.3d 447, 452-56 (7th Cir. 2002); Painter v. Shalala, 97 F.3d 1351, 1355-58 (10th

6   Cir. 1996); AMA v. Thompson, 2001 WL 619510 at *3-7 (N.D. Ill. May 29, 2001); Am. Soc'y of

7   Anesthesiologists v. Shalala, 90 F. Supp. 2d 973, 974-76 (N.D. Ill. 2000); Am. Soc'y of

8   Dermatology v. Shalala, 962 F. Supp. 141, 146 (D.D.C. 1996), aff'd, 116 F.3d 941 (1997).  For

9   the reasons stated below, it should be dismissed.

10  **I. THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE
        CONGRESS HAS PRECLUDED JUDICIAL REVIEW OF THE CONFIGURATION
11      OF FEE SCHEDULE AREAS.**

12      The threshold barrier to subject-matter jurisdiction in this action is simple.  The non-

13  reviewability provision at 42 U.S.C. § 1395w-4(i)(1)(D) unequivocally precludes judicial review

14  of any element that goes into the making of the geographic adjustment factors under 42 U.S.C.

15  § 1395w-4(e).  The statute could not be plainer:  there "shall be no administrative or judicial

16  review" under 42 U.S.C. § 1395ff "or otherwise," 42 U.S.C. § 1395w-4(i)(1), of "the

17  establishment of geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-

18  4(i)(1)(D), just as there shall be no administrative or judicial review of "the determination of

19  relative values and relative value units under subsection (c)," 42 U.S.C. § 1395w-4(i)(1)(B), and

20  there shall be no administrative or judicial review of "the determination of conversion factors

21  under subsection (d)."  42 U.S.C. § 1395w-4(i)(1)(C).  On the basis of this language, courts have

22  held that every element that goes into the relative values and every element that goes into the

23  conversion factor is unreviewable, and they have repeatedly declined to carve out individual

24  pieces of these determinations for judicial review.  Cataract, 279 F.3d at 452-54 ("transition

25  formula" for determining one part of relative values found unreviewable); Painter, 97 F.3d at

26  1355-56 (action that reduced conversion factor unreviewable); AMA, 2001 WL 61956 at *3-5

27  (declining to permit review of calculation that affects, and is referenced in subsection discussing,

28

non-reviewable conversion factor); <u>Anesthesiologists</u>, 90 F. Supp. 2d at 974-76 (declining to divide aspects of the relative values into reviewable and non-reviewable categories); <u>Soc'y of Dermatology</u>, 962 F. Supp. at 146 (relative values unreviewable). As the Court of Appeals for the Tenth Circuit put it: "We can think of little that Congress could have said to make the plain and unambiguous language of the statute, and its corresponding intent, more clear." <u>Painter</u>, 97 F.3d at 1356; <u>see also</u> <u>Cataract</u>, 279 F.3d at 453 ("[i]t would be difficult for Congress to have written" the subsection relevant here "in clearer terms"); <u>Anesthesiologists</u>, 90 F. Supp. 2d at 976 ("<u>totality</u>" of determination of relative values and relative value units is non-reviewable) (emphasis in original); <u>Soc'y of Dermatology</u>, 962 F. Supp. at 146 (statute "could not be a more clear prohibition of judicial review").

The plain language of 42 U.S.C. § 1395w-4(i)(1)(D) applies to the entire "subsection (e)" of 42 U.S.C. § 1395w-4, which Congress labeled "Geographic Adjustment Factors." This expressly includes the establishment of "geographic adjustment factors," 42 U.S.C. § 1395w-4(e)(2), which, in turn, are based on indexes that reflect relative costs in "fee schedule areas." <u>Id</u>. See 42 U.S.C. §§ 1395w-4(e)(1)(A) (i)-(iii), (e)(1)(C), (e)(1)(D), (e)(2)-(5). The concept of "fee schedule areas" is obviously an "integral part," <u>Cataract</u>, 279 F.3d at 453, of the establishment of the geographic adjustment factors and therefore falls squarely within the ambit of the non-reviewability provision at 42 U.S.C. § 1395w-4(i)(1)(D). Thus, to the extent it is necessary for the Secretary to define the boundaries of "fee schedule areas" to perform any functions under subsection (e), 42 U.S.C. §§ 1395w-4(e)(1)(A) (i)-(iii), (e)(1)(C), (e)(1)(D), (e)(2)-(5), that definition is not subject to judicial review. Plaintiffs' challenge here is "precisely what Congress sought to prohibit." <u>Cataract</u>, 279 F.3d at 454.[6]

