1 | Dario de Ghetaldi - Bar No. 126782
Jerry E. Nastari - Bar No. 151756
2 | Amanda L. Riddle - Bar No. 215221
COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
3 | 700 El Camino Real
P.O. Box 669
4 | Millbrae, California 94030-0669
Telephone: (650) 871-5666
5 | Facsimile: (650) 871-4144

6 | Colleen Duffy Smith - Bar No. 161163
Michael G. Reedy - Bar No. 161002
7 | MCMANIS, FAULKNER & MORGAN
50 West San Fernando Street, Suite 1000
8 | San Jose, CA 95113
Telephone: (408) 279-8700
9 | Facsimile: (408) 279-3244

10 | Plaintiffs' Co-Counsel
[Other Counsel on Signature Page]

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CRUZ, et al. | Case No. C 07-2888 MJJ |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| MICHAEL O. LEAVITT, | DATE:      1/15/2007 |
| Defendant. | TIME:      9:30 a.m. |
| | DEPT:      The Hon. Martin Jenkins |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PROCEDURAL DEFICIENCIES OF DEFENDANT'S MOTION TO DISMISS . . . . . 1

      A.    Deficiencies of Defendant's Motion Under Rule 12(b)(1) . . . . . . . . . . . . . . . . . 1

      B.    Deficiencies of Defendant's Motion Under Rule 12(b)(6) . . . . . . . . . . . . . . . . . 2

III.  SUMMARY OF THE COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Summary of Factual Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Summary of Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    There Are No Statutory Limitations on Judicial Review in This Case . . . . . . . . 7

            1.    There Is a Strong Presumption Favoring Judicial Review . . . . . . . . . . . 7

            2.    Judicial Review of the Establishment of Fee Schedule Areas Is
                  Not Prohibited by Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            3.    The Legislative History of 42 U.S.C. § 1395w-4(i) Demonstrates
                  that Congress Intended to Allow Judicial Review . . . . . . . . . . . . . . . . . . 8

            4.    Judicial Review of the Establishment of Fee Schedule Areas Is
                  Not Impliedly Foreclosed by 42 U.S.C. § 1395w-4(i)(1)(D) . . . . . . . . 10

      B.    Plaintiffs Properly Presented Their Claims to the Agency . . . . . . . . . . . . . . . . 14

            1.    Plaintiffs Satisfied the Jurisdictional Requirement of *Illinois Council* . . 14

            2.    Defendant Misconstrues the Nature of Plaintiffs' Claim . . . . . . . . . . . . 15

      C.    This Court Has Judisdiction to Review Plaintiffs' Complaint . . . . . . . . . . . . . 16

            1.    This Court Has Jurisdiction Under 28 U.S.C. § 1331 . . . . . . . . . . . . . 16

            2.    Alternatively, This Court Has Jurisdiction Under 42 U.S.C. § 405(g) . . 17

      D.    Exhaustion of Administrative Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    Plaintiffs Have Exhausted All Administrative Remedies . . . . . . . . . . . 17

            2.    Alternatively, Exhaustion Should Be Waived . . . . . . . . . . . . . . . . . . . . 18

      E.    Judicial Review Under the APA Is Not Limited in This Case . . . . . . . . . . . . . 20

      F.    Under the APA, Medicare May Not Ignore Its Own Policy . . . . . . . . . . . . . . . 24

i

G. The Constitutional Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    1. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2. Plaintiffs Are "Persons"Within the Meaning of the Fifth Amendment . . 25

    3. Plaintiffs' Due Process Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        a. Plaintiffs Have Sufficiently Alleged a Protected Property Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        b. Plaintiffs Had No Opportunity To Be Heard . . . . . . . . . . . . . . . 29

    4. Plaintiffs' Equal Protection Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    5. Unlawful Delegation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

H. Plaintiffs Properly Seek Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I. Defendant Improperly Attacks Plaintiffs' Standing . . . . . . . . . . . . . . . . . . . . . 34

V. ISSUES NOT RAISED OR CHALLENGED BY DEFENDANT . . . . . . . . . . . . . . . . 35

A. Statewide Budget Neutrality Is Not Authorized by Law . . . . . . . . . . . . . . . . . . 35

B. Arbitrary Refusal to Implement Locality Changes . . . . . . . . . . . . . . . . . . . . . . 37

C. Misrepresentations Relating to Public Comments . . . . . . . . . . . . . . . . . . . . . . 38

D. Disparate Treatment of Hospitals and Suppliers . . . . . . . . . . . . . . . . . . . . . . . 38

E. Arbitrary Configuration of Localities in Texas . . . . . . . . . . . . . . . . . . . . . . . . . 39

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ii

1

# TABLE OF AUTHORITIES

2

## Federal Cases

3      *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4      *American Medical Assn. v. Thompson*, 2001 WL 619510 (N.D. Ill. 2001) . . . . . . . . . . . . . . . . 11

5      *American Society of Anesthesiologists v. Shalala*, 90 F.Supp.2d 973 (N.D. Ill. 2000) . . . . . . . 11

6      *American Society of Cataract and Refractive Surgery v. Thompson*, 279 F.3d 447
       (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
7
       *Arizona State Department of Public Welfare v. HEW*, 449 F.2d 456 (9th Cir. 1971) . . . . . . . . 26
8
       *Arizona v. California,* 373 U.S. 546 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
9
       *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912 (9th Cir. 2001) . . . . . . . . . . . . 2, 4, 34
10
       *Atchison, Topeka & Santa Fe Railway Co. v. Witchita Board of Trade*, 412 U.S. 800
11     (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12     *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 2, 24

13     *Bellevue Hospital Center v. Leavitt*, 443 F.3d 163 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 38

14     *Bethesda Hospital Assoc. v. Bowen*, 485 U.S. 399 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

15     *Board of Trustees of Knox County Hospital v. Shalala*, 135 F.3d 493 (7th Cir. 1998) . . . . . . . 36

16     *Botany Worsted Mills v. United States,* 278 U.S. 282 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17     *Bowen v. City of New York*, 476 U.S. 467 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

18     *Bowen v. Massachusetts,* 487 U.S. 879 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

19     *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) . . . . . . . . . . . . . . 16, 19

20     *Chaker v. Crogan*, 428 F.3d 1215 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21     *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . 21

22     *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269
       (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
23
       *Cruz v. United States*, 387 F.Supp.2d 1057 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
24
       *Cullman Regional Med. Center v. Shalala*, 945 F.Supp. 287 (Dist. D.C. 1996) . . . . . . . . . . . . 25
25
       *De La Cruz v. Tormey,* 582 F.2d 45 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24, 25
26
       *Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999) . . . 34
27
       *Doe v. United States Dept. of Justice,* 753 F.2d 1092 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . 33
28

*Dunlop v. Bachowski*, 421 U.S. 560 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Farmilant v. Singapore Airlines, Ltd.*, 561 F.Supp. 1148 (N.D. Ill. 1983) . . . . . . . . . . . . . . . 2

*Frahm v. United States*, 492 F.3d 258 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Franklin Savings Corp. v. United States*, 970 F.Supp. 855 (D. Kan. 1997) . . . . . . . . . . . . . 4, 34

*Furlong v. Shalala*, 156 F.3d 384 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 29

*Furlong v. Shalala*, 1996 WL 393526 (S.D.N.Y. July 12, 1996) . . . . . . . . . . . . . . . . . . . . 13, 14

*Furlong v. Shalala*, 238 F.3d 227 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 27

*Gilligan v. Jamco Development Corp.*, 108 F.3d 246 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 2

*Gould Electronics, Inc. v. United States*, 220 F.3d 169 (3rd Cir. 2000) . . . . . . . . . . . . . . . . 1, 15

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C.Cir. 1970) . . . . . . . . . . . . . . . . 23

*Heckler v. Ringer*, 466 U.S. 602 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hillis Motors, Inc. v. Hawaii Automobile Dealers' Assn.*, 997 F.2d 581 (9th Cir. 1993) . . . . . . 26

*Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 36

*I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re United Telecommunications Inc., Sec. Litig.*, 781 F.Supp. 696 (D.Kan. 1991) . . . . . . . 2, 34

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . 1

*Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293 (11th Cir. 2004) . . . . . . . . . . . 19

*Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mathews v. Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27, 29

*Mayes v. Elrod*, 470 F.Supp. 1188 (D.C.Ill. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991) . . . . . . . . . . . . . . . . . . . . . 8, 15, 25

*Motor Vehicle Manufacturers Assn. v. State Farm Mutual Insurance Co.*, 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 36, 37

*N.L.R.B. v. International Broth. of Elec. Workers, Local 340*, 481 U.S. 573 (1987) . . . . . . . . . 19

*National Park and Conservation Assn. v. Stanton*, 54 F.Supp.2d 7 (D.D.C. 1999) . . . . . . . 31-33

*Norlinger v. Hahn*, 505 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . 24, 25

*Painter v. Shalala*, 97 F.3d 1351 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iv

*Pareto v. F.D.I.C.,* 139 F.3d 696 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 35

*Perot v. Federal Election Commission,* 97 F.3d 553 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . 31

*Perry v. Sindermann,* 408 U.S. 593 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Premo v. Martin,* 119 F.3d 764 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Public Citizen Health Research Group v. Auchter,* 702 F.2d 1150 (D.C. Cir. 1983) . . . . . . . . 25

*Ramming v. United States,* 281 F.3d 158 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Russello v. United States,* 464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*San Bernardino Mountains Cmty. Hosp. Dist. v. Sec'y of HHS,* 63 F.3d 882 (9th Cir. 1995) . . . 38

*Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1 (2000) . . . . . . . . . . . 14, 17, 19

*Shaw's Supermarkets, Inc. v. NLRB,* 884 F.2d 34 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 22, 23

*Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*South Carolina v. Katzenbach,* 383 U.S. 301 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Three Lower Counties Community Health Services Inc. v. U.S. Dept. of Health and Human Services,* 2007 WL 2932767 (D.D.C. October 9, 2007) . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United Black Fund, Inc. v. Hampton,* 352 F.Supp. 898 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . 31

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Webster v. Doe,* 486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Zuber v. Allen,* 396 U.S. 168 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33

### State Cases

*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143 . . . . . . . . . . . . 26, 27

*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480 . . . . . . . . . . . . . . . . . . . . . 27

### Federal Statutes

5 U.S.C. § 555(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 37

5 U.S.C. § 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1160(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

v

8 U.S.C. § 1329 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. § 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. §§ 8, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 20

38 U.S.C. § 211(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1395ff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

42 U.S.C. § 1395ff(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1395ff(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1395ff(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1395ii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

42 U.S.C. § 1395l(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1395l(u)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 1395l(u)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1395u(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 39

42 U.S.C. § 1395u(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 U.S.C. § 1395w-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20, 23, 28, 29, 36

42 U.S.C. § 1395w-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 1395w-4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

42 U.S.C. § 1395w-4(c)(2)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1395w-4(c)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1395w-4(c)(2)(C)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395w-4(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395w-4(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

42 U.S.C. § 1395w-4(d)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395w-4(d)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395w-4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 37

42 U.S.C. § 1395w-4(e)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 U.S.C. § 1395w-4(e)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1395w-4(e)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1395w-4(e)(2)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1395w-4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395w-4(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

42 U.S.C. § 1395w-4(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 1395w-4(i)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

42 U.S.C. § 1395w-4(i)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395w-4(i)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

42 U.S.C. § 1395w-4(j)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 20, 39

42 U.S.C. § 1395ww(d)(3)(E)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 1395x(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 254e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 405(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

42 U.S.C. § 405(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-19, 27

**Federal Regulations**

42 C.F.R. § 405.2466(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 C.F.R. § 405.926(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 C.F.R. § 414.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21

42 C.F.R. § 414.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 C.F.R. § 414.67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 C.F.R. §§ 405.800, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 C.F.R. §§ 405.900, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

1

**Federal Rules**

2    Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

3    Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 24, 33

4    Fed. R. Civ. P. 17(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5    Fed. R. Evid. 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6

**State Statutes**

7    Business & Professions Code §§ 16700, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

8    Code of Civil Procedure § 1085(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

9    Government Code § 23000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

10    Government Code § 23003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

11    Government Code § 23004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

12

**Legislative Material**

13    135 Cong. Rec. H5984-05 (9/27/1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14    135 Cong. Rec. H9333-01 (11/21/1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15    135 Cong. Rec. S13911-04 (10/24/1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

16    H.R. Rep. 101-386 (Conf. Rep.) (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17

**Other Material**

18    58 Fed. Reg. 37994 (7/14/1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

19    59 Fed. Reg. 32759 (6/23/1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20    59 Fed. Reg. 63410 (12/8/1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21    61 Fed. Reg. 59460 (11/22/1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22    69 Fed. Reg. 66236 (11/15/2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

23    71 Fed. Reg. 69623 (12/1/2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24    CMS, Medicare Claims Processing Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25    GAO, Medicare: Geographic Areas Used to Adjust Physician Payments for Variation in Practice
       Costs Should Be Revised (07-466 June 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26

27

28

viii

# I.    INTRODUCTION

As the Second Circuit observed in *Furlong v. Shalala*, 156 F.3d 384, 386 (2nd Cir. 1998) ("*Furlong II*"), "To plunge immediately without any explanation into the complexities of social security law is like jumping into a murky muddle of regulatory no-man's land. Fortunately, the crux of plaintiffs' complaint is relatively simple. Since at least 2001, changing demographics in localities across the country have resulted in relative cost changes that meet or exceed the regulatory thresholds for modifying "fee schedule areas" or "localities" established by Centers for Medicare and Medicaid Services ("CMS" or "Medicare") in 1996. Despite its awareness of the resulting wide-spread and significant payment disparities, CMS has refused to implement its own policy to revise the affected localities. Complaint, ¶¶ 166-206. After years of unsuccessfully seeking an administrative or a political solution, plaintiffs were simply forced to turn to the courts as a last resort.