---

[6] Those circumstances distinguish this action from <u>Furlong v. Shalala</u>, 1996 WL 393526 at *8 (S.D.N.Y. July 12, 1996), <u>aff'd in part, rev'd in part on other grounds</u>, 156 F.3d 384 (2d Cir. 1998), in which the court found that an "ancillary policy," which "applied only after relative values had been determined," was reviewable. <u>Cataract</u>, 279 F.3d at 453. Indeed, plaintiffs themselves appear to have conceded that <u>Furlong</u> is inapposite. <u>Compare</u> Joint Statement at 2 (plaintiffs identify "no cases" as relevant to reviewability) <u>with</u> <u>id</u>. at 4 & n.1 (defendant identifies relevant cases on reviewablity).

1
2

**II.  IF THE CONFIGURATION OF FEE SCHEDULE AREAS WERE REVIEWABLE, SUBJECT-MATTER JURISDICTION WOULD BE LACKING BECAUSE PLAINTIFFS HAVE NOT EXHAUSTED THE MEDICARE CLAIMS PROCESS.**

3

If the configuration of fee schedule areas were subject to administrative and judicial review,

4

subject-matter jurisdiction over plaintiffs' claims still would be lacking, however, because

5

plaintiffs also have not met the jurisdictional prerequisites necessary to bring a Medicare claim.

6

To be deemed to have obtained a "final decision" of the Secretary potentially subject to judicial

7

review, 42 U.S.C. § 1395ff(b)(1)(A), a claimant must first present a claim to a contractor for an

8

initial determination, and ordinarily "all aspects" of a "present or future claim" must then be

9

"channeled" through this appeals process before a challenge to the Secretary's policies can be

10

brought in district court.  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 12

11

(2000) (quoting Heckler v. Ringer, 466 U.S. 602, 614 (1984)).  The presentment requirement

12

cannot be waived, and the Supreme Court has recognized that the exhaustion requirement can be

13

waived only where the issues are "wholly collateral" to a claim for Medicare payment, Ringer,

14

466 U.S. at 618 (internal quotation marks omitted), and the alleged underpayment "could not be

15

remedied by the retroactive payment of benefits after exhaustion."  Id.; but see Illinois Council,

16

529 U.S. at 13-14 (indicating that exhaustion cannot be excused merely because an issue is

17

collateral).  These requirements, which are equally applicable to putative class actions seeking to

18

raise constitutional challenges, Weinberger v. Salfi, 422 U.S. 749, 764 (1975), have not been met

19

here.[7]

20
21
22

---

23

[7] Plaintiffs' contention that it is impossible to pursue the Medicare claims process because they challenge the methodology used in Part B payment for physicians' services, rather than the amount of that payment, see Compl. at ¶¶ 33-36, is a legal distinction that Congress eliminated in 1986 when it amended 42 U.S.C. § 1395ff to place Part A and Part B claims on exactly the same footing.  See Am. Acad. of Dermatology v. HHS, 118 F.3d 1495, 1499-1500 (11th Cir. 1997); Farkas v. Blue Cross & Blue Shield, 24 F.3d 853, 858-61 (6th Cir. 1994); Abbey v. Sullivan, 978 F.2d 37, 42-43 (2d Cir. 1992); Nat'l Kidney Patients Ass'n v. Sullivan, 958 F.2d 1127, 1130-34 (D.C. Cir. 1992); see also Illinois Council, 529 U.S. at 9-24 (upholding American Academy, Farkas, Abbey, and National Kidney Patients while limiting the holding in Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667 (1986)).