# II.    PROCEDURAL DEFICIENCIES OF DEFENDANT'S MOTION TO DISMISS

## A.    Deficiencies of Defendant's Motion Under Rule 12(b)(1)

Defendant brings this motion pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), stating grounds of lack of subject-matter jurisdiction, failure to exhaust administrative remedies and failure to state a claim. "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. [Citation.] This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice...." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).

Defendant submits no extrinsic evidence on the issue of jurisdiction and does not dispute the facts stated in the complaint regarding plaintiffs' presentment of its claim to the agency. He merely draws his own conclusion about the legal sufficiency of the claim that plaintiffs presented to the agency without sufficient authority to support that position. Therefore, the issue of jurisdiction must be decided on the facts as stated in the complaint and those facts must be taken as true. *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000).

Plaintiffs bear the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). However, on a threshold motion to dismiss for

1

1  want of subject matter jurisdiction, the plaintiff is "entitled to the speculative benefit of any facts

2  he might conceivably prove in support of his well pleaded allegations." *Farmilant v. Singapore*

3  *Airlines, Ltd*., 561 F.Supp. 1148, 1151 (N.D. Ill. 1983).

4      It is simply impossible to determine with any certainty which part of defendant's motion is

5  brought under Rule 12(b)(1).  There are only single citations to Rules 12(b)(1) and 12(b)(6) on the

6  first page of defendant's motion and no attempt was made by defendant to identify, let alone

7  differentiate, the issues raised under 12(b)(1) from those raised under 12(b)(6).

8      **B.    Deficiencies of Defendant's Motion Under Rule 12(b)(6)**

9      A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the ground that it

10  fails to state a claim for relief.  Such a motion is disfavored in the federal courts and is rarely

11  granted.  *Gilligan v. Jamco Development Corp*., 108 F.3d 246, 249 (9th Cir. 1997).

12      "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state
        a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in
13      support of his claim which would entitle him to relief. [Citation.] The issue is not
        whether a plaintiff's success on the merits is likely but rather whether the claimant
14      is entitled to proceed beyond the threshold in attempting to establish his claims.
        Moreover, in passing on a motion to dismiss, the allegations of the complaint should
15      be construed favorably to the pleader."  *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th
        Cir. 1976).
16

17      The court must accept as true all material allegations in the complaint, as well as reasonable

18  inferences to be drawn from them. *Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir. 1998). ***As a result,***

19  ***in its motion to dismiss, defendant is not permitted to dispute those allegations.***  Any defect must

20  be apparent from the face of the complaint.  The court cannot consider material outside the

21  complaint such as facts presented in briefs, affidavits or discovery materials. *Arpin v. Santa Clara*

22  *Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir. 2001); *see also In re United Telecommunications*

23  *Inc., Sec. Litig.,* 781 F.Supp. 696, 701, fn. 1 (D.Kan. 1991) [The court cannot consider extraneous

24  materials to put allegations in context.].)  Thus, a Rule 12(b)(6) dismissal is proper only where there

25  is either a "lack of cognizable legal theory" or "the absence of sufficient facts alleged under a

26  cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1990).

27      Defendant disregards this clear authority governing motions to dismiss and spends a

28  considerable amount of time in his moving papers improperly discussing facts outside the allegations

2

1  of the complaint, disputing the facts stated in the complaint, and arguing the merits of plaintiffs'

2  case.

3     As discussed in more detail in "Plaintiffs' Motion to Strike Declaration of William Hardwick

4  and Extraneous Materials Cited in Support of Defendant's Motion to Dismiss," filed and served

5  herewith, defendant improperly submitted "Exhibit A," the Declaration of William Hardwick in

6  Support of Defendant's Motion to Dismiss (the "Hardwick Declaration."). Defendant also cited to,

7  but did not submit or request judicial notice of, four additional documents which are not referenced

8  in the complaint: (a) H.R. Rep. 101-386 (Conf. Rep.) (1989); (b) 135 Cong. Rec. S13911-04

9  (10/24/1989); (c) CMS, Medicare Claims Processing Manual; and, (d) GAO, Medicare: Geographic

10  Areas Used to Adjust Physician Payments for Variation in Practice Costs Should Be Revised (07-

11  466 June 2007). Motion at pp. 3:12-16, 4:17-22, 8:17-12:17, 17:6-11, 19:2-5.[1]

12     In addition, defendant proffers an argument in an effort to explain the reasons for the

13  Secretary's decision to make revisions to the fee schedule areas in 1996. Motion at 5:16-27.

14  However, the reasons advanced by defendant go far beyond the reason expressed in the one citation

15  to the Federal Register in the entire paragraph. Motion at 5:22-25.

16     Defendant later expends ***four pages*** on a lengthy discussion about the Government

17  Accountability Office's ("GAO") report, which is not referenced in the complaint (perhaps because

18  it was published after the complaint was filed), the Secretary's response to that report, and the

19  claimed deficiencies in that report. Motion at p. 8:17-12:17. Defendant cites to the GAO report in

20  an attempt to dispute the merits of plaintiffs' case and validate defendant's failure to reconfigure the

21  locality designations.

22     Defendant titles two of his arguments as follows: "Plaintiffs' APA and Statutory Claims

23  ***Lack Substantive Merit***" and "Plaintiffs' Constitutional Claims ***Lack Merit***." Motion at pp. 20:11

24  and 22:3, respectively [emphasis added]. Such arguments require the introduction of facts outside

25  the complaint for support and are both premature and wholly irrelevant to the question of whether

26  ─────────────────

27    [1] A court may not take judicial notice on its own, without affording the parties an opportunity to be heard. *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993

28  F.2d 269, 273 (1st Cir. 1993). Plaintiffs do not object to the Court taking judicial notice of the legislative history cited above in (a) and (b).

3

1    the complaint states a claim as it is written, which is the only question to be considered on a Rule

2    12(b)(6) motion.

3            The facts outside the complaint and the arguments that rely on those facts should be

4    disregarded by the Court when it reviews the motion to dismiss. *Arpin, supra,* 261 F.3d at 925 [The

5    court cannot consider material outside the complaint such as facts presented in briefs, affidavits or

6    discovery materials.]; *see also Franklin Sav. Corp. v. United States*, 970 F.Supp. 855, 861, fn. 4 (D.

7    Kan. 1997) [The court elects not to consider two affidavits attached to defendants' motion to dismiss

8    "or any other material extraneous to the complaint in ruling on defendants' motion."].

9            Once the improper facts and arguments are extracted from defendant's motion, what remains

10   is the bare and incorrect assertion that each of plaintiffs' claims fails as a matter of law.

11   **III.    SUMMARY OF THE COMPLAINT**

12            **A.    Summary of Factual Allegations**

13           The opinion in *Furlong II* includes a helpful summary of a substantial portion of the

14   regulatory scheme that makes up the process by which physicians and other "suppliers" are paid

15   under Part B of Medicare. *Furlong II*, 156 F.3d at 386-388, §§ A(1)-(3).  Briefly, Medicare makes

16   payments to "suppliers" for providing medical services and supplies to Medicare beneficiaries based

17   on the average costs incurred by suppliers in providing similar services in the same geographic area

18   relative to the national average of such costs.[2]

19           Medicare's methodology for calculating payments to suppliers begins with its establishment

20   of geographic "fee schedule areas" ("FSAs") or "localities."  Those localities were first defined in

21   1966 by the local insurance carriers who were then responsible for setting the amounts Medicare

22   paid to physicians and other suppliers.  In 1991, Medicare assumed responsibility for establishing

23   localities and making changes to localities without an express grant from Congress to do so.

24           Medicare's payments to suppliers are calculated based on the average costs of providing

25   specific services within a locality relative to the national average costs of providing those services.

26

27           [2] Under 42 U.S.C. § 1395x(d), "supplier" means a physician, practitioner, facility (other than
28   a hospital), or other entity that furnishes items or services under Medicare.  Unless otherwise
     indicated, the terms "physician" and "supplier" are used synonymously herein.

4

1   Thus, to the extent that costs within a particular locality are relatively homogeneous, Medicare

2   payments to suppliers are relatively accurate reflections of those costs.  For similar reasons, to the

3   extent that a particular locality encompasses an area where costs are disparate, Medicare payments

4   to suppliers in such a locality will not accurately reflect those costs, but will be excessive for some

5   suppliers and inadequate for others.

6         In 1996, based on "the lack of consistency among localities and the significant demographic

7   and economic changes that had occurred since localities were originally established," Medicare

8   implemented a restructuring of its locality configuration and gave assurances that it would revise

9   those localities if "dramatic relative cost changes among areas" developed.  Since 1996, Medicare

10  has not revised those localities despite subsequent significant changes in demographics and relative

11  costs among localities, and despite numerous formal and informal requests to restructure localities.

12        As a result of Medicare's failure to restructure the localities, physicians and other suppliers

13  in areas throughout the United States are experiencing significant payment inequities.  Ultimately,

14  these inequities are causing a reduction in access to medical care for Medicare beneficiaries in many

15  areas of the United States.  For example, suppliers in certain counties in California, Texas and

16  Georgia are paid 12-24% less than their colleagues in neighboring, demographically similar counties

17  for providing exactly the same services.

18        Not only are there large boundary payments differences between neighboring counties such

19  as those described above, but there is also a fundamental inequity in how payment rates are

20  calculated. Under Medicare's current locality structure, counties are either defined as single-county

21  localities (primarily urban counties) or are grouped as a part of a multi-county locality (primarily

22  rural counties).  Suppliers in most urban single-county localities receive payments based on what

23  Medicare recognizes as their actual costs.  However, suppliers in over 175 urban and suburban

24  counties which are part of multi-county localities typically receive payments up to 13% less than

25  what Medicare recognizes as their costs.

26        Generally the payment discrepancies stem from Medicare's method of combining counties

27  into single localities and determining payments to suppliers in the localities by averaging costs of

28  each county within the locality.  Thus, inclusion of high-cost counties within a locality with

5

1    primarily rural counties tends to diminish the payments to the high-cost counties while increasing

2    the payments to the low-cost counties.  This means that every dollar that Medicare has underpaid

3    to plaintiffs has been overpaid to other physicians and suppliers in rural low-cost counties.

4        Physicians and other suppliers in the over 175 affected counties cannot afford to continue

5    treating Medicare patients and cannot take on new Medicare patients when they are not being

6    equitably compensated for their services.  Additional harm to physicians and suppliers in the

7    affected counties results from the fact that insurance companies such as Blue Cross base their

8    payments to physicians on rates paid by Medicare.  The harm is real and wide spread.

9        **B.    Summary of Claims for Relief**

10        Plaintiffs, the California Counties of Santa Cruz, Sonoma, San Diego, Marin, Santa Barbara,

11    San Luis Obispo, and Monterey, brought this action on behalf of themselves and others similarly

12    situated seeking judicial declarations that: (i) they have been denied equal protection of the law and

13    due process by Medicare's failure and refusal to assign them to fee schedule areas that reflect the

14    true economic costs of the services they provide relative to the national average of those costs; (ii)

15    42 U.S.C. § 1395w-4(j)(2) is unconstitutional as applied; (iii) 42 C.F.R. § 414.4 is unconstitutional

16    as applied; (iv) Medicare has unlawfully withheld or unreasonably delayed in the performance of

17    its duty to establish and modify fee schedule areas in violation of 5 U.S.C. § 706(1); (v)Medicare's

18    failure to reconfigure the current locality structure is arbitrary, capricious, or an abuse of discretion

19    in violation of 5 U.S.C. § 706(2)(A); (vi) Medicare's failure to reconfigure the current locality

20    structure has violated 5 U.S.C. § 706(2)(c) by denying Plaintiffs and Members of the Class their

21    statutory right to receive payments for services provided under Part B of Medicare that reflect the

22    true economic costs of the services they provide relative to the national average of those costs; and

23    (vii) Medicare has unlawfully delegated its duty to reconfigure the current locality structure to state

24    medical associations.

25        Plaintiffs also seek compensation on behalf of themselves and others similarly situated for

26    underpayments from March 14, 2001, to the present made to them by Medicare for the provision of

27    medical and other health services to Medicare beneficiaries under United States Code, Title 42,

28    Chapter 7, Subchapter XVIII, Part B, "Health Insurance for Aged and Disabled."

6

IV.    **LEGAL ARGUMENT**

A.    **There Are No Statutory Limitations on Judicial Review in This Case**

1.    **There Is a Strong Presumption Favoring Judicial Review**

Defendant has "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision[s]" with respect to the configuration of fee schedule areas. *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975).