24
25
26
27
28

1    At the outset, plaintiffs' complaint does not identify a single Part B claim that was ever

2    presented to a contractor for payment.  What the complaint erroneously characterizes as an effort

3    at "presentment" consists of a 73-page version of the 79-page complaint filed in this case.  See

4    Pl. Ex. 5-8 (attached to Compl.).  Such a document does not satisfy the presentment requirement.

5    See Three Lower Counties Cmty. Health Servs., Inc. v. HHS, 2007 WL 2932767 at *3 (D.D.C.

6    Oct. 9, 2007).  Treating the document as a request for a redetermination of some earlier (and

7    unidentified) initial determination on a Part B claim, the contractor determined that the request

8    was deficient "because it omits claims identifying information" required by the Medicare Claims

9    Processing Manual, Ch. 29, § 310.1B.2.b, such as the "beneficiary name, [Health Insurance

10   Claim] number, description of the service, and date of service."  Letter of NHIC, Corp. dated

11   May 11, 2007 at 1 (Pl. Ex. 9) (attached to Compl.).  In addition, there was no showing that the

12   request was filed in a timely fashion 120 days after receipt of any initial determination.  Id.  For

13   these reasons, the letter stated, "we conclude that your submission is not a cognizable request for

14   action by a carrier."  Id.  Contrary to plaintiffs' apparent view, the letter did not state that it was

15   impossible for a claim for Part B physician services to have been properly submitted.  Compl. at

16   ¶¶ 34-38.  It merely stated that a request for redetermination had not been properly submitted.

17   Even if plaintiffs had alleged facts sufficient to show that presentment had been made, the

18   waivable element of exhaustion (which plaintiffs failed to pursue by not submitting a proper

19   request for redetermination) could not be excused here.  Plaintiffs' contention – that they have

20   been underpaid for Part B physician services claims because they have been placed in an

21   unlawfully configured fee schedule area – obviously is not wholly collateral to a claim that they

22   have been underpaid for Part B claims.  Plaintiffs' demand for more than $2.4 billion in damages

23   for back-claims demolishes any argument that their claims could not be remedied by the

24   retroactive payment of benefits after exhaustion of administrative remedies.  In addition, the

25   mere supposition that the Secretary is unlikely to reconfigure fee schedule areas at the behest of

26   an individual supplier does not excuse exhaustion.  Cf., e.g., Lifestar Ambulance Serv., Inc. v.

27   United States, 365 F.3d 1293, 1297 (11th Cir. 2004) (citing Illinois Council for proposition that

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                         -17-

1    statutory and constitutional claims must be exhausted even where they "cannot be resolved

2    initially at the administrative level").  Thus, if the configuration of fee schedule areas were

3    deemed to be reviewable notwithstanding 42 U.S.C. § 1395w-4(i)(1)(D), subject-matter

4    jurisdiction under 42 U.S.C. § 1395ff(b)(1)(A) would be lacking.

5    **III.  JUDICIAL REVIEW OF FEE SCHEDULE AREAS IS NOT AVAILABLE
          UNDER THE ADMINISTRATIVE PROCEDURE ACT.**

6        Plaintiffs' claims fare no better to the extent that they are brought under the APA.  In the first

7    place, jurisdiction under 28 U.S.C. § 1331 (which is necessary to bring a cause of action under

8    the APA) is precluded under 42 U.S.C. § 1395ii, and, even if it were not, the non-reviewability

9    provision in 42 U.S.C. § 1395w-4(i)(1)(D) forecloses APA review.  5 U.S.C.§ 701(a)(1).  In

10   addition, APA review is precluded under 5 U.S.C. § 701(a)(2) because the definition of fee

11   schedule areas is "committed to agency discretion by law."  This exception applies when "statutes

12   are drawn in such broad terms that in a given case there is no law to apply," Webster v. Doe, 486

13   U.S. 592, 599 (1988) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

14   410 (1971) (citation omitted), so that "a court would have no meaningful standard against which

15   to judge the agency's exercise of discretion."  Lincoln v. Vigil, 508 U.S. 182, 191 (1993) (quoting

16   Heckler v. Chaney, 470 U.S. 821, 830 (1985)); Webster, 486 U.S. at 600 (same).  In such

17   circumstances, there are "no substantive standards on which a court could base its review," id.,

18   and thus "it is impossible to evaluate agency action for 'abuse of discretion.'"  Chaney, 470 U.S.