The presumption favoring judicial review of administrative action is so strong that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967).

Defendant has not overcome that heavy burden and has shown no evidence of a contrary legislative intent. As explained more fully, *infra*, the legislative history shows that Congress did not intend to restrict judicial review of the establishment or reconfiguration of fee schedule areas.

2.    **Judicial Review of the Establishment of Fee Schedule Areas Is Not Prohibited by Statute**

There is no statutory prohibition to the judicial review of Medicare's establishment of fee schedule areas. Defendant inappropriately relies on 42 U.S.C. § 1395w-4(i)(1)(D) as "unequivocal" authority in support of his argument that Congress precluded judicial review of the establishment of fee schedule areas. However, a plain reading of 42 U.S.C. § 1395w-4(i)(1) refutes defendant's assertion. It provides in its entirety:

> "There shall be no administrative or judicial review under section 1395ff of this title or otherwise of –
> "(A) the determination of the adjusted historical payment basis (as defined in subsection (a)(2)(D)(i) of this section),
> "(B) the determination of relative values and relative value units under subsection (c) of this section, including adjustments under subsections (c)(2)(F), (c)(2)(H), and (c)(2)(I) of this section and section 13515(b) of the Omnibus Budget Reconciliation Act of 1993,
> "(C) the determination of conversion factors under subsection (d) of this section, including without limitation a prospective redetermination of the sustainable growth rates for any or all previous fiscal years,
> "(D) the establishment of geographic adjustment factors under subsection (e) of this section, and
> "(E) the establishment of the system for the coding of physicians' services under this section."

7

The establishment of fee schedule areas is not included among those items listed in Subsections (A) – (E) in the above-quoted language. Therefore, the Court's analysis of defendant's argument should begin with the premise that the statute, on its face, does not bar judicial review of the establishment of fee schedule areas.

Had Congress intended to prohibit judicial review of the establishment of fee schedule areas, it could easily have used far more restrictive language such as that found in 8 U.S.C. § 1329 or 38 U.S.C. § 211(a). *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 494 (1991); *compare also* 42 U.S.C. § 1395l(u)(4)(D). In *McNary,* the Supreme Court construed the limitations on judicial review contained in 8 U.S.C. § 1160(e), and concluded, "It is presumable that Congress legislates with the knowledge of our basic rules of statutory construction, and given our well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action [citation], coupled with the limited review provisions of [§ 1160(e)], it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *McNary,* 498 U.S. at 596.

Further, where a statute contains a limited list of decisions that are exempt from judicial review, the Court should apply the well-known canon of statutory construction – *Expressio unis est exclusio alterius* – which advises that where a statute expresses and includes one thing it implies the intent to exclude others not expressed. *Frahm v. United States*, 492 F.3d 258, 263 (4th Cir. 2007) ["[T]he doctrine of *expressio unis est exclusio alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."] "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States,* 278 U.S. 282, 289 (1929). Simply by applying this principle of statutory construction, this Court should conclude that Congress intended to exclude the establishment of fee schedule areas from the list of matters that are not judicially or administratively reviewable.

### 3. The Legislative History of 42 U.S.C. § 1395w-4(i) Demonstrates that Congress Intended to Allow Judicial Review

The legislative history of 42 U.S.C. § 1395w-4(i) conclusively establishes that it was Congress' intent to allow judicial review of fee schedule areas because it ***intentionally omitted*** fee

8

schedule areas from those items specified in subd. (i) which are exempt from judicial review. Specifically, the initial House draft of the Omnibus Budget Reconciliation Act of 1989 ("OBRA 1989") included a provision that expressly prohibited administrative or judicial review of the establishment of fee schedule areas, as follows:

"(j) MISCELLANEOUS PROVISIONS.

"(1) EXPEDITED PROCEDURES FOR INITIAL IMPLEMENTATION. In order to implement subsections (a) and (b) on a timely basis, the Secretary may provide for publication of regulations on an interim, final basis and chapter 35 of title 44, United States Code, and Executive Order 12291 shall not apply to information and regulations required for purposes of carrying out such subsections.

"(2) RESTRICTION ON ADMINISTRATIVE AND JUDICIAL REVIEW. There shall be no administrative or judicial review under section 1869 or otherwise of –

"(A) the percentage adjustments for evaluation and management services under subsection (a)(1)(B)(I);

"(B) the relative values established for physicians' services under this section, including the relative value of components of services;

"(C) the national standard conversion factors established under this section;

"(D) the geographic indices and adjustment factors established under this section; and

"**(E) the selection of fee schedule areas under subsection (c)(3)(B).**" (135 Cong. Rec. H5984-05 at p. H6023; 1989 WL 184856 (9/27/1989); emphasis added.)

However, the Senate returned a version that did not include the selection of fee schedule areas among those items exempt from judicial review, as follows:

"(i) MISCELLANEOUS PROVISIONS.

"(1) RESTRICTION ON ADMINISTRATIVE AND JUDICIAL REVIEW.- There shall be no administrative or judicial review under section 1869 or otherwise of-

"(A) the determination of the adjusted prevailing charge (as defined in subsection (a)(2)(D)(i)),

"(B) the determination of relative value units under subsection (,)

"(C) the determination of conversion factors under subsection (d),

"(D) the establishment of values in the geographic practice cost index, the values in the geographic overhead index and the values in the geographic malpractice index under subsection (e), and

"***(E) the establishment of the system for the coding of physicians' services under this section.***" (135 Cong. Rec. H5984-05 at p. H6105; 1989 WL 184856 (9/27/1989); *see also* 135 Cong. Rec. S13911-04 at S13928-S13929 (10/24/1989); emphasis added.)

Ultimately, the House accepted the Senate version with minor revisions. *See* 135 Cong. Rec. H9333-01 at pp. H9333, H9358-H9359, H9538-H9539, and H9542-H9544 (11/21/1989); 1989 WL

9

189926.   The final bill, as enacted, did not include the prohibition on judicial review of the establishment of fee schedule areas as originally proposed by the House. 42 U.S.C. § 1395w-4(i).[3]

"Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *See Russello v. United States,* 464 U.S. 16, 23-24 (1983), citing *Arizona v. California,* 373 U.S. 546, 580-581 (1963).

The only reasonable conclusion this Court should draw from the legislative history is that, although Congress contemplated insulating fee schedule areas from judicial review, it ultimately decided to remove fee schedule areas from the protected list with the intent that the process of establishing fee schedule areas would be subject to judicial scrutiny.

### 4.    Judicial Review of the Establishment of Fee Schedule Areas Is Not Impliedly Foreclosed by 42 U.S.C. § 1395w-4(i)(1)(D)

Defendant argues that the establishment of fee schedule areas is foreclosed by 42 U.S.C. § 1395w-4(i)(1)(D).   First, it should be noted that the only calculation expressly foreclosed from judicial review under subd. (i)(1)(D) is the establishment of the geographic adjustment factors used to calculate reimbursements to suppliers ("payment GAFs").[4]   The establishment of fee schedule areas is not expressly foreclosed from judicial scrutiny under subd. (i)(1)(D) or any other statute.

Defendant argues that the establishment of fee schedule areas is integral and necessary to the establishment of payment GAFs and therefore should be afforded the same protection as the establishment of payment GAFs.   However, the cases upon which defendant relies for this

---

[3]  Plaintiffs respectfully request the Court take judicial notice of the cited legislative history. Fed. R. Evid. 201(b); *Chaker v. Crogan,* 428 F.3d 1215, 1223, fn. 8 (9th Cir. 2005).

[4]  Medicare uses the term "geographic adjustment factor" or "GAF" in two distinct ways. The first usage is referred to herein as the "payment GAF." There are three "payment GAFs," one each for work ("W"), practice ("P"), and malpractice ("MP") expenses.  Payment GAFs are used to calculate individual reimbursements for specific services in specific localities.  The payment GAFs are formulaically defined in 42 U.S.C. § 1395w-4(e) as multiples of "relative value units" ("RVUs") and "geographic practice cost indexes" ("GPCIs"): (a) $[RVU_W \times GPCI_W]$, $[RVU_{PE} \times GPCI_{PE}]$, and $[RVU_{MP} \times GPCI_{MP}]$.  The second usage is referred to herein as the "locality GAF" which is used by Medicare to rank the overall cost of providing medical care in a particular locality against a nationwide average of "1" and which is formulaically defined as the sum of national average ("NA") RVUs times the  GPCIs for a particular locality, or $[(RVU_{NAW} \times GPCI_W) + (RVU_{NAPE} \times GPCI_{PE}) + (RVU_{NAMP} \times GPCI_{MP})]$.  *See, e.g.*, 71 FR 69623, 69655-69656 (12/1/2006); *see also* Complaint at ¶ 128.

10

1   proposition are entirely distinguishable from the present dispute because of one crucial factor – none

2   of the cases involves a situation where there is clear legislative history that ***Congress did not intend***

3   ***judicial review to be foreclosed***.  *See* § IV(A)(3), *supra*.

4       In *American Society of Anesthesiologists v. Shalala*, 90 F.Supp.2d 973 (N.D. Ill. 2000)

5   ("*ASA*"), the court addressed the justiciability of a challenge to Medicare's calculation of the

6   "practice expense component" of the relative value units ("RVUs") for services pursuant to 42

7   U.S.C. § 1395w-4(c)(2)(C)(ii).  *ASA*, 90 F.Supp.2d at 974.  The court in *ASA* held the issue to be

8   exempt from judicial review pursuant to 1395w-4(i)(1)(B),  stating:

> "practice expense relative values are specifically made part of the selfsame
> Subsection (c) that is insulated from judicial review by Subsection (i)(1)(B).  If the
> Associations' position were accepted, the congressional mandate against court
> intervention would be totally frustrated, because the opportunity for parties such as
> Associations to launch in-court attacks on the individual strands – the specific items
> – that are both integral to and essential components of the congressional-protected
> determinations…."  *ASA*, 90 F.Supp.2d at 976.

13      The court in *ASA* held that the calculation of practice expense RVUs pursuant to § 1395w-

14  4(c)(2)(C)(ii) was "integral and essential" to § 1395w-4(c), and therefore insulated from review by

15  subsection (i)(1)(B) to the same extent as the "selfsame subsection" (c). Similar determinations were

16  made in every case cited by defendant, yet cannot be made in the instant case.  *See generally*,

17  *Painter v. Shalala*, 97 F.3d 1351 (10th Cir. 1996) [defendant's alleged failure to comply with the

18  "neutrality provision" contained in § 1395w-4(d)(1)(B) when establishing the "conversion factor"

19  pursuant to § 1395w-4(d) could not be judicially reviewed pursuant to § 1395w-4(i)(1)(C) which

20  prohibits the review of "the determination of conversion factors under subsection (d)" ]; *American*

21  *Medical Assn. v. Thompson*, 2001 WL 619510 (N.D. Ill. 2001) [a challenge to Medicare's

22  establishment of the "sustainable growth rate" pursuant to § 1395w-4(f), which is calculated

23  specifically to revise the "update adjustment factor" found at § 1395w-4(d)(3)(B), which in turn is

24  utilized to establish the conversion factor calculated pursuant to § 1395w-4(d) was insulated from

25  review pursuant to 1395w-4(i)(1)(C) which prohibits the review of "the determination of conversion

26  factors under subsection (d)"]; and *American Society of Cataract and Refractive Surgery v.*

27  *Thompson*, 279 F.3d 447 (7th Cir. 2002) [a challenge to Medicare's calculation of the "practice

28  expense component" of the "relative value for services" pursuant to § 1395w-4(c)(2)(C)(ii) could

11

1    not be judicially reviewed pursuant to § 1395w-4(i)(1)(B) which prohibits the review of "the

2    determination of relative values and relative value units under subsection (c)"].

3         None of these cases involves the establishment of fee schedule areas, which are defined

4    separately and apart from the calculation of fees under the fee schedule defined in 42 U.S.C. §

5    1395w-4, and none involves a process that Congress intended *should be* judicially reviewable.

6         As set forth in ¶ 111 of Complaint, Medicare itself does not treat the establishment of fee

7    schedule areas and the establishment of payment GAFs as "integral":

8         "In the 1994 Final Rule, Medicare noted that commenters from urban areas in
          Arkansas and New Mexico, both statewide localities, had stated that 'costs were
9         higher in their areas than in the rural areas of the State and that they should have a
          different GPCI from the rest of the State.' (Final Rule, 12/8/1994, 59 FR 63415.)
10        Medicare dismissed the comments about GPCIs as irrelevant to the issue of locality
          configuration:
11
              "'[42 U.S.C. § 1395w-4(e)(1)(A)(i)] requires that the GPCIs reflect
12            practice cost differences among fee schedule areas.  These fee
              schedule areas happen to be statewide areas and, thus, have statewide
13            GPCIs.  This is a locality issue rather than a GPCI issue.  As stated
              in the locality section of the proposed rule (59 FR 32759), we are
14            reviewing the existing payment locality configuration for possible
              changes sometime after 1996.  In the meantime, the only locality
15            changes we will consider are changes to a statewide locality in States
              currently having multiple payment areas.' (Final Rule, 12/8/1994, 59
16            FR 63415.)"