19   at 830; see, e.g., Methodist Hosp. v. Shalala, 38 F.3d 1225, 1230 (D.C. Cir. 1994) (because

20   statute "does not specify how the Secretary should construct [wage] index, nor how often she

21   must revise it," Congress "through its silence delegated these decisions to the Secretary.").

22       In this case, there is nothing in the statutory scheme that establishes any standard for

23   determining whether, when, or how fee schedule areas should be revised in response to any

24   change in demographic or economic conditions.  The statute merely states that "fee schedule

25   areas" are to be used as a point of reference in various aspects of the establishment of the

26   geographic adjustment factor, see 42 U.S.C. §§ 1395w-4(e)(1)(A) (i)-(iii), (e)(1)(C), (e)(1)(D),

27   (e)(2)-(5), and the term "fee schedule area" merely means "a locality" used "for purposes of

1  computing payment amounts for physician services," 42 U.S.C. § 1395w-4(j)(2), under the

2  "reasonable charges" payment regime that immediately preceded the fee schedule.  The

3  conference committee report repeats that "[f]ee schedule areas are the same as localities currently

4  used for payment purposes."  H.R. Rep. No. 101-386 at 743, reprinted in 1989 U.S.C.C.A.N. at

5  3346.  The question, then, is whether Congress created any legal standard to apply in defining the

6  localities used for purposes of the reasonable-charges payment regime.

7      The answer is no.  Under the predecessor regime, Congress delegated to Medicare contractors

8  standardless discretion to determine the boundaries of the "localities" used for purposes of 42

9  U.S.C. § 1395u(b).  On its face, the statutory scheme does not establish any time frames for

10 undertaking a revision of fee schedule areas, nor does it identify any set of demographic or

11 economic conditions the existence of which must trigger a revision in the configuration of fee

12 schedule areas.  Plaintiffs themselves concede that Congress "did not address the method by

13 which localities were to be defined" when it passed the fee-schedule legislation.  Compl. at ¶ 53.

14 In these circumstances, it is hard to see how there could possibly be a yardstick by which this

15 Court could declare that the Secretary had violated Congress' instructions by adopting the wrong

16 method or "timing" for change.  Nevada v. Watkins, 914 F.2d 1545, 1563-64 (9th Cir. 1990).[8]

17     Unwittingly, plaintiffs only complicate their problems when they helpfully allege that, prior

18 to 1992, localities "had no consistent geographic basis."  Compl. at ¶ 44.  If localities were not

19 configured on a consistent basis under 42 U.S.C. § 1395u(b), and Congress instructed the

20 Secretary to use those same inconsistently-configured localities as the model for the fee schedule

21

22 ─────────────────

23     [8] See also Or. Natural Res. Council v. Thomas, 92 F.3d 792, 798 (9th Cir. 1996) ("[i]n
   law, unlike religion or philosophy, there is nothing which is necessarily important or relevant," in

24 the absence of a statute or regulation that makes it so); Clementson v. Brock, 806 F.2d 1402,
   1404 (9th Cir. 1986) (challenge to agency inaction not reviewable "unless Congress provided

25 guidelines for the exercise of such authority"); Ariz. Power Auth. v. Morton, 549 F.2d 1231,
   1239 (9th Cir. 1977) ("In deciding whether agency action is committed to agency discretion by

26 law, it is not significant that there may be law, in the abstract, that could possibly be applied.
   Instead, we must determine whether in this particular case there is any specific law to apply.")

27 (citations omitted); Rank v. Nimmo, 677 F.2d 692, 699-700 (9th Cir. 1982) (statute authorizing
   agency head to take action "at [his] option" unreviewable).

28

1    areas, 42 U.S.C. § 1395w-4(j)(2), there is no basis for concluding that any subsequent

2    configuration of fee schedule areas is impermissibly inconsistent with any required principle of

3    organization.  The one thing that is absolutely clear, however, is that Congress did not <u>mandate</u>

4    the reconfiguration of fee schedule areas based strictly on a comparison of physician costs in

5    countywide geographic areas, because localities under 42 U.S.C. § 1395u(b) were not uniformly

6    configured on a countywide basis.  The county-based cost comparisons that plaintiffs believe the

7    Secretary <u>should</u> use to reconfigure localities, <u>see, e.g.</u>, Compl. at ¶ 169, may or may not have

8    merit as <u>policy</u> choices, but they cannot possibly be said to be <u>required</u> by 42 U.S.C. § 1395w-