17   Clearly the statement, "This is a locality issue rather than a GPCI issue," demonstrates Medicare's

18   understanding that the establishment of fee schedule areas is a process that is entirely separate from

19   the calculation of GPCIs, which, in turn, are used in the calculation of payment GAFs.

20        Another reason why the establishment of fee schedule areas and the establishment of

21   payment GAFs are separate processes comes from the facts that: (a) under § 1395w-4(e)(1)(C),

22   Medicare must review and revise GPCIs every three years; and (b) under § 1395w-4(e)(2)-(4),

23   Medicare must establish three payment GAFs each of which, as detailed in footnote 4, is the product

24   of a GPCI and an RVU (which Medicare is required under § 1395w-4(c)(2)(B)(ii) to adjust yearly

25   "to take into account changes in medical practice, coding changes, new data on relative value

26   components, or the addition of new procedures").[5]  Yet, as alleged in the complaint, Medicare has

27   ─────────────────

28        [5] Under § 1395w-4(c)(2)(B)(i), "not less often than every 5 years" the Secretary must review
     the RVUs for "*all* physicians' services."

                                                    12

not revised a single fee schedule area since 1996.  Complaint, ¶¶ 6, 12(d), 169, 177, 213, 258, 281, 306, 309, and 322.  The fact that Medicare is required to and has been able to modify GPCIs every three years and RVUs every year since 1997 – *without ever once modifying a single fee schedule area* – supports the conclusion that Congress and the agency treat the establishment of fee schedule areas as separate and distinct from the establishment and modification of payment GAFs under § 1395w-4(d), and further supports the conclusion that those tasks are in fact separate and distinct.

Finally, defendant argues in a footnote that "plaintiffs themselves appear to have conceded that [*Furlong v. Shalala*, 1996 WL 393526 (S.D.N.Y. July 12, 1996) ("*Furlong I*")] is inapposite.  Compare Joint Statement at 2 (plaintiffs identify 'no cases' as relevant to reviewability) with id. at 4 & n.1 (defendant identifies relevant cases on reviewability)."  Motion at p. 15, fn. 6.  As explained below, plaintiffs do not concede that *Furlong I* is inapposite to the issue of reviewability.  However, the citation to the parties' Joint Initial Case Management Statement is not only outside the complaint and therefore improper in the context of a motion to dismiss, it also completely mischaracterizes plaintiffs' simple statement that had nothing to do with the broad issue of reviewability: "Plaintiffs believe there are no cases which address the general issue of the Secretary's *failure to revise the fee schedule area (or 'locality') structure*."  Defendant certainly has not pointed to any such case, either in the Joint Initial Case Management Statement or in the instant motion, and plaintiffs continue to believe, after exhaustive research, that there are no cases which directly address that issue.

Although *Furlong I* does not address the specific issue of the reviewability of the establishment of fee schedule areas, the court in *Furlong I* did hold (as defendant points out) that "an 'ancillary policy,' which 'applied only after relative values had been determined,' was reviewable."  Motion at p. 15, fn. 6.  In *Furlong I*, the plaintiffs contended,

> "that they received insufficient reimbursements under Part B because the Medicare carriers improperly applied the 'one and one-half' rule to their concurrent invasive monitoring procedures....  Pursuant to this multiple procedure reimbursement rule, the Medicare carriers determined the total Medicare-approved charges by adding the Medicare-approved charges for one of the procedures to one-half of the Medicare-approved charges for the other procedure, resulting in less than full reimbursement to plaintiffs."  *Furlong I*, 1996 WL 393526 at *3.

The court in *Furlong I* held the application of the "one and one-half rule" was reviewable even though the Secretary's authority to create such an "ancillary policy" arose out of 42 U.S.C. §

13

1   1395w-4(c)(4) and § 1395w-4(i)(1)(B) precludes judicial review of "the determination of relative

2   values and relative value units under subsection (c)." *Furlong I*, 1996 WL 393526 at *7 - *8.

3          As in *Furlong I*, the establishment of fee schedule areas is ancillary to the determination of

4   GPCIs and GAFs 42 U.S.C. § 1395w-4(e) and may be reviewed by this Court.

5          **B.     Plaintiffs Properly Presented Their Claims to the Agency**

6                  **1.     Plaintiffs Satisfied the Jurisdictional Requirement of *Illinois Council***

7          It should be uncontested that plaintiffs have satisfied the jurisdictional prerequisite of

8   presentment in accordance with the holding in *Shalala v. Illinois Council on Long Term Care, Inc.*,

9   529 U.S. 1, 23-24 (2000). In *Illinois Council*, 529 U.S. 1, the Supreme Court established the rule

10  that all claims relating to the Medicare Act must be presented to the agency for review, whether or

11  not such review was available and whether or not such review would be futile. *See also Heckler v.*

12  *Ringer,* 466 U.S. 602, 617 (1984); *Mathews v. Eldridge,* 424 U.S. 319, 328 (1976).

13         The regulations governing the presentment of claims under Part B do not provide for a

14  process to assert a claim that challenges the constitutional and statutory validity of the agency's

15  policy regarding the fee schedule area structure. Despite that fact, plaintiffs presented their claim

16  to the agency as required by *Illinois Council*. Following the instructions of Dawn Cavanaugh of

17  NHIC, Medicare's carrier for California, five of the plaintiffs filed their claim with NHIC **and** with

18  the San Francisco office of Medicare on March 14, 2007. Complaint ¶¶ 28-32, Exs. 5 & 6 thereto.

19  On May 8, 2007, and May 16, 2007, respectively, the Counties of San Luis Obispo and Monterey

20  filed joinders to the claim with NHIC. Complaint, ¶¶ 30-31, Exs. 7-8 thereto.

21         Defendant relies on *Three Lower Counties Community Health Services Inc. v. U.S. Dept. of*

22  *Health and Human Services*, 2007 WL 2932767 at *3 (D.D.C. October 9, 2007) as support for his

23  argument that plaintiffs' claim does not satisfy the presentment requirement.[6] That reliance is

24  misplaced. *Three Lower Counties* involved a claim by a federally qualified health center ("FQHC")

25  that the reimbursement of FQHCs' "reasonable costs" as calculated under 42 U.S.C. § 1395l(a)(3)

26

27  _____

28  　　[6] According to the Pacer website for the District Court for the District of Columbia, plaintiff
    in *Three Lower Counties* filed a motion for reconsideration on October 19, 2007. Defendant's
    opposition to that motion was filed on November 13, 2007.

were improperly limited by 42 C.F.R. § 405.2466(b).  The plaintiff in *Three Lower Counties* merely submitted a letter to the Provider Reimbursement Review Board seeking an advisory opinion on whether that board had jurisdiction to hear a challenge to the limits on reimbursement imposed by 42 C.F.R. § 405.2466(b).  *Three Lower Counties,* 2007 WL 2932767 at *1-*2.

If plaintiffs' claim consisted of nothing more than the March 14, 2007, letter to Dawn Cavanaugh (Complaint, Ex. 6), the reasoning of the decision in *Three Lower Counties* might be compelling.  However, nothing in *Three Lower Counties* suggests that the detailed 73-page claim presented to NHIC in this case is, as defendant would have it, "a document [that] does not satisfy the presentment requirement."

### 2.     Defendant Misconstrues the Nature of Plaintiffs' Claim

Defendant misconstrues the nature of plaintiffs' claims as a challenge to a number of specific determinations with respect to the amount of compensation due under a number of specific requests for payment.  This case involves a broad challenge to the validity of rules, regulations, and policies of HHS, and does not seek a case-by-case redetermination of the carrier's calculations of specific amounts due.  If the challenge is successful, then those redeterminations will follow. *McNary*, 498 U.S. at 495.  However, defendant cannot simply invent other possible claims that plaintiffs might have brought in an attempt to avoid facing the claims that plaintiffs have actually filed.

Defendant also disputes the facts stated in the complaint and attempts to present an alternate factual interpretation of the carrier's letter to plaintiffs dated May 11, 2007.  Opposition, p. 17:6-16; *compare* Complaint, ¶¶ 34-35 and Ex. 9 thereto.  Such a factual argument is inappropriate at this juncture.  The issue of jurisdiction must be decided on the facts as stated in the complaint and those facts must be taken as true.  *Gould Electronics*, 220 F.3d at 176.

In any case, the presentment of a claim that is directed to a broad challenge to the validity of rules, regulations, and policies of HHS without including a claim based on a specific payment for a specific service is perfectly proper.  In *Bethesda Hospital Assoc. v. Bowen*, 485 U.S. 399 (1988), the Supreme Court held that a challenge to one of the Secretary's regulations was not barred by the failure to contest that regulation in a claim submitted to the carrier.  In *Bethesda Hospital*, Medicare providers brought an action challenging the validity of administrative regulations governing

15

reimbursement of malpractice insurance.  Pursuant to the applicable regulations, each provider had submitted a cost report to its fiscal intermediary who audited the report and issued a decision regarding the amount of reimbursement.  The providers appealed the intermediary's decision to the Provider Reimbursement Review Board, a board set up to review Part A Reimbursement determinations.  In their appeal, the providers also stated a claim challenging the validity of the malpractice insurance costs.  The issue was whether the Board had jurisdiction to consider the providers' challenge if it was not previously presented to the carrier.

The Supreme Court held that:

> "***No statute or regulation expressly mandates that a challenge to the validity of a regulation be submitted first to the fiscal intermediary***.  Providers know that under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, that the intermediary is without the power to award reimbursement except as the regulations provide, and that any attempt to persuade the intermediary to do otherwise would be futile."  *Bethesda Hospital Assoc.,* 485 U.S. at 404-406 [emphasis added].

That futility exists to a greater degree in this case.  Plaintiffs presented their claim simultaneously to the carrier and to Medicare.  Only the carrier responded stating it had no authority to address the issues presented.  Current Medicare regulations do not allow the review of such a determination because, as explained below, it is not an "initial determination" and therefore is not reviewable within the agency.  *See* 42 C.F.R. §§ 405.800, *et seq.*, and 405.900, *et seq.*

### C.    This Court Has Judisdiction to Review Plaintiffs' Complaint

#### 1.    This Court Has Jurisdiction Under 28 U.S.C. § 1331

Defendant fails to substantively address plaintiffs' claim that jurisdiction pursuant to 28 U.S.C. § 1331 is not barred by 42 U.S.C. § 405(h) in this case.  Complaint ¶¶ 33-36, and Ex. 9 thereto.  Instead, defendant leaps directly to the conclusion that plaintiffs failed to secure a final determination that would potentially be subject to judicial review pursuant to 42 U.S.C. § 405.

While citing to *Illinois Council* for other propositions, defendant completely fails to acknowledge the important exception drawn by the Supreme Court in that case to the application of section 405(h): "Regardless, it is more plausible to read [*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986)] as *holding* [42 U.S.C. § 1395ii] does not apply § 405(h) where

1  application of § 405(h) would not simply channel review through the agency, but would be mean

2  no review at all." *Illinois Council*, 529 U.S. at 19.  That exception applies here.

3       Medicare has no process by which plaintiffs' claim may be channeled through the agency

4  in order to obtain a final determination.  Complaint ¶¶ 33-36, and Ex. 9 thereto.  NHIC's letter of

5  May 11, 2007, written in response to plaintiffs' claims confirms that plaintiffs' claim cannot be

6  channeled through the agency where NHIC states that it "cannot grant, reject, or take any official

7  action" on plaintiffs' claim.  *Ibid*.  **Notably**, defendant does not identify in his motion any process

8  by which plaintiffs may obtain a final determination of their claims from HHS under 42 U.S.C. §

9  405(h), which could then be reviewed by a court under 42 U.S.C. § 405(g).

10      In *Furlong v. Shalala*, 238 F.3d 227, 232-236 (2nd Cir. 2001) ("*Furlong III*"), the court held,

11  after considering the Supreme Court's ruling in *Illinois Council*, that the claims of a group of

12  physicians that "the deliberate, unlawful and discriminatory action of the Health Care Financing

13  Administration in ... authorizing and directing Medicare Part B carriers to make reduced payments

14  for these medical procedures under the 'one and one half' surgical rule prior to December 31, 1993"

15  fell outside the scope of 42 U.S.C. § 405(h) and could be reviewed under 28 U.S.C. § 1331.

16      Plaintiffs analogous claims also fall outside the scope of 42 U.S.C. § 405(h).

17      **2.    Alternatively, This Court Has Jurisdiction Under 42 U.S.C. § 405(g)**

18      To the extent plaintiffs' claims fall within the scope of 42 U.S.C. § 405(h) and cannot be

19  brought under 28 U.S.C. § 1331, jurisdiction over plaintiffs' action can be exercised pursuant to 42

20  U.S.C. § 405(g) because, as discussed below, the NHIC's May 11, 2007, letter constitutes a final

21  determination by the Secretary that HHS does not have the authority to act on plaintiffs' claim.