9    4(j)(2).  Plaintiffs' APA challenge to the Secretary's configuration choices should therefore be

10   dismissed because there is no law to apply.[9]

11   **IV.  PLAINTIFFS' APA AND STATUTORY CLAIMS LACK SUBSTANTIVE MERIT.**

12       Even if plaintiffs' claims could survive dismissal to this point, their contention that the

13   Secretary's failure to effect a nationwide reconfiguration of fee schedule areas, as per <u>their</u>

14   specifications, constitutes a form of agency action "unlawfully withheld or unreasonably

15   delayed," 5 U.S.C. § 706(1), is patently without merit.  As the Supreme Court has made clear, the

16   "only agency action that can be compelled under the APA is action legally <u>required</u>," <u>Norton v.</u>

17   <u>Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 63 (2004) (emphasis in original), in the form of

18   "a specific, unequivocal command" to undertake a "precise, definite act" about which the agency

19

20   _____

21       [9] The decisions in this Circuit that find agency action committed to agency discretion by
     law in similar settings are legion.  <u>See, e.g.</u>, <u>Helgeson v. BIA</u>, 153 F.3d 1000, 1003 (9th Cir.
22   1998); <u>Dubbs v. CIA</u>, 866 F.2d 1114, 1121 (9th Cir. 1989); <u>Johnson Oyster Co. v. Baldridge</u>, 704
     F.2d 1060, 1062 (9th Cir. 1983); <u>City of Santa Clara v. Andrus</u>, 572 F.2d 660, 666-67 (9th Cir.
23   1978); <u>Strickland v. Morton</u>, 519 F.2d 467, 470 (9th Cir. 1975); <u>Ness Inv. Corp. v. USDA</u>, 512
     F.2d 706, 714-16 (9th Cir. 1975); <u>Ferry v. Udall</u>, 336 F.2d 706, 712-14 (9th Cir. 1964); <u>Mounkam</u>
24   <u>v. Way</u>, 2007 WL 974102 at *6-7 (D. Ariz. Mar. 30, 2007); <u>McDonnell v. Peterson</u>, 1992 WL
     477014 at *3 (N.D. Cal. Dec. 23, 1992).  Although an "irrational" departure from established
25   standards can, in some settings, be deemed to create a standard of review, <u>INS v. Yang</u>, 519 U.S.
     26, 32 (1996), there is no such departure here.  The Secretary has never established any time
26   frames or conditions that automatically trigger a need to revise fee schedule areas nationwide.
     Plaintiffs' contention that the Secretary has somehow "assumed" some "duty" in this regard,
27   Compl. at ¶¶ 268, 302, has no legal basis.

28

1  has "no discretion whatever." Id. (quoting ICC v. N.Y., N.H. & H.R. Co., 287 U.S. 178, 204

2  (1932), United States ex rel. Dunlap v. Black, 128 U.S. 40, 46 (1888), and Kendall v. United

3  States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 613 (1838)).  In the absence of such a command to

4  carry out "a ministerial or non-discretionary act," id. at 64 (quoting Attorney General's Manual on

5  the Administrative Procedure Act 108 (1947)), agency action cannot be deemed to be either

6  "unlawfully withheld," id. at 63 (quoting 5 U.S.C. § 706(1)) (emphasis added in Southern Utah),

7  or "unreasonably delayed." Id. at 64 n.1 (quoting 5 U.S.C. § 706(1)).  Obviously, if Congress

8  provided no standard at all for determining when or how fee schedule areas should be revised, it

9  cannot possibly have established a clear and unequivocal command to revise fee schedule areas

10  on any timetable, in response to any set of economic or demographic conditions, or in any

11  particular manner.  What plaintiffs seek here is what they conceive to be a "wholesale

12  improvement of this program by court decree," a remedy that the Supreme Court has clearly held

13  is not provided by the APA.  Southern Utah, 542 U.S. at 64 (quoting Lujan v. Nat'l Wildlife

14  Fed'n, 497 U.S. 871, 891 (1990).[10]

15      Plaintiffs' attempt to characterize their claim as one challenging agency action as "arbitrary,"

16  "capricious," or "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), is equally without