22      **D.    Exhaustion of Administrative Remedies**

23           **1.    Plaintiffs Have Exhausted All Administrative Remedies**

24      NHIC issued a final decision on May 11, 2007, in response to plaintiffs' administrative claim

25  filed on March 14, 2007.  NHIC's decision came in the form of a letter which stated:  "NHIC's

26  **decision** is that your submission does not constitute a request for redetermination….Thus, NHIC

27  **concludes** that it cannot grant, reject, or take any official action upon the submission, because the

28  submission is not a cognizable request for action by a carrier."  Complaint Ex. 9; emphasis added.

17

Plaintiffs do not dispute NHIC's decision and agree that: (a) their claim is not a request for redetermination of an "initial determination"; and (b) NHIC cannot take any official action upon the claim. Since the regulations under Part B do not allow for review of claims that do not seek an initial determination, plaintiffs have exhausted their administrative remedies.

Under 42 U.S.C. § 1395ff(a)(1), the Secretary is required to promulgate regulations for "initial determinations" made by a carrier as to whether an individual is entitled to benefits under Part A or B, the amount of those benefits, and "any other initial determination" made by a carrier. Under 42 U.S.C. §§ 1395ff(a)(3) and 1395ff(b), no initial determination may be appealed unless a party has sought a redetermination from the carrier.

The Secretary has adopted regulations implementing the directives of § 1395ff in 42 C.F.R. §§ 405.900, *et seq.* [Determinations, Redeterminations, Reconsiderations, and Appeals under Original Medicare (Parts A & B)]. Under 42 C.F.R. § 405.926(c) actions that are not "initial determinations" and which are not appealable within the agency include: "Any issue regarding the computation of the payment amount of program reimbursement of general applicability for which CMS or a carrier has sole responsibility under Part B such as the establishment of a fee schedule ...." Thus, the Secretary's own regulations preclude any appeal within the agency from a decision on a claim that involves issues such as those presented by plaintiffs in this matter.

Because there is no provision under the Secretary's regulations for an appeal from the type of claim brought by plaintiffs, the carrier's decision is final and cannot be reviewed or appealed within the agency. Therefore, plaintiffs have exhausted their administrative remedies and thereafter appropriately filed their complaint with the appropriate district court. Under 42 U.S.C. § 405(g), this Court has jurisdiction to resolve the statutory and constitutional questions that the agency does not, or cannot decide.

### 2. Alternatively, Exhaustion Should Be Waived

If this Court determines that 42 U.S.C. § 405(h) applies and also determines that the Agency's decision was not a final action, a waiver of the exhaustion requirement is appropriate here because: (1) the claims at issue are collateral to those presented administratively; (2) the claimants would be irreparably harmed were the exhaustion requirement to be enforced against them; and (3)

18

1   the exhaustion of administrative remedies would be futile. *Bowen v. City of New York*, 476 U.S.

2   467, 482-486 (1986).

3   Plaintiffs' complaint alleges facts that are presumed to be true for purposes of a motion to

4   dismiss that apply to each of the three factors. Complaint, ¶¶ 39-41. In response, defendant merely

5   offers brief conclusory statements. Motion at p. 17:19-26. Defendant only cites to one case –

6   *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1297 (11th Cir. 2004) – as the basis

7   for his assertion that the exhaustion requirement should not be waived for plaintiffs because "the

8   mere supposition that the Secretary is unlikely to reconfigure the fee schedule areas at the behest of

9   an individual supplier does not excuse exhaustion." Motion at p. 17:24-26.

10   *Lifestar* is questionable authority for defendant's position. In *Lifestar*, 365 F.3d at 1296, the

11   court makes the following statement: "Nor is Medicare's statutory exhaustion requirement subject

12   to judge-made exceptions on a case by case basis when a particular court might find the requirement

13   too burdensome or futile." The authority cited by the *Lifestar* court in support of this statement

14   comes from the **syllabus** in *Illinois Council*, 529 U.S. at 2, and not from the opinion of the Court:

15   "§ 405(h)'s bar reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion

16   of administrative remedies' ... by preventing the application of exceptions to those doctrines."

17   However, that is not even an accurate citation to the summary of the decision in *Illinois Council* by

18   the Reporter of Decisions because the *Lifestar* court took the quotation from the syllabus out of

19   context. Actually, the Reporter was describing what the state of the law **would be if** the Supreme

20   Court **did not take into account** the holding of *Michigan Academy*. *Illinois Council*, 529 U.S. at 2.

21   In addition, the issue of exhaustion of administrative remedies was not truly at issue in

22   *Lifestar* because the plaintiff there failed to file any claim with the agency whatsoever. *Lifestar*, 365

23   F.3d at 1295. Thus, the complaint was properly dismissed on jurisdictional grounds based on the

24   lack of presentment. *Illinois Council*, 529 U.S. at 24 ["At a minimum, however, the matter must be

25   presented to the agency prior to review in a federal court."] Any discussion of waiver of the non-

26   jurisdictional exhaustion doctrine is thus unnecessary to the decision and merely *dicta*. *N.L.R.B. v.*

27   *International Broth. of Elec. Workers, Local 340*, 481 U.S. 573, 592, fn. 5 (1987).

28   / / /

19

Here, as in *Bowen v. N.Y.,* 476 U.S. at 483, plaintiffs' claims with respect to Medicare's method of configuring localities are collateral to their prior claim for fees in precisely the same way as the *Bowen* plaintiffs' claims that the Secretary failed to follow applicable regulations were collateral to the claims for benefits that the *Bowen* plaintiffs had presented administratively. Similarly, plaintiffs have alleged that the perpetuation of the current fee schedule area configuration has resulted in "wide-spread, adverse public health effects in the form of a reduction in access to medical care for Medicare beneficiaries in almost 200 counties across the United States" (Complaint, ¶ 40), an allegation similar to the public health issues found sufficient in *Bowen v. N.Y.* to warrant a waiver. *Bowen v. N.Y.,* 476 U.S. at 483-484. Finally, it should be noted that here there is more than a "mere supposition that the Secretary is unlikely to reconfigure the fee schedule areas." As set forth in the complaint, the issue has been put before the Secretary every year since 2003 and the Secretary has not taken a single step toward resolving the serious payment imbalances, the existence of which HHS has recognized since 2001. Complaint, ¶ 41. As in *Bowen v. N.Y.*, 476 U.S. at 484-486, requiring exhaustion in this case would truly be futile and there is no chance that in waiving exhaustion there would be any premature interference with any agency process.

## E.    Judicial Review Under the APA Is Not Limited in This Case

Defendant is incorrect in arguing that he is shielded from plaintiffs' claims "because the definition of fee schedule areas is 'committed to agency discretion by law.'"[7] Motion, p. 18:10-12. This action does not challenge the Secretary's adopted *fee schedules*. Instead, this action challenges the *fee schedule areas* or "localities" adopted by the Secretary because the fee schedule areas adopted cause the reimbursement of costs to no longer be tied to national averages in violation of 42 U.S.C. § 1395w-4 and the Secretary's own announced understanding of his mandatory duty.

Section 1395w-4(j)(2) defines "fee schedule area" as a locality used under 42 U.S.C. § 1395u(b). Unfortunately, section 1395u(b) itself does not define "locality" and, therefore, "fee schedule area" is left undefined. After the physician fee schedule was implemented by OBRA 1989,

---

[7] Defendant also argues that judicial review of fee schedule areas is not available under the Administrative Procedure Act because jurisdiction under 28 U.S.C. § 1331 is precluded under 42 U.S.C. § 1395ii. This argument is addressed in § IV(C)(1), above.

20

the Secretary reviewed the resulting statutory modifications and determined that he was "not precluded from making locality changes." He has since adopted 42 C.F.R. § 414.4 allowing him to define fee schedule areas through the rule making process, assuming he has implied authority to do so. *See* Complaint, ¶¶ 57-62, 65-67, 86-88, and Ex. 3 thereto. Even assuming, *arguendo,* that the Secretary has authority to define fee schedule areas, there is no authority for the proposition that the Secretary has discretion to define fee schedule area in a manner that negates the express statutory requirement that fee schedules index costs reimbursements tied to national averages.

Existing statutory law imposes a ***mandatory*** duty upon the Secretary to establish, by regulation, before November 1 of each year the fee schedules in all fee schedule areas for the succeeding year. 42 U.S.C. § 1395w-4(b)(1). The Secretary recognizes that he is required to assure that fee schedules for each fee schedule area must be tied to national averages. In the 1996 Final Rule that established the current fee schedule area configuration, Medicare stated: "Thus, the GPCIs reflect the relative costs of practice expenses, malpractice insurance, and physician work in an area compared to the national average." Final Rule, 11/22/1996, 61 FR 59492.

As defendant acknowledges, the "committed to agency discretion by law" exception to judicial review under the APA only applies when "statues are drawn in such broad terms that in a given case there is no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988). However, "[where] there is 'law to apply'...the exemption for action 'committed to agency discretion' is inapplicable." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971). Here, there is not only a mandatory duty to apply when reviewing defendant's actions, but also a methodology adopted by the agency for the definition of localities, and a regulatory threshold policy adopted by the agency in response to questions about plans to change localities on a periodic basis to recognize future costs changes.

Defendant's argument that the lack of a definition for fee schedule area equals a grant of unlimited discretion and therefore also equals preclusion of judicial review under the APA ignores the well-recognized rule that when an agency has exercised its discretion by adoption of rules or regulations, the agency must either follow its rules or adopt an alternative rule, but the agency may not simply ignore its own rules.

21

In *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36-37 (1st Cir. 1989), the First Circuit summarized the legal standards applicable to this Court's review of CMS' failure to modify its payment localities in accord with its stated policy:

> "The law that governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that it is doing so and explaining why. As Professor Davis has pointed out, '[t]he dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them. [Citation.] The agency has a 'duty to explain its departure from prior norms. [Citation.] The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. *Whatever the ground for departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate....* [If] the agency distinguishes earlier cases[, it must] assert [ ] distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing.' [Citation.] It is, of course, true that the [agency] is free to adopt new rules of decision and that the new rules of law can be given retroactive application. Nevertheless, the [agency] may not depart *sub silentio*, from its usual rules of decision to reach a different, unexplained result in a single case. As this court held . . . , 'there may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case.' '[A]n inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated.' [Citations.]"

*Accord, I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) ["[If an agency] announces . . . a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)."]; *Motor Vehicle Manufacturers Assn. v. State Farm Mutual Insurance Co.,* 463 U.S. 29, 41-44 (1983) ["If Congress established a presumption from which judicial review should start, that presumption . . . [is] *against* changes in current policy that are not justified by the rulemaking record."]; *Atchison, Topeka & Santa Fe Railway Co. v. Witchita Board of Trade*, 412 U.S. 800, 806-810 (1973) ["There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to. From this presumption flows the agency's duty to explain its departure from prior norms."]; *Ramaprakash v. FAA*, 346 F.3d 1121, 1124-1125 (D.C. Cir. 2003) ["An agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable

22

departure from the essential requirement of reasoned decision making.'"]; *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied* 403 U.S. 923 (1971) ["[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to the intolerably mute."].

In 1996, CMS adopted a policy of establishing localities using the county as the basic unit. Complaint, ¶ 131.[8] As discussed in detail in the complaint, single-county and multi-county localities were created using the 5% iterative method with resulting large multi-county localities reexamined using the "mean absolute percentage deviation" or "MAPD" and reconfigured if the 3% payment error standard was exceeded. Complaint, ¶¶ 126-157.

In 1996, in response to commenters who raised questions about plans to change localities on a periodic basis to recognize future cost changes, Medicare established a policy of reexamining locality configurations in the future: "While we do not plan to routinely revise payment areas as we implement new GPCIs, we will review the areas in multiple locality States if the newer GPCI data indicates dramatic relative cost changes among areas." Complaint, ¶ 165.

The agency has itself established the standard for determining whether, when and how fee schedule areas should be revised in response to any change in demographic or economic conditions, and, by rule, established the standard which the Court may judge its action. The 5% iterative method adopted by the agency also included a 3% payment error standard. The agency has chosen, without explanation, to ignore that method and that standard. As discussed below, to ignore the statutory mandate that reimbursement of costs be indexed to national averages (42 U.S.C. § 1395w-4), as well as its own rule regarding configuring fee schedule areas is an abuse of discretion under the APA. *Shaw's Supermarkets*, 884 at 36-37.

---

[8]  Defendant argues that "Plaintiffs only complicate their problems when they helpfully allege that, prior to 1992, localities 'had no consistent geographic basis.'" The problem is defendant's and not plaintiffs'. The allegation shows that Medicare's maintenance of the current locality structure perpetuates a geographically and demographically arbitrary structure that has been in place since 1966.