17  merit.  In the first place, a "failure to act" is not the "same thing as a denial," Southern Utah, 542

18  U.S. at 63, and is not "final agency action." 5 U.S.C. § 704.  In any event, the discussion above

19  suffices to show that the Secretary obviously has a reasonable basis for giving the matter further

20  study before undertaking a change in fee schedule areas that will produce winners and losers in

21  the redistribution of billions of dollars in Medicare payments among health professionals across

22  the United States.  See 70 Fed. Reg. at 70,152.  The fact that neither the GAO nor MedPAC has

23  been able to identify a single problem-free approach, standing alone, refutes plaintiffs' contention

24  that the Secretary's "treatment of the localities" is "arbitrary." Compl. at ¶ 279.  Once again, if

25

26

_____

27      [10] See also Gros Ventre Tribe v. United States, 469 F.3d 801, 814 (9th Cir. 2006), cert.
denied, 2007 WL 1768286 (Oct. 1, 2007); Ctr. for Biological Diversity v. Veneman, 394 F.3d

28  1108, 1111-13 (9th Cir. 2005).

1    there is no legal standard by which to judge the current fee schedule area configuration wanting,

2    there is certainly no basis for deciding that the one that currently exists violates the law.[11]

3    **V.  PLAINTIFFS' CONSTITUTIONAL CLAIMS LACK MERIT.**

4         Plaintiffs' constitutional claims have even less force.  At the outset, states and their political

5    subdivisions are not persons within the meaning of the Fifth Amendment, and therefore lack

6    either due-process or equal-protection rights.  South Carolina v. Katzenbach, 383 U.S. 301, 323-

7    24 (1966); Premo v. Martin, 119 F.3d 764, 771 (9th Cir. 1997); Ariz. State Dep't of Pub. Welfare

8    v. HEW, 449 F.2d 456, 478 (9th Cir. 1971); Cruz v. United States, 387 F. Supp. 2d 1057, 1067

9    (N.D. Cal. 2005).  In any event, it is well-settled that a supplier that chooses to treat Medicare

10   patients has no protected property right, see Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972), to

11   payment in any amount that exceeds the published fee schedule, Cataract, 279 F.3d at 454-56;

12   Painter, 97 F.3d at 1356-58; AMA, 2001 WL 619510 at *6-7, and nothing in the Constitution

13   confers on suppliers any substantive due-process right to expect that fee schedule areas will be

14   reconfigured, let alone reconfigured at any particular time, in any particular way, or on the basis

15   of any particular set of economic or demographic conditions.  Furthermore, to the extent the issue

16   is reviewable, the Medicare claims process affords an "opportunity to be heard at a meaningful

17   time in a meaningful manner."  City of Los Angeles v. David, 538 U.S. 715, 717 (2003) (quoting

18   Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotation marks omitted)).  Plaintiffs'

19   due-process claim therefore lacks merit.

20

21

22   _____

23        [11] The same analysis defeats plaintiffs' claim, Compl. at ¶¶ 355-359, that the Secretary's
     alleged failure to reconfigure localities nationwide constitutes agency action "in excess of
24   statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).
     Since their complaint does not seek to re-establish the locality configuration that existed prior to
25   1992, it is not clear what point plaintiffs are trying to make when they allege that "[t]here is no
     clear statutory authority for Medicare to establish payment localities or 'fee schedule areas.'"
26   Compl. at ¶ 57.  The authority to define fee schedule areas comes from the facts that the
     Secretary must make use of them to establish the geographic adjustment factors, 42 U.S.C.
27   § 1395w-4(e), and that the definition of fee schedule areas, 42 U.S.C. § 1395w-4(j)(2), gives him
     the same discretion that the contractors enjoyed under 42 U.S.C. § 1395u(b).
28

1   Plaintiffs' equal-protection claim also fails as a matter of law.  The whole purpose of the

2   geographic adjustment is to make Medicare payments unequal.  Although it is not clear from

3   their complaint, plaintiffs appear to assume that some constitutionally impermissible threshold of

4   inequality is passed whenever physician costs in one county exceed physician costs in another

5   county by a factor of 5 percent.  But plaintiffs do not explain why 5 percent – as opposed to 1

6   percent or 50 percent – is the magic number that creates a disadvantaged classification.  They do

7   not seek equality of payment for physician services in all counties in the United States.  They

8   merely seek a different form of unequal payment, one that they perceive better serves their

9   financial interests and what they assert to be the public-policy objectives of the Medicare Act.