### F.    Under the APA, Medicare May Not Ignore Its Own Policy

Defendant begins his attack on plaintiffs' statutory claims by first stating that "[plaintiffs'] contention that the Secretary's failure to effect a nationwide reconfiguration of fee schedule areas, as per their specifications, constitutes a form of agency action 'unlawfully withheld or unreasonably delayed...is *patently without merit*." Motion at p. 20:12-15 [emphasis added.]. First, as discussed in § II(B) , any discussion regarding the merits of plaintiffs' claims is premature and irrelevant to the question of whether plaintiffs' complaint states a claim for recovery under a cognizable legal theory. *De La Cruz, supra,* 582 F.2d at 48; *Balistreri, supra,* 901 F.2d at 699 [a Rule 12(b)(6) dismissal is proper only where there is either a "lack of cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."].

Second, as discussed above, it is not plaintiffs' specifications that they insist that Medicare be held to, but its own. In 1996, Medicare devised the 5% iterative method and specifically stated that it "*will review the areas in multiple locality States if the newer GPCI data indicates dramatic relative cost changes among areas*." Complaint, ¶¶ 126-157, 165. The case law is clear that agency action that is a departure from this policy can constitute action that is unlawfully withheld or unreasonably delayed or arbitrary, capricious [or] an abuse of discretion. *Shaw's Supermarkets, supra,* 884 F.2d at 36-37["The law that governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that it is doing so and explaining why.]; see also cases in accord with *Shaw's Supermarkets* cited above in § IV(E).

Defendant relies on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004), to bolster its argument that because Congress has provided no standard for determining when or how fee schedule areas should be revised, the agency cannot be compelled to act. *Southern Utah* is distinguishable from the present circumstance. In that case, the Southern Utah Wilderness Alliance sought to compel agency action under the APA in light of the Bureau of Land Management's ("BLM") alleged failure to manage off road vehicle use on the federal land. The court held that while BLM's obligation to manage the federal land was mandatory, it remained in its discretion how to achieve that objective. However, in *Southern Utah* there was no evidence that the agency had adopted a standard by which its discretion would be exercised. In addition, plaintiffs here do as the

24

*Southern Utah* court insists by directing their attack against some particular agency action that has caused them harm. *Southern Utah, supra*, 542 U.S. at 64; *citing Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990).

Defendant's argues that a failure to act is not the same as a denial, and that it is not a final action. Motion at p. 21:17-18. As discussed above, Medicare's "failure to act" is still actionable under 5 U.S.C. § 706 because it is one that is legally required. Further, even if this is merely a matter of delayed action, the APA requires agencies to conclude matters presented to them "within a reasonable time." 5 U.S.C. § 555(b). Where the public health is affected, a delay of over six years is simply "too long." *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157-1158 (D.C. Cir. 1983).

Defendant then leaps to the sweeping conclusion that plaintiffs' statutory claims lack merit because "the Secretary obviously has a reasonable basis for giving the matter further study before undertaking a change in fee schedule areas that will produce winners and losers in the redistribution of billions of dollars in Medicare payments among health professionals across the United States." Motion at p. 21:18-24. This argument tacitly admits the existence of the problem, the solution to which was adopted by Medicare in 1996. As to whether a reasonable basis exists warranting study, or what that reasonable basis might be, the unsupported assertion that it exists does not make it so. This attack on the merits of plaintiffs' claim is also obviously premature. *De La Cruz, supra,* 582 F.2d at 48.

### G.     The Constitutional Claims

#### 1.     Standard of Review

"For constitutional challenges to agency actions, the Court's review is *de novo*. The Court shall make 'an independent assessment of the citizen's claim of constitutional' right and need not accord deference to the agency's decision." *Cullman Regional Medical Center v. Shalala*, 945 F.Supp. 287, 293 (Dist. D.C. 1996); *McNary*, 498 U.S. at 493.

#### 2.     Plaintiffs Are "Persons"Within the Meaning of the Fifth Amendment

Defendant asserts that plaintiffs have no due process or equal protection rights because "states and their political subdivisions are not persons within the meaning of the Fifth Amendment."

1  Defendant's argument amounts to a claim that plaintiffs, as California counties, lack capacity to sue

2  under the Fifth Amendment.[9]

3       Corporations are "persons" that may assert due process or equal protection claims.  *See*

4  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) [holding that corporations have rights

5  under the due process clause of the Fifth Amendment].

6       Under Fed.R.Civ.P. 17(b), the "capacity to sue or be sued shall be determined by the law of

7  the state in which the district court is held . . . ."  *See Hillis Motors, Inc. v. Hawaii Automobile*

8  *Dealers' Assn.*, 997 F.2d 581, 584 (9th Cir. 1993) [applying Fed. R. Civ. P. 17(b), the court analyzed

9  Hawaii law to determine whether a corporation had standing under Hawaii law to pursue a federal

10  antitrust action]; *Mayes v. Elrod*, 470 F.Supp. 1188, 1192 (D.C.Ill. 1979) [applying Fed.R.Civ.P.

11  17(b), the court analyzed Illinois law to determine whether a "governmental corporation" could be

12  sued in federal courts for deprivation of civil rights under 42 U.S.C. § 1983].

13       Under California law, counties are political subdivisions of the state and are also "quasi-

14  corporations."  California Government Code § 23000 provides: "A county is the largest political

15  division of the State having corporate powers."  California Government Code § 23003 provides: "A

16  county is a body corporate and politic, has the powers specified in this title and such others

17  necessary implied from those expressed."  California Government Code § 23004 provides in

18  pertinent part:

19       A county may: (a) Sue and be sued. . . . (c) Make contracts and purchase and hold
         personal property necessary to the exercise of its powers.  (d) Manage, sell, lease or
20       otherwise dispose of its property as the interests of its inhabitants require. . . .

21       In *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, the California

22  Supreme Court reversed the trial court's order sustaining PG&E's demurrer without leave to amend.

23  The court held that under California law a county was a "person" who could bring an action under

24

25       [9]  The cases that defendant cites in support of his argument do not support the premise that
     ***California counties*** lack capacity to assert due process or equal protection claims.  *See South*
26   *Carolina v. Katzenbach*, 383 U.S. 301, 323-324 (1966) [the State of South Carolina lacks capacity];
     *Premo v. Martin*, 119 F.3d 764, 771 (9th Cir. 1997) [an executive department of the State of
27   California lacks capacity]; *Arizona State Department of Public Welfare v. HEW*, 449 F.2d 456, 478
     (9th Cir. 1971) [an executive department of the State of Arizona lacks capacity]; and *Cruz v. United*
28   *States*, 387 F.Supp.2d 1057, 1067 (N.D. Cal. 2005) [Mexican state-owned banks lack capacity].

26

the Cartwright Act (California Business & Professions Code §§ 16700, *et seq*.). *PG&E,* 16 Cal.4th at 1150-1158. The California Supreme Court also held that Stanislaus County could bring an action under the Sherman Antitrust Act (15 U.S.C. § 1), the Wilson Tariff Act (15 U.S.C. §§ 8, *et seq*.), and the Clayton Act (15 U.S.C. § 15) because "unless specifically limited by some other legislative provision, a county enjoys the same powers as any other corporate entity in seeking damages for injuries suffered." *PG&E,* 16 Cal.4th at 1158-1159.

Similarly, in *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491, fn. 12, the California Supreme Court held that a county is "sufficiently corporate in character" for purposes of the exercise of writ jurisdiction under California Code of Civil Procedure § 1085(a) in a case where two California counties had argued that the Tahoe Regional Planning Compact violated the counties' due process and equal protection rights under the California Constitution and the Fourteenth Amendment to the United States Constitution.[10]

Thus, under California law, each of the plaintiffs has standing as a "person" to bring this action, including the claims asserted under the Fifth Amendment.

### 3.    Plaintiffs' Due Process Claims

#### a.    Plaintiffs Have Sufficiently Alleged a Protected Property Right

Defendant argues that "it is well-settled that a supplier who chooses to treat Medicare patients has no protected property right to payment in any amount that exceeds the published fee schedule." Motion, p. 22:9-11; citations omitted. Once again, this sort argument only defeats a straw man.

Since plaintiffs' complaint falls outside the scope of 42 U.S.C. § 405(h), the due process claims of the complaint are reviewed under the traditional due process analysis described by *Mathews*, 424 U.S. at 335. *Furlong III*, 238 F.3d at 236.

Plaintiffs' complaint alleges plaintiffs have "a property interest in receiving payments from Medicare that reflects the true economic cost of the medical and other services they provide to Medicare beneficiaries" and "a property interest in being assigned to the correct payment localities."

---

[10]   California Code of Civil Procedure § 1085(a) provides in pertinent part: "A writ of mandate may be issued by any court to any inferior tribunal, corporation ...."

Complaint, ¶¶ 318-319.  In addition, plaintiffs' complaint alleges they have "a reasonable expectation that they will be placed in properly classified localities based on Medicare's promise and duty to do so" and "have a further reasonable expectation that they will be paid based on a locality classification methodology that is uniformly and equitably applied and that they will not be intentionally underpaid as a result of their locality classification."  Complaint, ¶ 320.

In *Perry v. Sindermann*, 408 U.S. 593, 602-603 (1972), the Supreme Court rejected a narrow and formalistic approach to defining due process rights, stating, "'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms.  Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' [Citation.] A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. [Citation.]"

Here, plaintiffs' property interest arises out of: (a) the statutory requirements of § 1395w-4 that payments to suppliers be made based on local costs relative to the national average; (b) the process Medicare employed in 1996 to meet those statutory requirements by configuring the current locality structure using the 5% iterative method, with resulting inaccuracies corrected when identified by the 3% "mean absolute percentage deviation" (Complaint, ¶ 141); (c) Medicare's 1996 promise to reconfigure localities "if the newer GPCI data indicates dramatic relative cost changes among areas" (Complaint, ¶ 165); (d) beginning in 2001, Medicare's own data showed that the locality structure was no longer meeting the "major goal of . . . reducing payment differences among adjacent geographic areas" (Complaint, ¶ 172); (e) Medicare's recognition, first acknowledged in 2001, that there were "payment disparities" between localities and "wide variations in the practice costs within a single locality (Complaint, ¶¶ 173, 178, and 188); and (f) Medicare's admission that it "[did] not disagree with the view that a comprehensive evaluation of the current payment localities is due." (Complaint, ¶ 200).

Here, there is an established set of criteria that was employed by Medicare after five years of study that set thresholds for determining when payment differences within and between localities were significant enough to warrant a national reconfiguration.  As a result of changing

28

1    demographics, those thresholds were passed beginning in 2001 resulting in underpayments to some

2    physicians and overpayments to others.  As alleged, Medicare has intentionally failed to reconfigure

3    the payment localities to correct the payment imbalances.  Complaint, ¶¶ 282, 285, 311-313, 320.

4        These facts show a property interest at least as significant as those found sufficient for due

5    process purposes in *Furlong II*, 156 F.3d at 394-396.

6                    **b.    Plaintiffs Had No Opportunity To Be Heard**

7        Under *Mathews v. Eldridge*, 424 U.S. at 335, the second factor a court must consider in a due

8    process claim is the risk of an erroneous deprivation of a private interest through the procedures used

9    and the probable value of additional or substitute procedural safeguards.  On this point, defendant's

10   entire argument is that "to the extent the issue is reviewable, the Medicare claims process affords

11   an "opportunity to be heard at a meaningful time in the meaningful manner. [Citation.]"  Defendant

12   then concludes that plaintiffs' due process claim lacks merit.  Motion at 15-19.

13       Defendant fails to identify a single extant procedure for the review of plaintiffs' claims or

14   any other manner in which plaintiffs have an opportunity to be heard.  Without any support for the

15   premise, defendant's conclusion must fail.

16                   **4.    Plaintiffs' Equal Protection Claims**

17       "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy

18   reason for the classification, the legislative facts on which the classification is apparently based

19   rationally may have been considered to be true by the governmental decision maker, and the

20   relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary

21   or irrational. [Internal citations omitted.]" *Norlinger v. Hahn*, 505 U.S. 1, 11 (1992).

22       Plaintiffs' complaint alleges that defendant is intentionally maintaining a payment system

23   that does not pay local costs relative to the national average as required by 42 U.S.C. § 1395w-4.

24   Complaint, ¶¶ 282, 285, 311-313.  Because of the budget neutral nature of the Medicare program,

25   underpayments to plaintiffs result in overpayments to others.

26       Where there are substantial payment disparities such as those between San Mateo, Santa

27   Cruz, and Santa Clara Counties – where suppliers in Santa Cruz County receive 25% less for

28   performing exactly the same medical services as suppliers in neighboring San Mateo and Santa

                                                29

Clara Counties – there is simply no rational basis for maintaining the locality structure that caused those imbalances.  Since 1996, Medicare's only explanation for not following its own policy to reconfigure localities was that if Medicare reconfigured localities there would be "winners and losers."  That is, some suppliers would receive reimbursement at a higher rate and some would receive it at a lower rate.  However, Medicare's explanation is not a rational justification for maintaining the *status quo*, it is simply a recognition of what would result if the *status quo* were to be changed.  Additionally, Medicare's justification is an implicit admission that some suppliers are currently receiving more than they should and some are receiving less.

Plaintiffs' equal protection claim is not based, as defendant would have it, on an assertion of a right to equal payment.  Motion, p. 23:1-2.  It is based on the fact that since 2001 Medicare has knowingly reimbursed plaintiffs under the current locality configuration at a rate that is disproportionate to local costs relative to the national average in violation of their statutory rights.