10  Equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic"

11  of the policy choices of federal agencies in this manner.  Heller v. Doe, 509 U.S. 312, 319 (1993)

12  (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).  Economic policies of the

13  kind at issue in this case come to the Court with "a strong presumption of validity," id., and must

14  be upheld so long as there exists "any reasonably conceivable state of facts," id. (quoting Beach,

15  508 U.S. at 313), that could establish "a rational relationship between the disparity of treatment

16  and some legitimate governmental purpose."  Id.  In determining whether it is rational, the

17  Secretary's policy "choice is not subject to courtroom fact-finding and may be based on rational

18  speculation unsupported by evidence or empirical data."  Beach, 508 U.S. at 315.  Given the

19  costs, administrative burdens, and effect on rural and urban physicians throughout the United

20  States, there is certainly a rational basis for the Secretary's judgment that the matter needs to be

21  evaluated fully before any changes of the kind contemplated by plaintiffs are made.  70 Fed. Reg.

22  at 70,152; see, e.g., Nordlinger v. Hahn, 505 U.S. 1, 6-18 (1992) (tax system does not violate

23  equal protection even though taxpayer paid five times more in taxes than neighbors who owned

24  comparable homes within same residential development).

25  Plaintiffs' non-delegation claim – which is apparently an objection to the fact that, when

26  considering ad hoc changes in fee schedule areas, the Secretary looks to a consensus of support

27  within the medical community in favor of making a change, 70 Fed. Reg. at 70,152 – is patently

28

1    without merit.  It does not violate any non-delegation principle to consider private views in

2    deciding whether and how to make policy changes.  See Soc'y of Dermatology, 962 F. Supp. at

3    146 n.3.[12]

4    **VI.   THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY TO BE
         SUED FOR DAMAGES.**

5        Even if plaintiffs' complaint could survive to this point, their demand for more than $2.4

6    billion in damages is hard to fathom.  The Medicare Act authorizes challenges to final decisions

7    on claims for the payment of Part B claims, 42 U.S.C. § 1395ff(b)(1)(A), and the APA authorizes

8    suits for injunctive relief, 5 U.S.C. §§ 701-706, but plaintiffs have cited no authority for the

9    proposition that there exists any "unequivocally expressed" waiver of sovereign immunity to be

10   sued for damages.  Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002) (quoting United

11   States v. King, 395 U.S. 1, 4 (1969)).  There is therfore no statutory basis for the award of any

12   damages.[13]

13

14

15

16   ─────────────────

17       [12] See generally Sunshine Anthracite Coal. Co. v. Adkins, 310 U.S. 381, 388 (1940);
     United States v. Rock Royal Co-Op, Inc., 307 U.S. 533, 577-78 (1939); Currin v. Wallace, 306
18   U.S. 1, 15-16 (1939); St. Louis, Iron Mountain, & S. Ry. v. Taylor, 210 U.S. 281, 287 (1908);
     Butte City Water Co. v. Baker, 196 U.S. 119, 126-27 (1905); Buttfield v. Stranahan, 192 U.S.
19   470, 492-97 (1904); EMR Network v. FCC, 391 F.3d 269, 273 (D.C. Cir. 2004); Cospito v.
     Heckler, 742 F.2d 72, 88 (3d Cir. 1984); NARUC v. FCC, 737 F.2d 1095, 1144 (D.C. Cir. 1984).
20   Plaintiffs' reliance on a presidential signing statement questioning the constitutionality of a
     statute that required the Secretary to create statewide fee schedule areas in two states if sufficient
21   support was expressed by the congressional delegations of, and private organizations in, those
     states, is misplaced.  Compl. at ¶¶ 63-64, 360-67 (discussing President's position on § 4117 of the
22   Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388, 1388-65-
     1388-66 (1990)).  The latter statute compelled the Secretary to take action when congressmen
23   and private actors demanded it, see 56 Fed. Reg. at 25,833, rather than merely authorizing the
     Secretary to take local support into account.  Indeed, plaintiffs themselves emphasize that the
24   Secretary has declined to automatically adopt fee schedule changes merely because they were
25   recommended by local interests.  Id. at ¶ 74 (citing 56 Fed. Reg. at 59,593).