Finally, defendant does not address the allegations of Medicare's disparate treatment of hospitals and physicians under their respective fee schedules.  That disparate treatment is more fully set forth in § V(D), *infra*, but an example will suffice here.  Whereas doctors in Santa Cruz County are paid the same low rates as doctors in rural Alpine County, hospitals in Santa Cruz County are classified as "urban" and receive the highest rate of payment in the entire country.  Complaint, ¶ 280.  Here again, there is no conceivable rational basis for such treatment.

### 5.    Unlawful Delegation

Plaintiffs' complaint alleges that Medicare unlawfully delegated its authority to initiate changes to fee schedule areas to state medical associations.  The complaint contains citations to numerous statements by Medicare supporting the allegation.  *See* Complaint, ¶¶ 106-108, 116-118, 176-178, 185, 202, 224-228, 284(c), 323-324, 351(c), 362-367.[11]

---

[11]  Defendant argues that "plaintiffs themselves emphasize that the Secretary has declined to automatically adopt fee schedules merely because they were recommended by local interests. Id., at ¶ 74 (citing 56 Fed. Reg. At 59,593)."  Motion, p. 24, fn. 13.  Defendant overstates what plaintiffs allegedly "emphasize."  The referenced paragraph includes a quotation from 1991 at a time when Medicare was beginning its study on locality reconfiguration.  Medicare stated that it "would be unlikely to consider any locality changes before 1996, except changes involving consolidation of Statewide localities."  As detailed in ¶ 72, in the 1991 Proposed Rule, Medicare also stated, "We propose to allow conversion to Statewide localities in States if overwhelming support from the

30

In 1991, President George H. W. Bush's 1991 directive to Medicare not to enforce a similar unconstitutional delegation of authority to create two statewide localities.   Complaint, ¶¶ 63-64. Defendant relegates his discussion of this truly unique aspect of this case to a footnote.   *Compare* Motion, p. 24 at fn. 12.

Under the unlawful delegation doctrine, an agency may not completely shift its responsibility to administer its duties to a private actor.  *Perot v. Federal Election Commission,* 97 F.3d 553, 559 (D.C. Cir. 1996).  This is particularly true where an agency has delegated duties to a private actor whose objectivity may be questioned on grounds of conflict of interest.  *Sierra Club v. Sigler*, 695 F.2d 957, 962 (5th Cir. 1983).

"The relevant inquiry in any delegation challenge is whether Congress intended to permit the delegatee to delegate the authority conferred by Congress."  *National Park and Conservation Assn. v. Stanton*, 54 F.Supp.2d 7 (D.D.C. 1999).  In this case, there was no express delegation of authority by Congress to the Secretary to create or modify fee schedule areas.  Complaint, ¶¶ 57-62, 86-88.  Further, there has certainly been no indication of Congress' intent to permit the Secretary to delegate any part of the authority to create or modify fee schedule areas to state medical associations.  No such indication is alleged in the complaint and defendant's motion to dismiss offers no suggestion that such an intent ever existed.[12]

Delegations by federal agencies to private entities are valid so long as the federal agency or official retains final reviewing authority.  *United Black Fund, Inc. v. Hampton*, 352 F.Supp. 898, 904 (D.D.C. 1972).  However, the agency must first have the authority to delegate.

In *Zuber v. Allen*, 396 U.S. 168 (1969), the Supreme Court invalidated a provision in a regulation setting prices of milk which provided that farmers close to Boston would receive a higher price for their milk than those further away.  The Supreme Court first noted that where a statute

---

physician community for the change can be demonstrated."

[12]  Defendant questions "what point plaintiffs are trying to make when they allege that '[t]here is no clear statutory authority for Medicare to establish payment localities or 'fee schedule areas.'" Motion at p. 22, fn. 11, quoting Complaint at ¶ 57. As *Zuber,* 396 U.S. at 193, teaches, the lack of an express grant of ***authority to create*** fee schedule areas from Congress to the Secretary is relevant because it tends to show that Congress did not give the Secretary ***authority to delegate*** any part of the authority to create fee schedule areas to state medical associations.

31

delegating authority to an administrator "does not contain a mandate phrased in broad and permissive terms," the administrator "does not have 'broad dispensing power.'" *Zuber*, 396 U.S. at183. The Supreme Court noted that the Secretary had not "advanced any economic justification for these differential payments" to farmers near Boston, and that it was "plain from the administrative record that the nearby differential was included in the original Boston order as a recognition of the favored position of nearby producers in the fluid market and as an inducement to nearby farmers to approve the secretary's order." *Zuber*, 396 U.S. at 188.

In response to the Boston farmers' argument that the statutory scheme called for approval by the farmers, the Supreme Court held, "If provision for such approval could ever legitimize a regulation not authorized by statute, the provision has no significance in the case before us, in light of the consideration already discussed. It is the Secretary, not the farmers, who is responsible for administering the statute and ***initiating*** orders." *Zuber*, 396 U.S. at 195-196; emphasis added.

In *Stanton*, 54 F.Supp.2d at 19-21, certain environmental groups challenged the National Park Service's ("NPS") plan for management of the Niobrara National Scenic River in Nebraska (the "Niobrara") in part because the plaintiffs alleged that the NPS had unlawfully delegated its management duties to the Niobrara Council ("Council"), an entity that had been formed by an agreement between the NPS and local Nebraska governmental entities. The court held that the NPS had unlawfully delegated its duties because: (a) the NPS retained no oversight over the Council or over its actions or ***inactions***; (b) the Council's dominant private local interests were likely to conflict with national environmental interests that the NPS is statutorily mandated to represent; (c) the NPS lacked authority to appoint or remove members of the Council aside from its single appointed member (out of 15 total); (d) the NPS lacked authority to determine which interests would be represented on the Council; and (e) the NPS lacked authority to control Council funding.

The court also pointed out that the "tenuous relationship" between the Council and the NPS meant that the NPS could not ensure that all federal statutes are complied with. *Id.*, at 21. The court concluded that the NPS had no "'final reviewing authority' over the Council" and that the NPS had unlawfully delegated authority to the Council. *Stanton*, 54 F.Supp.2d at 19-21.

/ / /

32

Defendant's belief that plaintiffs' non-delegation claim is "patently without merit" notwithstanding, the allegations of the complaint show that the authority to initiate fee schedule area modifications has been delegated by Medicare to state medical associations. Such a delegation has been deemed by a former chief executive as unconstitutional. The delegation was made despite the fact that no clear Congressional authority was ever given to Medicare to create fee schedule areas, and without any evidence of an intent to permit delegation of that authority. Medicare delegated the authority to interested groups who do not represent all "suppliers" who receive payments under Part B, groups over which Medicare has absolutely no oversight. In other words, the delegation at issue here is not a simple matter of Medicare seeking to "consider private views in deciding whether and how to make policy changes." Motion, p. 24:1-2. It is an unconstitutional delegation of authority. *Zuber,* 396 U.S. at 183, 195-196; *Stanton,* 54 F.Supp.2d at 19-21.

### H.    Plaintiffs Properly Seek Reimbursement

Defendant claims that 5 U.S.C. § 702 bars the remedy sought by plaintiffs in the complaint and that the government has not waived sovereign immunity to be sued for damages. First, defendant's attack is procedurally unsound. A Rule 12(b)(6) motion will not be granted merely because plaintiff requests a specific remedy to which he or she is not entitled. "(I)t need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1104 (D.C. Cir. 1985) [emphasis in original].

Second, what plaintiffs seek is not "money damages" as that term is used in 5 U.S.C. § 702, but rather monetary relief in the form of reimbursement to which they would have been entitled had defendant appropriately reconfigured the fee schedule areas. See "Declaration of Dario de Ghetaldi in Support of Plaintiffs' Opposition to Motion to Dismiss Complaint," ¶ 4.

Such a claim is not barred by 5 U.S.C. § 702 which states in pertinent part:

"An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."

33

In *Bowen v. Massachusetts,* 487 U.S. 879 (1988), the State of Massachusetts brought an action for review of a decision of the Department of Health and Human Services that certain services provided to persons residing in state-owned intermediate care facilities for the mentally-retarded did not qualify for reimbursement under the Medicaid program. The State of Massachusetts sought both declaratory and injunctive relief, as well as reimbursement of for the disallowed services. The Supreme Court held that 5 U.S.C. § 702 does not foreclose judicial review of the claim for monetary relief brought by the state because it did not seek "monetary damages" as that term is used in the law. *Bowen,* 487 U.S. at 892-893. Rather, the State's claim was one "seeking reimbursement to which the State was allegedly already entitled, rather than money in compensation for losses suffered as a result of the disallowance." *Bowen,* 487 U.S. at 880. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'monetary damages.'" *Bowen,* 487 U.S. at 893.

Here, like in *Bowen*, plaintiffs do not seek monetary damages in the sense of "compensatory relief for an injury suffered." Instead, plaintiffs seek reimbursement to which they would already be ***entitled*** if defendant had properly reconfigured the fee schedule areas.

## I.    Defendant Improperly Attacks Plaintiffs' Standing

Defendant's attack on the Counties of Santa Barbara, San Luis Obispo, San Diego and Monterey's standing to bring this action is both premature and procedurally unsound.

To begin with, defendant does not challenge the standing of three of the plaintiffs. The "presence of one party with standing assures that [the] controversy before [the] Court is justiciable." *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 330 (1999).

Further, the attack is based solely on the improperly submitted Hardwick Declaration which cannot be considered on a motion to dismiss. *Arpin*, 261 F.3d at 925 [a court cannot consider material outside the complaint such as facts presented in briefs, affidavits or discovery materials]; *see also Franklin Savings*, 970 F.Supp. at 861, fn. 4 [the court elected not to consider two affidavits attached to defendants' motion to dismiss "or any other material extraneous to the complaint in ruling on defendants' motion"]; *see also In re United Telecomms,* 781 F. Supp. at 701, fn. 1 [a court cannot consider extraneous materials to put allegations in context]. For purposes of this motion, the

34

1    court must accept as true all material allegations in the complaint, as well as reasonable inferences

2    to be drawn from them.  *Pareto,* 139 F.3d at 699 .

3        The facts supporting each plaintiff's standing to bring this action are clearly stated in the

4    complaint at ¶¶ 22-24.  Under the authorities cited above, those allegations must be accepted as true

5    for purposes of this motion and they cannot be contradicted by the Hardwick Declaration.

6        As more fully set forth in Exhibits 1-4 to the Declaration of Dario de Ghetaldi, served and

7    filed herewith, the complaint can be amended, if necessary, to include the numerous Medicare

8    billing numbers used by each of the four challenged plaintiffs during the relevant time period and

9    which were not located by Mr. Hardwick in his efforts.

10   **V.    ISSUES NOT RAISED OR CHALLENGED BY DEFENDANT**

11       Defendant's motion ignores five significant issues raised in plaintiffs' complaint.

12       **A.    Statewide Budget Neutrality Is Not Authorized by Law**

13       ***First***, the motion does not address the allegations relating to defendant's improper imposition

14   of statewide budget neutrality on locality changes.  What began as an inducement to states to convert

15   to single locality fee schedule areas in 1993 evolved over the years in Medicare's pronouncements

16   in the Federal Register from a convenient tool that could be employed at will into something that

17   Medicare now characterizes – without authority – as an absolute requirement of law.

18       In 1991, Medicare converted Minnesota, Nebraska, and Oklahoma into single fee schedule

19   areas without imposing statewide budget neutrality on the process.  Complaint, ¶¶ 75-77, 98-99, and

20   184(a).  In 1993, Medicare eliminated a specialty-specific fee schedule area in Washington without

21   imposing statewide budget neutrality on the process, and even explained how the process would

22   have an effect on a nationwide basis.  Complaint, ¶¶ 100-102.

23       As alleged in the complaint, Medicare accurately acknowledged in 1993 that the statutory

24   fee schedule only requires changes to fee schedule areas be budget neutral on a nationwide basis and

25   does not require they be budget neutral on a statewide basis:  "'The physician fee schedule is

26   budget-neutral on a national basis.... There is no statutory requirement that the physician fee

27   schedule be budget neutral within a State.'" Complaint, ¶ 91, quoting from Proposed Rule, 58 FR

28   37994, 38002 (7/14/1993).  However, Medicare also decided in 1993 to offer statewide budget

1    neutrality as an inducement to states to convert to single fee schedule areas.  Complaint, ¶¶ 89-97,

2    104-105.  Thus, the conversions of North Carolina and Ohio in 1993 (Complaint, ¶¶ 103-105) and

3    Iowa in 1994 (Complaint, ¶¶ 112-114) were done on a statewide budget neutral basis.  Then, the

4    large-scale modifications of fee schedule areas in 1996 was also accomplished on a statewide budget

5    neutral basis.  Complaint, ¶¶ 158-160.

6        Where the use of statewide budget neutrality was used as an inducement in the 1990's, by

7    the next decade, Medicare began asserting that statewide budget neutrality was somehow required

8    by law – without ever identifying which law required it.  In 2004, Medicare stated, "Locality

9    changes are budget-neutral with respect to the aggregate amount of Medicare money in a State."