26       [13] To the extent that plaintiffs' calculation of "damages" is based on a challenge to any
27   rulemaking that occurred more than six years ago, see, e.g., Compl. at ¶¶ 207-12, 216-244, it is
     also time-barred.  28 U.S.C. § 2401(a).
28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ                     -24-

**VII.  SOME OF THE PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT SUPPLIERS.**

Finally, the Counties of Santa Barbara, San Luis Obispo, San Diego and Monterey lack standing because they do not operate facilities that are suppliers participating in Medicare Part B. Declaration of William Hardwick at ¶¶ 7-10 (Def. Ex. A).

## CONCLUSION

For the reasons stated, plaintiffs' complaint should be dismissed.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL: | |
| DANIEL MERON | PETER D. KEISLER |
| General Counsel | Assistant Attorney General |
| | |
| CAROL J. BENNETT | SCOTT N. SCHOOLS |
| Acting Associate General Counsel | United States Attorney |
| | |
| MARK D. POLSTON | /s/ Peter Robbins |
| Deputy Associate | SHEILA M. LIEBER |
| General Counsel for Litigation | PETER ROBBINS |
| | Department of Justice |
| GIOCONDA MOLINARI | 20 Massachusetts Avenue, N.W., Room 7142 |
| H. ANTONY LIM | Washington, D.C.  20530 |
| Attorneys | Tel:  (202) 514-3953 |
| U.S. Department of Health | |
| and Human Services | Attorneys for Defendant |

1

## CERTIFICATE OF SERVICE

2      Pursuant to 28 U.S.C. § 1746, I hereby certify that, this 23rd day of October, 2007, I caused

3   copies of the foregoing document to be served electronically on the following persons at the

4   following electronic addresses:

5              Dario DeGhetaldi
               deg@coreylaw.com
6
               Colleen Duffy Smith
7              cduffysmith@mfmlaw.com,spuumala@mfmlaw.com

8              Patrick Key Faulkner
               pfaulkner@co.marin.ca.us,jmichaels@co.marin.ca.us
9
               Jack F. Govi
10             jgovi@co.marin.ca.us,pjackson@co.marin.ca.us

11             William Merrill Litt
               littwm@co.monterey.ca.us, littw@co.monterey.ca.us
12
               Dana Maureen McRae
13             dana.mcrae@co.santa-cruz.ca.us

14             Jerry E. Nastari
               jen@coreylaw.com,deg@coreylaw.com
15
               Michael Gannon Reedy
16             mreedy@mfmlaw.com,smaes@mfmlaw.com

17             Amanda L. Riddle
               alr@coreylaw.com
18
               Mari-Ann Gibbs Rivers
19             mrivers@co.marin.ca.us,adooley@co.marin.ca.us

20   and by first class mail, postage prepaid, on:

21             Celeste E. Andersen
               Office of the County Counsel
22             105 East Anapamu, Suite 201
               Santa Barbara, CA 93101
23
               Patricia Gomez
24             Office County Counsel
               1055 Monterey St #D320
25             San Luis Obispo, CA 93408

26             James Lindholm
               Office of the County Counsel
27             1055 Monterey Street, Suite D320
               San Luis Obispo, CA 93408

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ

1

2                  Charles Joseph McKee
Office of the County Counsel
County of Monterey

3                  168 West Alisal Street
Third Floor

4                  Salinas, CA 93901

5                  John James Sansone
Office of the County Counsel

6                  1600 Pacific Highway, Room 355
San Diego, CA 92101

7

8                  Stephen Shane Stark
Office of the County Counsel

9                  105 E Anapamu St Suite 201
Santa Barbara, CA 93101-2000

10                Steven Michael Woodside
County of Sonoma

11                575 Administration Dr. Rm. 105
Santa Rosa, CA 95403-2815

12

13  October 23, 2007               /s/ Peter Robbins
                                    PETER ROBBINS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO DISMISS
C 07-2888 MJJ