10    Complaint, ¶ 176.  In 2005, Medicare made a similar statement: "Under our current statutory

11    authority, it is well known that changes to the payment localities must be implemented in a budget

12    neutral manner."  Complaint, ¶ 199.

13        The complaint clearly alleges that the imposition of a statewide budget neutrality

14    requirement is not authorized by law.  Complaint, ¶¶ 177, 199 and fn. 25, 284(a), and 351(a).

15    Defendant's motion not only fails to identify what law authorizes such a modification to the fee

16    schedule, it completely ignores one of the most significant unauthorized barriers to a solution to the

17    payment imbalance erected by Medicare.  Complaint, ¶¶ 284(a) and 351(a).

18        The imposition of a statewide budget neutrality requirement into the fee schedule equation

19    contained in 42 U.S.C. § 1395w-4 is something "which Congress has not intended [the agency] to

20    consider" in implementing the fee schedule.  *Motor Vehicle Mfrs. Ass'n,*, 463 U.S. at 43.  Medicare

21    has not promulgated statewide budget neutrality as a rule through notice and comment, even though

22    the notice and comment procedure is mandatory for such a rule if the statutory scheme even

23    permitted it.  *Board of Trustees of Knox County Hospital v. Shalala*, 135 F.3d 493, 500 (7th Cir.

24    1998); *Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165, 169-170 (7th Cir. 1996).

25        Statewide budget neutrality is not among the expressly enumerated factors of the fee

26    schedule formula, nor does it serve the statutory purpose of providing reimbursement to suppliers

27    based on local costs relative to the national average.  Imposing statewide budget neutrality creates

28    an artificial limitation on the calculation of local costs that is not authorized or contemplated by the

36

1    statutory formula.  Where, as Medicare accurately admitted in 1993 (*see* Complaint, ¶ 91), the

2    statute requires ***nationwide*** budget neutrality, altering the fee schedule formula to require statewide

3    budget neutrality distributes the effects of a locality reconfiguration only within the boundaries of

4    a state instead of spreading those effects nationwide, thereby raising and lowering payment rates

5    within the state to a higher degree than would result if the effect were spread across the entire nation.

6        For these reasons, the imposition of statewide budget neutrality is arbitrary and capricious

7    within the meaning of 5 U.S.C. § 706(2)(A).  *Motor Vehicle Mfrs.,* 463 U.S. at 43.

8        **B.    Arbitrary Refusal to Implement Locality Changes**

9        ***Second***, the motion to dismiss does not address defendant's arbitrary refusal to implement

10    the locality changes in California proposed by the California Medical Association ("CMA") in 2004

11    and 2005.  Briefly, the CMA had proposed a reconfiguration of California's fee schedule areas using

12    the 5% iterative method which would result in ten counties (including each of the plaintiffs herein)

13    becoming single-county localities.  Under the CMA proposals, the  payment reductions to the

14    counties remaining in the "Rest of California" or "Region 99" to be phased in over a two-year period

15    with funding from resulting from payment reductions all other California fee schedule areas.

16    Complaint, ¶¶ 180-184 and 186-187.

17        Defendant's stated reason for rejecting the proposal was that Medicare "'does not have the

18    authority under [42 U.S.C. § 1395w-4(e)] to reduce the GPCIs of some localities in a State to offset

19    higher payments to other localities.'  (Final Rule, 11/15/2004, 69 FR 66236.)"  Complaint, ¶ 183,

20    *see also* ¶¶ 284(b), 323, and 351(b).

21        By making this assertion, Medicare has placed itself squarely on the horns of a difficult

22    dilemma.  If such a limitation does exist, defendant has ignored it numerous times in the past.  When

23    a fee schedule area configuration is changed, the reduction in the GPCIs of some fee schedule areas

24    to offset higher payments to others is an inherent feature of a nationally budget neutral payment

25    system.  As alleged in the complaint, similar effects on the values of GPCIs arose from defendant's

26    phase-in of the 1996 restructuring of fee schedule areas, and from the imposition of statewide budget

27    neutrality on modifications to fee schedule areas in 1993, 1994, and 1996.  *See* Complaint, ¶¶ 105,

28    114, and 158-163.

37

1   If such limitation does not exist, then Medicare's reason for rejecting the locality

2   reconfiguration contained in the 2004 Proposed Rule was arbitrary and capricious.

3       Defendant's motion does not address this issue at all.

4       **C.    Misrepresentations Relating to Public Comments**

5       *Third*, the motion does not address defendant's misrepresentations relating to the public

6   comments on the 2005 Proposed Rule.  *See* Complaint at ¶ 200 and p. 47, fn. 26.  As justification

7   for its decision not to implement the 2005 Proposed Rule which would have made Santa Cruz and

8   Sonoma Counties individual fee schedule areas, Medicare stated that "it is apparent that this

9   proposed change is not acceptable to the majority of commenters at this time."   Complaint, ¶ 200.

10  In fact, as plaintiffs' complaint alleges, there were approximately 5,000 comments in favor of the

11  Proposed Rule and only approximately 25 against.  Complaint, p. 47, fn. 26.  Defendant's motion

12  does not address this misrepresentation.

13      **D.    Disparate Treatment of Hospitals and Suppliers**

14      *Fourth*, the motion does not address defendant's disparate treatment of hospitals and

15  suppliers resulting from the use of MSAs as geographical units under Part A and the use of counties

16  and multi-county localities as geographical units under Part B.  Complaint, ¶¶ 279-281.[13]

17      Payments to hospitals under Part A are calculated based in part on "the relative hospital wage

18  level in the geographic area of the hospital compared to the national average hospital wage level."

19  42 U.S.C. § 1395ww(d)(3)(E)(i).  In *Bellevue Hospital Center v. Leavitt*, 443 F.3d 163, 175-176 (2nd

20  Cir. 2006), the court concluded that Medicare's "use of MSAs to fill the gap left by the ambiguous

21  term 'geographic areas' is reasonable."  Similarly, in *San Bernardino Mountains Cmty. Hosp. Dist.*

22

23

---

24  [13] The statewide and multi-county localities are by far the largest geographic units Medicare
25  uses to compute payments to physicians.  Medicare uses county-based geographic areas to define
    "physician scarcity areas" ("PSA") where physicians receive a 5% incentive payment for providing
    services to beneficiaries.  *See* 42 U.S.C. § 1395l(u)(2) and 42 C.F.R. § 414.66.  Medicare also uses
26  county and partial-county based geographic units to define "health professional shortage areas"
    ("HPSA")   where physicians receive a 10% incentive payment for providing services to
27  beneficiaries.  *See* 42 U.S.C. § 254e and 42 C.F.R. § 414.67.  Medicare regularly publishes the ZIP
    codes that define the PSAs and HPSAs in the Federal Register.  *See* 69 FR 66236 at 66697-66899
28  (11/15/2004).

38

1  *v. Sec'y of HHS*, 63 F.3d 882, 889 (9th Cir. 1995), the court upheld the Secretary's use of MSAs to

2  determine which hospitals are in urban or rural areas.

3  Payments to suppliers under Part B are calculated based in part on various expenses "in the

4  different fee schedule areas compared to the national average of such costs."  42 U.S.C. § 1395w-

5  4(e)(1)(A).  "Fee schedule area" is defined in 42 U.S.C. § 1395w-4(j)(2) as "a locality under [42

6  U.S.C. § 1395u(b)] for purposes of computing payment amounts for physicians' services."  Section

7  1395u(b)(3) states in pertinent part:  "In determining the reasonable charge for services for purposes

8  of this paragraph, there shall be taken into consideration the customary charges for similar services

9  generally made by the physician or other person furnishing such services, as well as the prevailing

10  charges in the locality for similar services."  *See* Complaint, ¶¶ 57-62.  As discussed above,

11  Medicare has defined the geographic areas called "fee schedule areas" or "localities" under Part B

12  in a non-uniform manner with some areas encompassing entire states, some encompassing from two

13  to 47 counties, and some encompassing only one county.

14  The complaint contains a concrete example of the effect of the disparate methods Medicare

15  employed in defining the geographic areas used in the payment formulas under Part A and Part B:

16  "Santa Cruz County suppliers are grouped in the demographically diverse 'Rest of California'

17  locality and receive 25% less than neighboring Santa Clara County and San Mateo County suppliers

18  for providing exactly the same services.  In stark contrast, Santa Cruz hospitals are currently paid

19  at the highest rates under Part A – not only in the State of California – but in the entire nation."

20  Complaint, ¶ 280.  Further disparate effects resulting from the disparate methods are detailed in the

21  chart in ¶ 281 of the complaint.

22  Defendant's motion does not address the validity of this disparate treatment or its effects.

23  **E.    Arbitrary Configuration of Localities in Texas**

24  *Fifth*, the motion does not address the glaringly arbitrary configuration of the two-county

25  "Houston" and "Austin" fee schedule areas in Texas.  Complaint, ¶¶ 234-239.  The two fee schedule

26  areas contain counties that are demographically dissimilar and that are not geographically

27  contiguous.  The combinations were not among the localities in the Proposed Rule in July 1996

28  (Complaint, ¶¶ 235 & 237), but were created without explanation in the Final Rule.  The only

39

1    possible explanation for the combination is confusion over the fact that the county seat of one of the

2    counties in each of the respective fee schedule areas has the same name as the second county.

3    Complaint, ¶¶ 236 & 238.  Defendant has not addressed the issue in his motion.

4    **VI.    CONCLUSION**

5         For all of the foregoing reasons, plaintiffs respectfully request that the Court deny

6    defendant's motion.  However, to the extent the Court deems the complaint defective, plaintiffs

7    respectfully request leave to amend and have submitted the Declaration of Dario de Ghetaldi

8    herewith to show some of the ways in which plaintiffs can allege additional facts.

9    Dated: November 20, 2007

10                                    _____/s/ Dario de Ghetaldi_____

11                          Dario de Ghetaldi (SBN 126781)
                           Jerry E. Nastari (SBN 151756)
12                          Amanda L. Riddle (SBN 215221)
                           COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
13                          700 El Camino Real
                           Millbrae, CA 94030
14                          Telephone: 650-871-5666
                           Facsimile: 650-871-4144

15
                           Colleen Duffy Smith (SBN 161163)
16                          Michael G. Reedy (SBN 161002)
                           McManis, Faulkner & Morgan LLP
17                          50 West San Fernando Street, Suite 1000
                           San Jose, CA 95113
18                          Telephone: (408) 279-8700
                           Facsimile: (408) 279-3244

19

20

21

22

23

24

25

26

27

28

1

**ADDITIONAL COUNSEL FOR PLAINTIFFS**

2

Dana M. McRae - Bar No. 142231
Santa Cruz County Counsel

3

Office of the County Counsel
Government Center, County of Santa Cruz

4

701 Ocean Street, Room 505
Santa Cruz, CA 95060

5

Tel: 831-454-2040
Fax: 831-454-2115

6

Attorneys for the County of Santa Cruz

7

Steven M. Woodside - Bar No. 58684
Sonoma County Counsel

8

Office of the County Counsel
575 Administration Drive, Suite 105A

9

Santa Rosa, CA 95403
Tel: 707-565-2421

10

Fax: 707-565-2624
Attorneys for the County of Sonoma

11

John J. Sansone - Bar No. 103060

12

San Diego County Counsel
Office of the County Counsel

13

County Administration Center
1600 Pacific Highway, Room 355

14

San Diego, CA 92101
Tel:619-531-4860

15

Fax: 619-531-6005
Attorneys for the County of San Diego

16

Patrick K. Faulkner - Bar No. 70801

17

Marin County Counsel
Jack F. Govi - Bar No. 88483

18

Assistant Marin County Counsel
Mari-Ann Gibbs Rivers - Bar No. 117053

19

Deputy Marin County Counsel
Office of the County Counsel

20

3501 Civic Center Drive, Suite 303
San Rafael, CA 94903

21

Tel: 415-499-6117
Fax: 415-499-3796

22

Attorneys for the County of Marin

23

Stephen Shane Stark - Bar No. 63779
Santa Barbara County Counsel

24

Celeste E. Andersen - Bar No. 141965
Deputy Santa Barbara County Counsel

25

Office of the County Counsel
105 East Anapamu, Suite 201

26

Santa Barbara, CA 93101
Tel: 805-568-2950

27

Fax: 805-568-2982
Attorneys for the County of Santa Barbara

28

James B. Lindholm - Bar No. 43513
San Luis Obispo County Counsel
Patricia Gomez - Bar No. 122536
Deputy San Luis Obispo County Counsel
Office of the County Counsel
1055 Monterey Street, Suite D320
San Luis Obispo, CA 93408
Tel: 805-781-5400
Fax: 805-781-4221
Attorneys for the County of San Luis Obispo

Charles J. McKee - Bar No. 152458
Monterey County Counsel
William M. Litt - Bar No. 166614
Deputy Monterey County Counsel
Office of the County Counsel
168 West Alisal Street, 3rd Floor
Salinas, CA 93901
Tel: 831-755-5045
Fax: 831-755-5283
Attorneys for the County of Monterey

41