1    Dario de Ghetaldi - Bar No. 126782
     Jerry E. Nastari - Bar No. 151756
2    Amanda L. Riddle - Bar No. 215221
     COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
3    700 El Camino Real
     P.O. Box 669
4    Millbrae, California  94030-0669
     Telephone: (650) 871-5666
5    Facsimile: (650) 871-4144

6    Colleen Duffy Smith - Bar No. 161163
     Michael G. Reedy - Bar No. 161002
7    MCMANIS, FAULKNER & MORGAN
     50 West San Fernando Street, Suite 1000
8    San Jose, CA 95113
     Telephone: (408) 279-8700
9    Facsimile: (408) 279-3244

10   Plaintiffs' Co-Counsel
     [Other Counsel on Signature Page]

11

12

13                   IN THE UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15

16   COUNTY OF SANTA CRUZ, et al.        )   Case No. C 07-2888 MJJ
                                         )
17                 Plaintiffs,           )
                                         )   DECLARATION OF DARIO DE
18          v.                           )   GHETALDI IN SUPPORT OF
                                         )   PLAINTIFFS' OPPOSITION TO MOTION
19   MICHAEL O. LEAVITT,                 )   TO DISMISS COMPLAINT
                                         )
20                 Defendant.            )   DATE:      1/15/2007
                                         )   TIME:      9:30 a.m.
21   _____ )   DEPT:      The Hon. Martin Jenkins

22

23

24          I, Dario de Ghetaldi, hereby declare under penalty of perjury:

25          1.      I am an attorney at law, licensed to practice in the State of California and in the

26   Northern District of California.  I am a partner in the firm of Corey, Luzaich, Pliska, de Ghetaldi &

27   Nastari LLP, attorneys for plaintiffs herein.  I make this declaration in order to show the ways in

28   which plaintiffs' complaint can be amended to alleged additional facts.

                                              1

     DECLARATION OF DARIO DE GHETALDI I/S/O PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT

2.    Defendant has submitted the declaration of William Hardwick in an attempt to show (to which plaintiffs have elsewhere objected) that four of the seven plaintiffs – County of San Diego, County of Santa Barbara, County of San Luis Obispo, and County of Monterey – lack standing because they were not Medicare suppliers during the relevant time period.  Mr. Hardwick's declaration reaches the conclusion that the four counties were not suppliers because of an inability to find a supplier number associated with those counties' names.  Attached hereto as Exhibits 1 - 4 are true and correct copies declarations from responsible officials from each of those counties stating that each of the counties was a supplier during the relevant periods.  The declarations specifically identify the supplier names and numbers used by each of the counties during the relevant time period.  The facts contained in those declarations can be added to an amended complaint.

3.    Plaintiffs made FOIA requests for data in December 2006 and January 2007, months before their claim was filed.  The requests sought data: (a) needed to establish amount of underpayments; and (b) needed to establish specific localities in which underpayments occurred and ultimately establish identity of class members.  On August 20, 2007, CMS responded to the requests, stating that the requested data does not exist.  To date, defendant has not produced the requested data and has continued to state that it does not exist.  Plaintiffs can amend their complaint to allege that CMS' statement is either false or that CMS has secretly used arbitrary values in the formulas used to establish geographic localities and repayment amounts.  If the former alternative is true, plaintiffs can amend their complaint to allege that the CMS is intentionally withholding evidence.  If the latter alternative is true, plaintiffs can amend their complaint to allege that the elements of the payment formula and the locality GAFs published by defendant in the Federal Register during the relevant time period have not been calculated as required by law.

4.    Defendant contends that plaintiffs are not entitled to damages in this action.  The term "damages" was used in the claims submitted to CMS and in the complaint to mean the amount of underpayments and nothing more.  The terms can be substituted in an amended complaint.

5.    Several events occurred after plaintiffs' claims and complaint were filed that support the plaintiffs' allegations.  The facts outlined in the following paragraphs can be added, if necessary, to an amended complaint.

2

1    (A) On July 2, 2007, the American Medical Association's newspaper published an article

2    on the allegations of plaintiffs' complaint.  The article included portions of an interview with

3    Thomas A. Scully, the administrator of CMS from May 2001 to December 2003:

4    "Former CMS Administrator Thomas A. Scully said there's no easy answer,
     especially when any change has to be budget neutral.

5

6    "'You have a finite pot of money, and if you raise one county, you hurt another.' said
     Scully, a partner at the New York city-based investment firm, Welsh, Carson,
     Anderson & Stowe.  He acknowledged that some data were old and said CMS has

7    pushed for more current practice cost surveys.

8    "'A lot of doctors' concerns are legitimate.  But it's a formula fight,' Scully said.
     '***Sometimes you have to make arbitrary calls*** based on the best data you have.'

9    [Emphasis added.]"

10   The interview took place after the claims were submitted and after the complaint was filed and thus

11   admission was not available to plaintiffs for inclusion in those documents.

12   (B) On June 29, 2007, the GAO submitted a report to the Chairman of the Subcommittee on

13   Health of the House Committee on Ways and Means entitled "Geographic Areas Used to Adjust

14   Physician Payments for Variation in Practice Costs Should Be Revised," GAO-07-466 (*see*

15   www.gao.gov/cgi-bin/getrpt?GAO-07-466).  The GAO report supports many of the allegations of

16   plaintiffs complaint.  In particular, the GAO Report specifically  concluded that localities could be

17   reconfigured without imposing a substantial amount of additional administrative burden.

18   "CMS officials we spoke with stated they would experience onetime upfront costs
     if the current payment localities were modified, regardless of the number of localities

19   generated by the approach chosen.  Specifically, CMS creates a distinct physician fee
     schedule for each payment locality and would have to perform data reliability checks

20   on the localities' physician fee schedules to ensure their accuracy.  Agency officials
     stated that they would have to reprogram CMS systems, update its files that assign

21   carriers and physicians to a payment locality, and provide physicians with extensive
     education on the payment locality modifications.  However, CMS officials stated that

22   they did not anticipate that significant modifications to payment localities would
     require a substantial amount of additional ongoing administrative burden.

23

24   "In addition, CMS officials stated that any change to the payment localities would
     cause Medicare carriers to incur upfront costs.  Representatives from the five
     Medicare carriers that we spoke with each stated that a moderate increase in the

25   number of payment localities would not require a substantial amount of additional
     resources.  They each indicated that modifying the payment localities would cause

26   onetime transitional costs.  Specifically, they would be required to create new data
     files that assigned each physician to a new payment locality. Carrier representatives

27   also indicated that an increase in the number of payment localities would increase
     their ongoing operational costs.  Specifically, the carriers must load each of the

28

3

1    distinct physician fee schedules CMS sends them into their data systems and then
2    perform data reliability checks on the to ensure they are accurate.

3    "Physicians would not incur additional administrative burden if their payment
     locality changed. In addition, physicians in California we spoke with stated that if
     the current localities were modified, they would not experience an increase in
4    administrative burden and would complete the same paperwork as they do currently.
     CMS officials we spoke with agreed that physicians' paperwork requirements would
5    remain the same. In addition, representatives from the medicare carriers we spoke
     with stated that they do not anticipate having to provide physicians with significant
6    additional training about payment locality modifications, since most carriers already
     routinely send each physician a complete fee schedule specific to their payment
7    locality." [GAO-07-466, "Medicare Payment for Physician Services," pp. 37-38.]

8    Further, the GAO Report contains a lengthy response from CMS which includes the following

9    admissions: (a) that there are variations in practice costs within payment locality boundaries; (b) that

10   CMS has known about these variations for a "number of years"; (c) that CMS continues to delegate

11   authority to state medical associations to initiate any locality reconfiguration; (d) that CMS

12   continues to assert without legal support that locality changes must be budget neutral within a state;

13   and (e) that CMS has not changed the locality structure since the mid-1990's:

14   "Currently there are 89 Medicare physician payment localities to which geographic
     practice cost indices (GPCIs) are applied. The structure of the payment localities has
15   been in place since 1998 [sic]. Over time, changing demographics and local
     economic conditions may have led to variations in practice costs within payment
16   locality boundaries. The Centers for Medicare and Medicaid Services (CMS) is
     concerned about the potential impact of these variations had has been studying this
17   issue and potential alternatives for a number of years. However, because changes to
     the GPCIs must be applied in a budget neutral manner (and under the current locality
18   system, budget neutrality results in aggregate payments within each State remaining
     the same), there are significant redistributive effects to any change. Therefore,
19   because of this redistributive impact, we have looked for support from an impacted
     state, such as from a State medical association, before proposing to make changes to
20   payment localities in a state." [GAO-07-466, "Medicare Payment for Physician
     Services," p. 74.]

21

22   (C) On July 12, 2007, CMS published a Proposed Rule in the Federal Register (72 FR

23   38112) on "Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B

24   Payment Policies for CY 2008" that examined the possibility of using one of several methods to

25   reconfigure localities in California only. In the Proposed Rule, CMS indicates that it recognizes the

26   existence of the problems detailed in plaintiffs' complaint, and persists in imposition of a policy not

27   supported by law under which CMS continues to declare that any locality change within a state must

28   be budget-neutral within that state:

4

1
2
3
4

"As indicated previously, we recognize that changing demographics and local economic conditions may lead to increased variations in practice costs within payment locality boundaries. We are concerned about the potential impact of these variations. But, we are also concerned about the redistributive effects of locality changes since changes must be applied in a budget neutral manner (and under the current locality system, BN results in aggregate payments within each State remaining the same)." (72 FR 38140.)

5

(D) On August 30, 2007, the Medicare Payment Advisory Commission (MedPAC) submitted

6

a response to CMS' July 2007 Proposed Rule. A true and correct copy of MedPAC's response is

7

attached hereto as Exhibit 5. On page 4 of that response, MedPAC reached a conclusion identical

8

to one of the key allegations in plaintiffs' complaint:

9
10
11
12
13
14

"Some organizations that represent physicians have raised an issue that the structure of the payment localities often causes payments under the PFS to inaccurately reflect the local costs of providing care. ***This can cause physicians in some areas to be systematically underpaid while others are overpaid, creating payment equity issues. The underlying factor for the payment inaccuracies is that many localities encompass geographic areas with very different costs of providing care. This appears to occur for two reasons: many localities are too large to accurately track geographic differences in costs of care and many are based on geographic entities established in 1966 and have not been adjusted to reflect changes in economic and demographic conditions.*** [Emphasis added.]"

15

(E) On August 31, 2007, the CMA submitted a response to the 7/12/2007 Proposed Rule, a

16

true and correct copy of which is attached hereto as Exhibit 6. The CMA's response points out

17

several basic math errors contained in the Proposed Rule, inconsistent values and conclusions, and

18

the need for additional data from CMS before CMA can effectively respond to the Proposed Rule.

19

(F) On August 31, 2007, plaintiffs submitted a response to the 7/12/2007 Proposed Rule, a

20

true and correct copy of which is attached hereto as Exhibit 7. Plaintiffs' response makes a number

21

of the same observations as the CMA and reaches a number of the same conclusions about the

22

Proposed Rule.

23

(G) On November 1, 2007, CMS' draft Final Rule on "Revisions to Payment Policies Under

24

the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008" was put on display

25

with the Federal Register. The final rule is scheduled to be published in the Federal Register on

26

November 27, 2007 (*see* http://www.cms.hhs.gov/center/physician.asp). The draft Final Rule

27

(http://www.cms.hhs.gov/PhysicianFeeSched/downloads/CMS-1385-FC.pdf) contains a number of

28

relevant statements and ultimately concludes that further study is needed before CMS will

5

1   reconfigure any localities.  The draft Final Rule includes the following Comments and Responses

2   on pp. 143-144:

3       "Comment: Comments regarding changes in the payment localities in California
        were universally accompanied with a belief that we should implement these changes,
4       without decreasing payments to any counties.

5       "Response: We understand the desire to avoid the negative impact implementing any
        of these options might have on certain areas.  **However, the statute requires that**
6       **geographic adjustments be established based upon an index of costs that is tied to**
        **national averages.  As a result, when the average increases in one locality because**
7       **of the addition of a higher cost county, the average in the locality that previously**
        **contained the higher cost county will necessarily decrease.  Any changes in**
8       **localities will necessarily produce changes in the underlying GPCIs, and we have**
        **no authority to assign or retain GPCIs that do not represent the actual values for**
9       **a locality.**

10      "Comment: Many commenters suggested that we consider a national solution to
        payment locality structure problem, not focus on a single state.
11
12      "Response: **Our proposals attempted to address locality issues in an area of the**
        **country where the incongruity of certain GAFs within localities is particularly**
13      **evident.  In addition, these issues have been brought to our attention regularly over**
        **the past several years, and the California Medical Association has demonstrated**
14      **its desire and willingness to work with us to develop ideas for resolving them.**  We
        viewed these proposals relating only to California as a starting point and, as we
15      indicated in the proposed rule, we would consider applying any changes to additional
        States in the future. [Emphases added.]"

16          I, Dario de Ghetaldi, hereby declare under penalty of perjury that I have read the foregoing

17   Declaration and know its contents.  The same is true of my own personal knowledge, except for

18   those matters stated on information and belief which I believe to be true.  If called to testify as a

19   witness, I could do so competently.

20          Executed on November 20, 2007, at Millbrae, California.

21
                                                    /s/ Dario de Ghetaldi
22                                                  Dario de Ghetaldi

23

24

25

26

27

28

                                                6

1

**ADDITIONAL COUNSEL FOR PLAINTIFFS**

2

Dana M. McRae - Bar No. 142231
Santa Cruz County Counsel

3

Office of the County Counsel
Government Center, County of Santa Cruz

4

701 Ocean Street, Room 505
Santa Cruz, CA 95060

5

Tel: 831-454-2040
Fax: 831-454-2115

6

Attorneys for the County of Santa Cruz

7

Steven M. Woodside - Bar No. 58684
Sonoma County Counsel

8

Office of the County Counsel
575 Administration Drive, Suite 105A

9

Santa Rosa, CA 95403
Tel: 707-565-2421

10

Fax: 707-565-2624
Attorneys for the County of Sonoma

11

John J. Sansone - Bar No. 103060

12

San Diego County Counsel
Office of the County Counsel

13

County Administration Center
1600 Pacific Highway, Room 355

14

San Diego, CA 92101
Tel:619-531-4860

15

Fax: 619-531-6005
Attorneys for the County of San Diego

16

Patrick K. Faulkner - Bar No. 70801

17

Marin County Counsel
Jack F. Govi - Bar No. 88483

18

Assistant Marin County Counsel
Mari-Ann Gibbs Rivers - Bar No. 117053

19

Deputy Marin County Counsel
Office of the County Counsel

20

3501 Civic Center Drive, Suite 303
San Rafael, CA 94903

21

Tel: 415-499-6117
Fax: 415-499-3796

22

Attorneys for the County of Marin

23

Stephen Shane Stark - Bar No. 63779
Santa Barbara County Counsel

24

Celeste E. Andersen - Bar No. 141965
Deputy Santa Barbara County Counsel

25

Office of the County Counsel
105 East Anapamu, Suite 201

26

Santa Barbara, CA 93101
Tel: 805-568-2950

27

Fax: 805-568-2982
Attorneys for the County of Santa Barbara

28

James B. Lindholm - Bar No. 43513
San Luis Obispo County Counsel
Patricia Gomez - Bar No. 122536
Deputy San Luis Obispo County Counsel
Office of the County Counsel
1055 Monterey Street, Suite D320
San Luis Obispo, CA 93408
Tel: 805-781-5400
Fax: 805-781-4221
Attorneys for the County of San Luis Obispo

Charles J. McKee - Bar No. 152458
Monterey County Counsel
William M. Litt - Bar No. 166614
Deputy Monterey County Counsel
Office of the County Counsel
168 West Alisal Street, 3rd Floor
Salinas, CA 93901
Tel: 831-755-5045
Fax: 831-755-5283
Attorneys for the County of Monterey

7

# LIST OF EXHIBITS

1. Declaration of Suzanne Jacobson, County of Santa Barbara

2. Declaration of Terry Hogan, County of San Diego

3. Declaration of Michael Hoberg, County of Monterey

4. Declaration of Jeff Hamm, County of San Luis Obispo

5. MedPAC Response dated 8/30/2007 to CMS' 7/12/2007 Proposed Rule

6. CMA Response dated 8/31/2007 to CMS' 7/12/2007 Proposed Rule

7. Plaintiffs' Response dated 8/31/2007 to CMS' 7/12/2007 Proposed Rule

# EXHIBIT  1

1   DARIO de GHETALDI (126782)
    JERRY E. NASTARI (151756)
2   AMANDA L. RIDDLE (215221)
    COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
3   700 El Camino Real
    P.O. Box 669
4   Millbrae, CA 94030
    Telephone:    (650) 871-5666
5   Facsimile:    (650) 871-4144

6   COLLEEN DUFFY SMITH (161163)
    MICHAEL G. REEDY (161002)
7   McMANIS FAULKNER & MORGAN
    A Professional Corporation
8   50 West San Fernando Street, 10th Floor
    San Jose, California 95113
9   Telephone:    (408) 279-8700
    Facsimile:    (408) 279-3244
10  Email:        cduffy@mfmlaw.com

11  Plaintiffs' Co-Counsel
    [Other Counsel on Signature Page]
12
                    IN THE UNITED STATES DISTRICT COURT
13
                    NORTHERN DISTRICT OF CALIFORNIA
14

15.

16  COUNTY OF SANTA CRUZ, ET AL.,          Case No. C 07-2888 MJJ

17          Plaintiffs,

18  vs.                                    **DECLARATION OF SUZANNE
                                           JACOBSON IN SUPPORT OF
19  MICHAEL O. LEAVITT,                    PLAINTIFFS' OPPOSITION TO
                                           MOTION TO DISMISS COMPLAINT**
20          Defendant.

21

22          I, Suzanne Jacobson, hereby declare under penalty of perjury, as follows:

23          1.      I am Certified Public Accountant and the Deputy Director/Chief Financial Officer

24  of the Santa Barbara County Public Health Department and the Custodian of Records for the

25  Santa Barbara County Public Health Department. I have served in this capacity for ten years. I

26  have fiduciary responsibility for all financial operations of the Public Health Department,

27  including the function of patient billing. I oversee staff that processes the billing to third-party

28

                                              1
DECLARATION OF SUZANNE JACOBSON                              CASE NO. C 07-2888 MJJ

1    intermediaries, including billing to Medicare.

2        2.        Through the period from 2001 to the present, the County of Santa Barbara Public

3    Health Department has participated in the Medicare Part B program and has actively billed the

4    Medicare Part B program through the National Heritage Insurance Corporation (NHIC).  When

5    billing NHIC, the Public Health Department has used the following applicable Medicare

6    Supplier numbers:

7

8                County Health Clinic - Carpinteria        W5365A

9                County Health Clinic - Franklin           W5365E

10               County Health Clinic - Lompoc             W5365C

11               County Health Clinic - Santa Maria        W5365D

12               County Health Clinic - Santa Barbara      W5365B

13               Physicians Medical Group                  W5365F

14

15        I declare under penalty of perjury under the laws of the State of California and the United

16   States that the foregoing is true and correct.  This declaration is based upon my own personal

17   knowledge, except where stated as based upon information and belief.  If called as a witness to

18   testify to the matters asserted herein, I could testify competently.

19

20        Executed on November 7, 2007, at Santa Barbara, California.

21

22

23                                                    _____
                                                      SUZANNE JACOBSON, CPA

24

25

26

27

28

2

DECLARATION OF SUZANNE JACOBSON                              CASE NO. C 07-2888 MJJ

# EXHIBIT 2

DARIO de GHETALDI (126782)
JERRY E. NASTARI (151756)
AMANDA L. RIDDLE (215221)
COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030
Telephone:    (650) 871-5666
Facsimile:     (650) 871-4144

COLLEEN DUFFY SMITH (161163)
MICHAEL G. REEDY (161002)
McMANIS FAULKNER & MORGAN
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:     (408) 279-3244
Email:          cduffy@mfmlaw.com

Plaintiffs' Co-Counsel
[Other Counsel on Signature Page]

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CRUZ, ET AL., | Case No. C 07-2888 MJJ |
|     Plaintiffs, | |
| vs. | **DECLARATION OF TERRY HOGAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT** |
| MICHAEL O. LEAVITT, | |
|     Defendant. | |

I, Terry Hogan, hereby declare under penalty of perjury, as follows:

1.        I am the Finance Director of the Health and Human Services Agency of the County of San Diego. I have served in this capacity for four years. I have fiduciary responsibility for all financial operations of the Health and Human Services Agency, including the function of patient billing.

2.        During the period from 2001 to the present, the County of San Diego, Health and

1  Human Services Agency, has participated in the Medicare Part B program and has actively billed

2  the Medicare Part B program through Edgemoor Hospital.  The Medicare Provider Identification

3  Number is M055008.

4          I declare under penalty of perjury under the laws of the State of California and the United

5  States that the foregoing is true and correct.  This declaration is based upon my own personal

6  knowledge, except where stated as based upon information and belief.  If called as a witness to

7  testify to the matters asserted herein, I could testify competently.

8

9          Executed on November 16, 2007, at San Diego, California.

10

11

12                                          TERRY HOGAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT 3

1    DARIO de GHETALDI (126782)
     JERRY E. NASTARI (151756)
2    AMANDA L. RIDDLE (215221)
     COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP
3    700 El Camino Real
     P.O. Box 669
4    Millbrae, CA 94030
     Telephone:    (650) 871-5666
5    Facsimile:     (650) 871-4144

6    COLLEEN DUFFY SMITH (161163)
     MICHAEL G. REEDY (161002)
7    McMANIS FAULKNER & MORGAN
     A Professional Corporation
8    50 West San Fernando Street, 10th Floor
     San Jose, California 95113
9    Telephone:    (408) 279-8700
     Facsimile:     (408) 279-3244
10   Email:       cduffy@mfmlaw.com

11   Plaintiffs' Co-Counsel
     [Other Counsel on Signature Page]

12

                 IN THE UNITED STATES DISTRICT COURT
13

                   NORTHERN DISTRICT OF CALIFORNIA
14

15

16   COUNTY OF SANTA CRUZ, ET AL.,      |   Case No. C 07-2888 MJJ

           Plaintiffs,
17

18   vs.                           **DECLARATION OF MICHAEL D.**
                                   **HOBERG IN SUPPORT OF**
19   MICHAEL O. LEAVITT,          **PLAINTIFFS' OPPOSITION TO**
                                   **MOTION TO DISMISS COMPLAINT**
           Defendant.
20

21

22

23       I, Michael D. Hoberg, hereby declare under penalty of perjury, as follows:

24       1. I am a Certified Government Financial Manager and the Chief of Fiscal Services of

25 the Monterey County Health Department. I have served in this capacity for two years. I have

26 fiduciary responsibility for all financial operations of the Public Health Department, including

27 the function of patient billing. I oversee Finance Managers who process billing to third-party

28 intermediaries, including billing to Medicare.

                                                  1

DECLARATION OF MICHAEL D. HOBERG                        CASE NO. C 07-2888 MJJ

2. Through the period from 1995 to the present, Monterey County Health Department has participated in the Medicare Part B program and has actively billed the Medicare Part B program through the National Heritage Insurance Corporation (NHIC), based in Chico, California. The County of Monterey also owns and operates seven Federally Qualified Health Centers (FQHC) in Monterey County. The numbers corresponding to these clinics and the approximate length of time that the County has been billing Medicare Part B under these numbers are as follows:

| | | |
|---|---|---|
| Seaside Family Health Center | Billing Since 9/01/1995 | ZZZ15686Z |
| Monterey County Clinic at Marina | Billing Since 3/9/1996 | ZZZ15683Z |
| Alisal Health Center | Billing Since 9/03/1999 | ZZZ15685Z |
| Laurel Womens Health Clinic | Billing Since 7/1/2004 | ZZZ02040Z |
| Laurel Family Practice Clinic | Billing Since 7/1/2004 | ZZZ02040Z |
| Laurel Internal Medicine Clinic | Billing since 7/1/2004 | ZZZ02040Z |
| Laurel Pediatrics Clinic | Billing Since 7/1/2004 | ZZZ02040Z |

3. Monterey County receives between $250,000 and $480,000 per year in Medicare Part B reimbursements related to the Clinics listed above. I am informed and believe that Monterey County receives substantial additional reimbursements through its Behavioral Health Division. I am informed and believe that the Behavioral Health Division began participating in the Medicare Part B program beginning on July 1, 1996 under the billing code ZZZ23290Z.

///

///

///

///

///

///

DECLARATION OF MICHAEL D. HOBERG

2

CASE NO. C 07-2888 MJJ

1    I declare under penalty of perjury under the laws of the State of California and the United

2  States that the foregoing is true and correct. This declaration is based upon my own personal

3  knowledge, except where stated as based upon information and belief. If called as a witness to

4  testify to the matters asserted herein, I could testify competently.

5    Executed on November 19, 2007, at Salinas, California.

6

7                                    MICHAEL D. HOBERG, CGFM

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

DARIO de GHETALDI (126782)
JERRY E. NASTARI (151756)
AMANDA L. RIDDLE (215221)
COREY, LUZAICH, PLISKA, de GHETALDI & NASTARI LLP
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030
Telephone: (650) 871-5666
Facsimile: (650) 871-4144

COLLEN DUFFY SMITH (161163)
MICHAEL G. REEDY (161002)
McMANIS FAULKNER & MORGAN
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244
Email:    cduffy@mfmlaw.com

Plaintiffs' Co-Counsel
[Other Counsel on Signature Page]

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CRUZ, ET AL.,<br><br>                      Plaintiffs,<br><br>        v.<br><br>MICHAEL O. LEAVITT,,<br><br>                      Defendant. | Case No.:    C 07-2888 MJJ<br><br>**DECLARATION OF JEFF HAMM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT** |

I, Jeff Hamm, hereby declare under penalty of perjury, as follows:

1.      I am the Director of the San Luis Obispo County Health Agency and responsible for directing and controlling the operations of the San Luis Obispo County Health Agency. I have served in this capacity for 1.5 years. I oversee the fiduciary responsibility for all financial operations of the Health Agency, including the function of patient billing that includes billing to

Medicare.

2.        Through the period from 2001 to the present, the County of San Luis Obispo Health

Agency has participated in the Medicare Part B program and has actively billed the Medicare Part B

program through the National Heritage Insurance Corporation (NHIC) for Mental Health billings.

When billing NHIC, the Health Agency has used Medicare Provider number W4103. Attached to

this declaration, Exhibit A, pages 1-3, are copies of said billings.

The Health Agency also participates in the Medicare Part B program and has actively billed

Medicare Part B for services in the Public Health Laboratory using Medicare Provider number

558286. Attached to this declaration, Exhibit A, page 4, is a copy of a system generated record of

said billings.

I declare based on my own personal knowledge that the Exhibit to this declaration is true

and accurate and are copies of original documents on file with the County of San Luis Obispo

Health Agency. If called as a witness to testify to the matters asserted herein, I could testify

competently.

Executed on November 16, 2007, at San Luis Obispo, California.

JEFF HAMM

12214ktpld.doc

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

**MEDICARE**
PART B CARRIER
Phone (866) 502-9054

January 21, 2005

ROSA DRAGO
SAN LUIS OBISPO COMMUNITY
2180 JOHNSON AVE
SAN LUIS OBISPO, CA 93401-4558

Regarding: Provider File Update
Provider ID:  W4103
Provider Name:
Reference:  43-04-345-673-010

Dear Provider:

I am pleased to inform you that your request to update certain information regarding your Medicare
provider file has been completed. Based on the documentation that you provided, the following
information was updated.

   * Per your CMS 855-B your file is updated, we have dropped as authorized representative Enn
     Mannard and added as authorized representative eff. 120104 Rosa Drago for your ID#W4103.

Thank you for the opportunity to provide you with this service. If you have any questions regarding
your provider number, UPIN, billing procedures or electronic claims submission you may call our
Customer Service Department at (866) 502-9054.

Sincerely,

Veronica Meza

Provider Enrollment Unit

**NHIC**

National Heritage Insurance Company
Medicare Provider Enrollment
P.O. Box 60560
Los Angeles, CA 90060
A CMS CONTRACTED CARRIER

Exhibit A, Page 1 of 4

WHIC. CORP.
PROVIDER #: W4103
CHECK/EFT #:147437136          11/15/06

147437136 000003650
SAN LUIS OBISPO GNRL HOSP
PAGE #: 9 OF 10

BEHAVIORAL HEALTH

MEDICARE
REMITTANCE
NOTICE

| PERF PROV | SERV DATE | POS MOS | PROC | MODS | BILLED | ALLOWED | DEDUCT | COINS | GRP/RC-AMT | PROV PD |
|---|---|---|---|---|---|---|---|---|---|
| NAME | | HIC 557886216A | ACNT 541544 | | 93.20 | 35.98 | 0.00 | ICN 1206215073180 ASG Y MOA MA01 MA07 4.50 CO-172 57.22 PR-122 13.49 | 17.99 |
| WA44031F | 0619 061906 53 | 1 99213 | | | | | | 70.71 | 17.99 |
| PT RESP | 17.99 | | CLAIM TOTALS | | 93.20 | 35.98 | 0.00 | 4.50 | 17.99 NET |
| NAME | | HIC 557886216A | ACNT 541544 | | 93.20 | 35.98 | 0.00 | ICN 1206281072210 ASG Y MOA MA01 MA07 4.50 CO-172 57.22 PR-122 13.49 | 17.99 |
| WA44031F | 0710 071006 53 | 1 99213 | | | | | | 70.71 | 17.99 |
| PT RESP | 17.99 | | CLAIM TOTALS | | 93.20 | 35.98 | 0.00 | 4.50 | 17.99 NET |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | |
| NAME | | HIC 557886216A | ACNT 541544 | | 93.20 | 35.98 | 0.00 | ICN 1206276023440 ASG Y MOA MA01 MA07 4.50 CO-172 57.22 PR-122 13.49 | 17.99 |
| WA44031F | 0816 081606 53 | 1 99213 | | | | | | 70.71 | 17.99 |
| PT RESP | 17.99 | | CLAIM TOTALS | | 93.20 | 35.98 | 0.00 | 4.50 | 17.99 NET |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | |
| NAME | | HIC 564027984A | ACNT 537311 | | 116.50 | 59.73 | 0.00 | ICN 1206124122650 ASG Y MOA MA01 MA27 MA07 7.47 CO-172 56.77 PR-122 22.40 | 29.86 |
| WA67211A | 0314 031406 53 | 1 99214 | | | | | | 79.17 | 29.86 |
| PT RESP | 29.87 | | CLAIM TOTALS | | 116.50 | 59.73 | 0.00 | 7.47 | 29.86 NET |
| NAME | | HIC 564027984A | ACNT 537311 | | 116.50 | 59.73 | 0.00 | ICN 1206163232590 ASG Y MOA MA01 MA27 MA07 7.47 CO-172 56.77 PR-122 22.40 | 29.86 |
| WA67211A | 0412 041206 53 | 1 99214 | | | | | | 79.17 | 29.86 |
| PT RESP | 29.87 | | CLAIM TOTALS | | 116.50 | 59.73 | 0.00 | 7.47 | 29.86 NET |
| NAME | | HIC 564027984A | ACNT 537311 | | 116.50 | 59.73 | 0.00 | ICN 1206184095360 ASG Y MOA MA01 MA07 7.47 CO-172 56.77 PR-122 22.40 | 29.86 |
| WA67211A | 0524 052406 53 | 1 99214 | | | | | | 79.17 | 29.86 |
| PT RESP | 29.87 | | CLAIM TOTALS | | 116.50 | 59.73 | 0.00 | 7.47 | 29.86 NET |
| NAME | | HIC 564027984A | ACNT 537311 | | 116.50 | 59.73 | 0.00 | ICN 1206215071080 ASG Y MOA MA01 MA07 7.47 CO-172 56.77 PR-122 22.40 | 29.86 |
| WA67211A | 0627 062706 53 | 1 99214 | | | | | | 79.17 | 29.86 |
| PT RESP | 29.87 | | CLAIM TOTALS | | 116.50 | 59.73 | 0.00 | 7.47 | 29.86 NET |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | |
| NAME | | HIC 564027984A | ACNT 537311 | | 139.80 | 59.73 | 0.00 | ICN 1206277121280 ASG Y MOA MA01 MA27 MA07 7.47 CO-172 80.07 PR-122 22.40 | 29.86 |
| WA67211A | 0808 080806 53 | 1 99214 | | | | | | 102.47 | 29.86 |
| PT RESP | 29.87 | | CLAIM TOTALS | | 139.80 | 59.73 | 0.00 | 7.47 | 29.86 NET |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | |
| NAME | | HIC 564027984A | ACNT 537311 | | 116.50 | 0.00 | 0.00 | ICN 1206303119040 ASG Y MOA MA130 MA83 0.00 CO-16 116.50 | 0.00 |
| WA67211A | 0831 083106 53 | 1 99214 | | | | | | 116.50 | 0.00 |
| REM: M81 | | | | | | | | | |
| PT RESP | 0.00 | | CLAIM TOTALS | | 116.50 | 0.00 | 0.00 | 0.00 | 0.00 NET |
| NAME | | HIC 551362508CJ | ACNT 528154 | | 186.40 | 95.71 | 0.00 | ICN 1206124122640 ASG Y MOA MA01 MA07 11.96 CO-172 90.69 PR-122 35.89 | 47.86 |
| WA67211A | 0330 033006 53 | 1 99215 | | | | | | 126.58 | 47.86 |
| PT RESP | 47.85 | | CLAIM TOTALS | | 186.40 | 95.71 | 0.00 | 11.96 | 47.86 NET |
| NAME | | HIC 551362508CJ | ACNT 528154 | | 116.50 | 0.00 | 0.00 | ICN 1206277121270 ASG Y MOA MA130 MA83 0.00 CO-16 116.50 | 0.00 |
| WA67211A | 0820 082006 53 | 1 99214 | | | | | | 116.50 | 0.00 |
| REM: M81 | | | | | | | | | |
| PT RESP | 0.00 | | CLAIM TOTALS | | 116.50 | 0.00 | 0.00 | 0.00 | 0.00 NET |
| NAME | | HIC 001620571A | ACNT 542722 | | 163.10 | 59.73 | 37.33 | ICN 1206163232730 ASG Y MOA MA01 MA07 0.00 CO-172 103.37 PR-122 22.40 | 0.00 |
| N20A73D2A | 0412 041206 53 | 1 99214 | | | | | | 125.77 | 0.00 |
| PT RESP | 59.73 | | CLAIM TOTALS | | 163.10 | 59.73 | 37.33 | 0.00 | 0.00 NET |



NMIC. CORP.
PO BOX 272857
CHICO CA 95927-2857
800-502-9054

147437136 C00003658

MEDICARE
REMITTANCE
NOTICE

SAN LUIS OBISPO GNRL HOSP
2178 JOHNSON AVE
SN LUIS OBISPO, CA  93401-4533

PROVIDER #:    W4103
PAGE #:        1 OF 10
DATE:          11/15/06
CHECK/EFT #:   147437136



NOV 2 7 2006

Countdown has begun: do you have your NPI? Don't risk disruption to your cash
flow - Get your NPI now! National Provider Identifiers (NPIs) will be required
on claims sent on or after May 23, 2007. Every healthcare provider needs to get
an NPI! Learn more about NPI and how to apply by visiting
www.cms.hhs.gov/NationalProvidentStand/ on the CMS website.

If you have your NPI you may start billing it on your electronic claims. Please
continue to use both the NPI and legacy number until May 22, 2007.

| PERF PROV | SERV DATE | POS NOS | PROC | MODS | BILLED | ALLOWED | DEDUCT | COINS | GRP/RC-AMT | PROV PD |
|---|---|---|---|---|---|---|---|---|---|---|
| NAME | | | HIC 566435671A | ACNT 543501 | | | | ICN 1206251011970 | ASG Y  MOA MA01  MA07 | |
| W20A7302A | 0707 070706 53 | 1 99214 | | | 116.50 | 59.73 | 0.00 | 7.47 | CO-172  58.77 | 29.86 |
| | | | | | | | | | PR-122  22.40 | |
| PT RESP | 29.87 | | CLAIM TOTALS | | 116.50 | 59.73 | 0.00 | 7.47 | 79.17 | 29.86 |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | | 29.86 NET |
| NAME | | | HIC 566435671A | ACNT 543501 | | | | ICN 1205276DX3400 | ASG Y  MOA MA01  MA07 | |
| W20A7302A | 0817 081706 53 | 1 99214 | | | 139.80 | 59.73 | 0.00 | 7.47 | CO-172  80.07 | 29.86 |
| | | | | | | | | | PR-122  22.40 | |
| PT RESP | 29.87 | | CLAIM TOTALS | | 139.80 | 59.73 | 0.00 | 7.47 | 102.47 | 29.86 |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | | 29.86 NET |
| NAME | | | HIC 546474733A | ACNT 538708 | | | | ICN 1206277121230 | ASG Y  MOA MA01  MA07 | |
| WA672I1A | 0806 080806 53 | 1 99214 | | | 130.48 | 59.73 | 0.00 | 7.47 | CO-172  70.75 | 29.86 |
| | | | | | | | | | PR-122  22.40 | |
| PT RESP | 29.87 | | CLAIM TOTALS | | 130.48 | 59.73 | 0.00 | 7.47 | 93.15 | 29.86 |
| CLAIM INFORMATION FORWARDED TO: CALIFORNIA-MEDICAID | | | | | | | | | | 29.86 NET |

MEDICARE PAYMENT                    147559403

CMS                    NHIC

147437136

FEDERAL HEALTH INSURANCE BENEFITS ACCOUNT
ADD61    00003658
SAN LUIS OBISPO GNRL HOSP
2178 JOHNSON AVE
SN LUIS OBISP, CA  93401-4535

11-15-06                $3,530.92

VOID 1 YEAR AFTER ISSUE DATE
THIS IS YOUR CHECK, PLEASE CASH PROMPTLY

****3,530DOLLARS AND 92CENTS

Ronald P. Varga
AUTHORIZED SIGNATURE

⑆147559403⑆ ⑈024309379⑈60183930l⑈

11/19/2007 MON 14:54  [TX/RX NO 8937]  Ⓩ006

NOV-09-2007 15:49 From: SLO PH LAB        8057811023        To:8057811273        P.2/2

RUN DATE: JUN 30,2007 3:56 PM SAN LUIS OBISPO COUNTY PUBLIC HEALTH LABORATORYPAGE: 18

PRACTICE ANALYSIS REPORT
YTD Summary for: PARTY BILLED BY SITE
PARTY BILLED BY SITE = SAN LUIS OBISPO PHL - MEDICARE

| CODE | DESCRIPTION | STD FEE | JUN/2007 MONTH-TO-DATE NUMBER | AMOUNT | YEAR-TO-DATE NUMBER | AMOUNT |
|------|-------------|---------|--------|--------|--------|--------|
| CHARGES | | | | | | |
| | BACTERIOLOGY: ENTERIC CULTURES | | 0 | 0.00 | 2 | 36.00 |
| | BACTERIOLOGY: GONORRHEA | | 1 | 48.00 | 26 | 1105.00 |
| | BACTERIOLOGY: MISCELLANEOUS | | 3 | 150.00 | 61 | 3233.00 |
| | MYCOBACTERIOLOGY | | 16 | 568.00 | 113 | 3821.00 |
| | PARASITOLOGY | | 4 | 98.00 | 55 | 1520.00 |
| | IMMUNOLOGY: SYPHILIS SEROLOGY | | 0 | 0.00 | 0 | 0.00 |
| | MYCOLOGY | | 7 | 214.00 | 47 | 1622.00 |
| | SEROLOGY | | 1 | 15.00 | 10 | 154.00 |
| | VIROLOGY: ISOLATION AND IDENT. | | 1 | 48.00 | 24 | 1123.00 |
| | URINALYSIS | | 2 | 28.00 | 19 | 266.00 |
| | SERVICE | | 8 | 120.00 | 43 | 675.00 |
| | TOTAL CHARGES | | 43 | 1298.00 | 452 | 15851.00 |
| DEBIT ADJUSTMENTS | | | | | | |
| | TOTAL DEBIT ADJUSTMENTS | | 0 | 0.00 | 2 | 94.00 |
| CREDIT ADJUSTMENTS | | | | | | |
| | TOTAL CREDIT ADJUSTMENTS | | 22 | 789.08 | 196 | 7421.33 |
| PAYMENTS | | | | | | |
| | TOTAL PAYMENTS | | 25 | 860.52 | 190 | 5197.87 |
| TRANSFERS | | | | | | |
| | TOTAL TRANSFERS | | 0 | 0.00 | 26 | 1538.03 |

MEDICARE PROVIDER # X558286

Exhibit A, Page 4 of 4

# EXHIBIT 5



601 New Jersey Avenue, N.W. • Suite 9000
Washington, DC 20001
202-220-3700 • Fax: 202-220-3759
www.medpac.gov

Glenn M. Hackbarth, J.D., Chairman
Robert D. Reischauer, Ph.D., Vice Chairman
Mark E. Miller, Ph.D., Executive Director

August 30, 2007

Herb B. Kuhn, Acting Deputy Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–1385–P
Box 8018
Baltimore, Maryland 21244-8018

**RE:  File code CMS-1385-P**

Dear Mr. Kuhn:

The Medicare Payment Advisory Commission (MedPAC) is pleased to submit these comments on CMS's proposed rule entitled: *Medicare program; Revisions to payment policies under the physician fee schedule, and other Part B payment policies for CY 2008* [CMS-1385-P] Federal Register, July 12, 2007. We appreciate your staff's ongoing efforts to administer and improve payment systems for physician and other services, particularly considering the agency's competing demands.

***Resource-based PE RVUs***

In estimating the per service price of medical equipment, CMS assumes that all equipment is operated 50 percent of the time that practices are open for business and that practices pay an interest rate of 11 percent when borrowing money to buy equipment. If these assumptions are inaccurate, then the RVUs of services that use costly equipment will also be inaccurate. In this proposed rule, CMS acknowledges that the 50 percent use rate applied to all equipment does not reflect the actual usage of all equipment, but states that there is not sufficient evidence to justify an alternative assumption. We believe there are two options for changing this assumption:

- collect data on equipment use through a survey of providers, or
- set a standard based on how frequently efficient providers are expected to use expensive equipment.

The American Medical Association's (AMA's) Physician Practice Information Survey, which is currently in the field, is collecting information on how many hours per week certain high-cost equipment, such as magnetic resonance imaging (MRI) and computed tomography (CT) machines, are used. This survey may produce estimates that CMS could use to update its assumption of how frequently expensive equipment is operated.

Herb B. Kuhn, Acting Deputy Administrator
Page 2

If there are not enough valid responses to the AMA's questions on equipment use, however, CMS could choose to field its own targeted survey to collect this information. In 2006, MedPAC conducted a survey of a representative sample of imaging providers in six markets that demonstrated that a short, targeted questionnaire can be used to collect information on how often providers use medical equipment and achieve a high response rate. Our survey results indicate that providers in those markets use MRI machines more than 90 percent of the time and CT machines more than 70 percent of the time (MedPAC, *Report to the Congress: Increasing the Value of Medicare*, 2006). This survey, which had a 72 percent response rate, raised questions about whether CMS underestimates how frequently providers use MRI and CT equipment. CMS could design and field a similar survey based on a nationally-representative sample of providers who use MRI machines, CT machines, and other expensive equipment. (Inexpensive equipment is a lower priority because it represents a small fraction of a service's practice expense.)

An alternative option is for CMS to base the assumption for expensive equipment on an expectation of how frequently efficient providers operate such equipment. CMS could retain the 50 percent assumption for less costly equipment. If providers buy expensive equipment and use it only half the time or less, this inflates the per service price of the equipment, which means that Medicare pays more for services performed with the equipment. Medicare should set its rates at a level that encourages providers to be efficient. For example, one could argue that a provider that purchases a $1 million machine should be expected to use it during all the hours it is open for business, with some allowance for down time due to maintenance and patient cancellations. Indeed, the MedPAC survey found that several MRI providers operate their machines more than 90 percent of the time. Because changes to practice expense RVUs are budget neutral, any savings from adopting a higher equipment use assumption would be redistributed to other physician services.

CMS's current assumption that providers pay an interest rate of 11 percent when purchasing equipment is based on 1997 data from the Small Business Administration (SBA) on prevailing loan rates for small businesses for equipment that costs over $25,000 with a useful life of over 7 years. Based on 2007 data from the SBA, CMS reports in the proposed rule that the interest rate for equipment at the same price and useful life ranges from 10.1 to 13 percent. CMS proposes to retain the current 11 percent interest rate.

The Commission appreciates that CMS has reviewed more current data on interest rates from the SBA. We encourage CMS to provide more information about the data. How were the SBA data collected (e.g., are they from a survey)? What methods did CMS use to analyze the data (e.g., how did CMS identify that the loans were used to purchase equipment)? Further, we encourage the agency to consider using an average of rates from multiple years. Using an average rate from multiple years would reflect the range of rates paid by providers who bought their equipment at different times. The number of years used to calculate the average rate could be based on the estimated useful life of equipment, such as five years for MRI and CT machines. Although changing the interest rate would have a very minimal effect on PE RVUs for services that use low-cost equipment, it would have a larger impact on services that use expensive equipment.

Herb B. Kuhn, Acting Deputy Administrator
Page 3

The Commission also suggests that CMS establish a reasonable time frame to periodically review and update the wage rates for clinical staff and the purchase prices of supplies and equipment, which are used in setting PE RVUs. CMS last updated nonphysician clinical staff wages for the 2002 fee schedule and has not indicated when wages will be reviewed again. CMS repriced supplies and equipment in the last few years but has not indicated when it will next perform a comprehensive review. Moreover, the prices of new, high-cost supplies and equipment should be reviewed more frequently than other items to ensure that price changes are reflected in the relative values. Prices for new items are likely to drop over time as they diffuse into the market and as other companies begin to produce them.

### Geographic practice cost indices (GPCIs): GPCI update

CMS has reviewed the geographic practice cost indices (GPCIs) and proposes new GPCIs for 2008. As you know, three separate GPCIs correspond to each of the three components of physician payment: physician work, PE, and professional liability insurance. The current PE GPCI does not recognize that individual services have different shares of inputs for which prices vary geographically (e.g., nonphysician staff and office space) and for which prices are uniform because they are purchased in national markets (e.g., equipment and supplies). Thus, for services with below average shares of equipment and supplies, the index does not adjust a large enough portion of the PE RVU; for services with above average shares of equipment and supplies, it adjusts too large a portion of the RVU. This distorts prices, which may alter the mix of services provided within a high- or low-cost area. We developed an alternative GPCI which better recognizes that services have different shares of inputs for which prices vary geographically (MedPAC, *Report to the Congress: Promoting Greater Efficiency in Medicare*, June 2007). This alternative—which excludes equipment and supplies—would be applied to the portion of the PE RVU related to indirect costs and nonphysician clinical labor but not to the portion related to equipment and supplies. It would produce more accurate prices for specific services among different markets, thus reducing financial incentives to provide one service over another. We encourage CMS to examine this alternative GPCI for its next proposed rule. We can offer technical assistance to CMS in considering this GPCI. We believe that the agency could implement this alternative within its current statutory authority.

Our alternative GPCI excludes equipment and supplies. Because staff wages and office rent vary geographically, the alternative is composed of nonphysician staff wages (50 percent of the index), office rent (33 percent), and other expenses (17 percent). The weights for each component are based on the relative size of each component in the MEI.
Although localities under the alternative GPCI have a wider range of values, this is balanced by not applying the alternative to the entire PE RVU. We apply the alternative GPCI to the portion of the RVU related to indirect costs and nonphysician clinical labor but not to the portion related to equipment and supplies. The reason is because the alternative GPCI includes inputs related to indirect costs and nonphysician clinical labor but not equipment and supplies. To determine the full PE RVU, the portion of the RVU adjusted by the GPCI is added to the unadjusted portion (representing equipment and supplies).

Herb B. Kuhn, Acting Deputy Administrator
Page 4

Our alternative GPCI would reduce PE payments for services with below-average shares of equipment and supplies (e.g., office/outpatient visit) in areas where input costs are low and increase them in areas where input costs are high. For example, the PE payment for office/outpatient visit (code 99213) would decline by 3.4 percent in the lowest-GPCI area (Puerto Rico) and increase by 3.0 percent in the highest-GPCI area (San Francisco). The total payment for this service would fall by 1.3 percent in Puerto Rico and increase by 1.6 percent in San Francisco.  The alternative GPCI would have the reverse effect on services with above-average shares of equipment and supplies (e.g., MRI of the brain). For example, the PE payment for the technical component of MRI of the brain, with and without contrast (code 70553), would increase by 22.4 percent in Puerto Rico and decline by 18.8 percent in San Francisco. The total payment for this service would rise by 18.6 percent in Puerto Rico and fall by 16.7 percent in San Francisco.

***Geographic practice cost indices: Reconfiguring payment localities***

CMS has divided the country into 89 localities for applying geographic adjusters to physicians' payments. As described in the previous section, each locality has a set of three geographic practice cost indices that Medicare uses to adjust payment rates.

Some organizations that represent physicians have raised an issue that the structure of the payment localities often causes payments under the PFS to inaccurately reflect the local costs of providing care. This can cause physicians in some areas to be systematically underpaid while others are overpaid, creating payment equity issues. The underlying factor for the payment inaccuracies is that many localities encompass geographic areas with very different costs of providing care. This appears to occur for two reasons: many localities are too large to accurately track geographic differences in costs of care and many are based on geographic entities established in 1966 and have not been adjusted to reflect changes in economic and demographic conditions.

In this proposed rule, CMS expressed concern over variation in costs within existing payment localities. In response, CMS is soliciting comments on three possible locality reconfigurations:

- *Option 1:* Within each of the current localities, identify the counties where a measure of cost—the geographic adjustment factor (GAF)—is at least 5 percent higher than the GAF of the entire locality. Each of these high-cost counties would become a new payment locality.
- *Option 2:* The same as Option 1, except within each existing locality, combine the counties within the same state that are identified as high cost into a single new locality.
- *Option 3:* Within each state, order counties by GAF from highest to lowest. Combine into a new locality the county with the highest GAF and the other counties that have a GAF within 5 percent of the highest cost county. Then, find the highest cost county that remains. Combine that county and all the counties that have a GAF within 5 percent of the new highest-cost county. Continue this method until all counties are in a locality.

Herb B. Kuhn, Acting Deputy Administrator
Page 5

All three reconfigurations have the goal of revising payment localities so that payments more accurately reflect local costs of care. MedPAC agrees with this goal, and we have examined other methods of reconfiguration. Key results from our analysis include:

- Under existing localities, some areas have payments that differ substantially from local costs, creating some large payment inaccuracies.
- Large payment inaccuracies are not widespread. Most areas have fairly small differences between payments and local costs.
- Because most areas face small payment inaccuracies, improving payment accuracy requires calibrating payment changes so that they are small in most places.

Using the county as the definition of local markets for physician services, we started our analysis by investigating the extent of payment inaccuracies at the county level. We recognize that counties are largely an administrative geographic unit and do not perfectly represent local markets. However, counties are the smallest geographic unit for which data on physician costs are collected.

Our analysis of the data indicates that some large payment inaccuracies exist at the local level, with the largest differences between physician payments and local costs being close to 15 percent. However, large inaccuracies are relatively infrequent. Less than 1 percent of counties have payment rates that differ from local costs by more than 10 percent, and only 10 percent have differences of at least 5 percent (Figure 1).

As CMS considers alternatives to the existing payment localities, it should try to meet two goals: pay accurately for local input costs and avoid large differences in payments between adjacent counties. However, these two goals are typically in conflict with each other and a good definition of payment localities should balance them. On the one hand, relatively small localities typically promote more accurate payments because smaller localities tend to have less variation in costs of care than larger localities. Therefore, striving for accurate payments usually leads to many localities. For example, making all 3,200 counties individual payment localities would result in more accurate payments than using states. However, this could be cumbersome and GAFs could be unstable over time in areas with little data. On the other hand, large payment localities typically have smaller differences among adjacent counties within a state. An extreme example is using the nation as a payment locality, which would result in no differences in payments between adjacent counties.

Herb B. Kuhn, Acting Deputy Administrator
Page 6



**Figure 1. Difference between locality GAF and county GAF**

Note: GAF (geographic adjustment factor); RVU (relative value unit).
Source: MedPAC analysis of data on geographic adjustment factors from CMS.

Because the organizations that advocate a reconfiguration of the payment localities are arguing for more accurate payments at the local level, we investigated two methods that would improve payment accuracy. Improving payment accuracy at the local level requires smaller payment localities, which leads us in the direction of more localities than currently exist.

One of these methods uses the existing localities as the starting point, and we refer to it as the "locality" option. This method goes through an iterative process for each locality. In the first iteration, we compare the GAF for the highest-cost county in a locality to the average GAF among the lower-cost counties in the locality. If the GAF of the highest-cost county exceeds the average of the other counties by more than a pre-set threshold (5 percent), the highest-cost county becomes a separate locality. In the next iteration, we compare the GAF of the second-highest county to the average GAF of the remaining lower-cost counties. If the GAF of the second-highest county exceeds the average of the lower-cost counties by the pre-set threshold, it becomes a separate locality. The process stops when the GAF of the highest-cost remaining county does not exceed the average of the lower-cost counties by the pre-set threshold, and the remaining counties form a single locality.

Our locality option is similar to CMS's Option 1 discussed above, with one key difference: Our method is iterative, but CMS's is not. CMS compares the GAF of each county in a locality to the average GAF for all counties in the locality. We start by comparing the GAF of the highest-cost county in a locality to the average GAF for all lower-cost counties. Then we go through

Herb B. Kuhn, Acting Deputy Administrator
Page 7

iterations, comparing the GAF of the highest-cost remaining county to the average GAF of the remaining lower-cost counties.

The difference in practice between these two methods is that iterative methods tend to result in more payment localities. We prefer the iterative method over a method that compares the GAF of the highest-cost entity to the overall average GAF because the most costly entities are often very large and have a strong influence on the overall average GAF. In cases where the difference in GAFs is large between the highest-cost entity and all other entities, using the overall average reduces the likelihood that the highest-cost entity would become a separate locality.

The other method we developed, which we refer to as the metropolitan statistical area (MSA) option, starts at the state level. We collect the urban counties in each state into MSAs and the nonurban counties into a nonurban area. An iterative process follows. In the first iteration, we compare the GAF of the highest-cost MSA in a state to the average GAF of the other areas in the state. If the GAF of the highest-cost MSA exceeds the average of the lower-cost areas by a pre-set threshold (5 percent) the highest-cost MSA becomes a separate locality. In the next iteration, we compare the MSA with the second-highest GAF to the average GAF of the remaining lower-cost areas. If the second-highest GAF exceeds the average of the lower-cost areas by more than the pre-set threshold, the second-highest MSA becomes a separate locality. The process stops when the GAF of the highest-cost remaining MSA does not exceed the average of the lower-cost areas by the pre-set threshold, and the remaining areas form a single locality.

Both the locality and MSA options would shift spending within a state. However, neither would affect aggregate spending within a state, and, therefore, neither would affect national aggregate spending. In other words, both options are budget neutral.

We evaluated both the locality and MSA options using a 5 percent threshold for identifying new payment localities. We found that both options would increase the number of localities from the current number of 89 (Table 1). Because both options increase the number of localities, the size of localities is smaller relative to existing localities. The result is more accurate payments. The average difference between county and locality GAFs is 2.2 percent under current localities. That would decrease to 1.5 percent under the locality option and 2.0 percent under the MSA option (Table 1). However, the average difference in GAFs among adjacent counties would be higher under the locality option (2.0 percent) than under the current localities (1.8 percent) because the locality option breaks down existing localities into smaller units. In contrast, the average difference among adjacent counties would decline under the MSA option (to 1.4 percent) because more counties under the MSA option would have no difference between its GAF and the GAF of its adjacent counties.

Herb B. Kuhn, Acting Deputy Administrator
Page 8

**Table 1.  Locality and MSA options have similar effect on geographic adjustment factors**

| Locality definition method | Number of localities | Avg diff betwen county and locality GAFs | Avg difference in GAFs among adjacent counties | Avg change in GAFs from current levels |
|---|---|---|---|---|
| Locality option | 186 | 1.5% | 2.0% | 1.0% |
| MSA option | 119 | 2.0 | 1.4 | 1.6 |
| Current method | 89 | 2.2 | 1.8 | NA |

Note:      MSA (metropolitan statistical area), GAF (geographic adjustment factor). All averages are means among counties, weighted by number of relative value units. The average changes in GAFs in the final column are averages of absolute value changes. The average of the actual change in GAFs is zero under both the locality and MSA options because both options are budget neutral to the existing localities.

Source:      MedPAC analysis of data on geographic practice cost indexes from CMS.

Although both options would increase payment accuracy and would affect differences in payments between existing localities, these two options would have small effects on both measures (Table 1). For example, a move from current localities to the locality option would change payments by less than 2 percent in 82 percent of all counties; a move to the MSA option would change payments by less than 2 percent in 67 percent of all counties (Figure 2).

Finally, under the current localities, thirty-four states are statewide localities, meaning there is a single payment rate for all physicians in those states. Six of those states—Minnesota, Nebraska, Oklahoma, North Carolina, Ohio, and Iowa—opted for statewide configuration because of widespread agreement among physicians in those states. It is plausible that widespread preferences for statewide localities are still present in these six states and may be present in other statewide localities. Therefore, if CMS reconfigures the payment localities, it may be prudent to determine which statewide localities would like to maintain that status and exclude them from reconfiguration.

Herb B. Kuhn, Acting Deputy Administrator
Page 9

**Figure 2. Change in GAFs from current level under locality and MSA options**



Note: GAF (geographic adjustment facor), RVU (relative value unit), MSA (metropolitan statistical area).
Source: MedPAC analysis of geographic practice cost indexes from CMS.

### *Coding—additional codes from 5-year review*

In addition to proposals on practice expense RVUs, the proposed rule addresses the fee schedule's RVUs for physician work. During the most recent 5-year review of work RVUs, CMS deferred action on 58 codes because either the agency had not received a recommendation from the American Medical Association/Specialty Society Relative Value Scale Update Committee (RUC) or because CMS had asked the RUC to reevaluate its original recommendation. Now that the RUC has completed its work, CMS is proposing to accept all but one of the RUC recommendations and complete the 5-year review.

As we have seen with previous work on the 5-year review for 2007 and indeed with work on both of the earlier reviews—for 1997 and 2002, the proposed action on the additional 58 codes is tipped in favor of higher RVUs: RVUs would go up for 33 codes, down for 10 codes, and not change for 15 codes. In addition, CMS is proposing to adopt a RUC recommendation that would increase the valuation of physician work for anesthesia services by 32 percent. To maintain the required budget neutrality of these changes, the proposal is to increase the budget neutrality adjustment that applies to the fee schedule's work RVUs. The adjustment would increase from the current 10.1 percent to 11.8 percent.

The Commission remains concerned about what appears to be a bias in the 5-year review in favor of undervalued codes as compared to overvalued codes. Services that are overvalued may

Herb B. Kuhn, Acting Deputy Administrator
Page 10

be overprovided because they are more profitable than other services. In addition, because so many more codes would have their values increased than decreased, CMS would passively devalue all work RVUs with a budget neutrality adjustment of almost 12 percent.

In our March 2006 Report to the Congress, MedPAC evaluated the five-year-review process and concluded that CMS itself must take a more central role in identifying potentially misvalued services, especially overvalued ones. We recommended that CMS reduce its reliance on physician specialty societies by establishing a standing panel that would provide expertise in addition to that provided by the RUC. This new panel would help CMS identify misvalued services and collect data to establish supporting evidence for the RUC to consider. The panel would also be useful in evaluating codes when no specialties express an interest in collecting the necessary data, as happened with the case of one code.

The Commission has also identified ways to identify services in need of review. First, the Secretary could implement reviews of services based on analyses of Medicare data. For example, high volume growth may be an indicator that the price of a service is set too high. Second, the Commission suggested instituting automatic reviews of work RVUs for selected recently introduced services. The time and intensity may decline as they are disseminated, and there is evidence that the current review process is not timely enough to detect such changes. Third, the Secretary should establish a process by which all services are reviewed periodically.

We recognized that the recommendations would increase demands on CMS and—since the goal was to improve the accuracy of Medicare's payments and achieve better value for Medicare spending—encouraged the Congress to provide the agency with the financial resources and administrative flexibility to undertake them. Our recommendations were not intended to supplant the RUC but rather to augment it. The RUC and the specialty societies play an important role, which should continue.

To date, CMS has not implemented the Commission's recommendations. Last year, in the final rule for 2007, the agency acknowledged the recommendations and stated that it is continuing to examine how best to identify misvalued services. There was also a reference to a new RUC subcommittee that will suggest approaches to identifying overvalued services. While the Commission is hopeful that this subcommittee will have some success, the history of a review process dominated by specialty societies suggests that more effort is necessary. We encourage you to revisit our recommendations.

### *ASP Issues*

The ASP payment method ties Medicare payment rates for Part B drugs to average transaction prices. It has resulted in substantial savings for the Medicare program and its beneficiaries. Sometimes manufacturers offer provider discounts for one of their products contingent on purchases of one or more other products. We have recommended that CMS clarify how these bundled discounts should be allocated when manufacturers calculate ASP. In the proposed rule, CMS requires that manufacturers allocate the total value of all price concession proportionately according to the dollar value of the units of each drug sold under a bundled arrangement.  This

Herb B. Kuhn, Acting Deputy Administrator
Page 11

method is similar to the method proposed for allocating bundled discounts under Medicaid. We are generally supportive of this methodology and believe it would result in more accurate ASPs in most cases.

We congratulate CMS for tackling this difficult issue and providing guidance to manufacturers. Bundled discounts can take many forms. For example, some bundling arrangements may include only Part B drugs while others may include both Part B drugs and other products. Similarly, price concessions may be structured in different ways. We have found that the way manufacturers allocate the bundled discount can affect the accuracy of reported ASPs. In our 2007 report to the Congress on the impact of changes in Medicare payments for Part B drugs, we suggested a number of different ways in which bundled discounts might be allocated to preserve the integrity of the payment system.

Although we believe the method proposed by the agency will increase the accuracy of the payment system, we do not believe that the method is sufficient to cover all cases where bundled price concessions result in inaccurate ASPs. Contract terms between manufacturers and the providers who purchase their products change frequently. These terms may still create contingencies that distort the accuracy of payment rates. If the Medicare payment rate does not reflect the average purchase price, physicians may find that financial rather than clinical factors drive their choice of products. The Commission believes that the link between ASP and transaction prices must be maintained.

One commenter has suggested that CMS establish an exceptions process. Under this proposal, providers could supply evidence of contractual arrangements that included bundled price concession with drugs for which there are no clinical alternatives. The provider would have to show how the contract affected the accuracy of the payment rate and limited its ability to purchase needed products at the Medicare rate. CMS would evaluate the evidence and allow for a suitable comment period. If the agency determined that allocation of discounts in the bundled arrangement resulted in the distortion of ASP, it could require the manufacturer to reallocate bundled discounts according to the contingencies in the contract terms. We believe this proposal is worth considering in terms of feasibility, including determining which products would fall into the exceptions process.

### *ESRD provisions*

Using the method the agency developed last year, CMS proposes to update the add-on payment to the composite rate (as mandated by the MMA) by 0.5 percent, thus increasing the total add-on payment from 14.9 percent in 2007 to 15.5 percent in 2008. This update would result in increasing the add-on payment from $19.64 to $20.36 per session, or an increase in total add-on payments of about $22.6 million in 2008.

In our June 2005 report, the Commission recommended to the Congress that these two payments should be combined. The add-on payment is complex and administratively burdensome for the agency to maintain. In addition, an increase in the add-on payment for dialysis drugs risks

Herb B. Kuhn, Acting Deputy Administrator
Page 12

overpayment for use of the drugs. For these reasons, the Secretary should seek Congressional authority to combine the composite rate and the add-on payment.

### IDTF issues

We support CMS's proposal to prohibit fixed-site independent diagnostic testing facilities (IDTFs) from sharing their space, equipment, or staff, or subleasing their operations, to another individual or organization. CMS says that this change would make it easier to ensure that each IDTF establishes Medicare billing privileges and meets Medicare's performance standards. CMS also claims that this policy would prevent subleasing agreements that could violate physician self-referral and anti-kickback prohibitions.

We are concerned about the emergence of arrangements in which a physician practice leases a block of time from an imaging provider (such as an IDTF) or agrees to pay the provider a per service fee to use its facility. The group practice then refers its patients to the imaging provider for imaging tests and bills the insurer for the services, usually profiting from the difference between the insurer's payment rates and the fees the practice pays to the imaging provider. A recent study found that these types of arrangements are common among physicians who billed a large California plan for advanced imaging studies.[a] The Department of Justice is investigating whether a chain of imaging centers in Florida violated the federal anti-kickback statute by offering leasing deals to physicians that allowed the physicians to profit from referring patients for MRI and CT studies.[b] These arrangements create financial incentives that may influence physicians' clinical judgment and may lead to unnecessary services. Several studies have found that physicians who benefit financially from diagnostic imaging refer their patients more frequently for imaging studies than those who don't.[c] CMS's proposed change to the IDTF rules would prevent at least some of these leasing arrangements by prohibiting IDTFs from leasing their space, equipment, or staff to physicians who are able to refer patients to the facility and bill Medicare for the services.

### Physician self-referral provisions

*Changes to reassignment and physician self-referrals rules relating to diagnostic tests (anti-markup provision)*

CMS proposes to prohibit physicians from marking up the technical or professional component of a diagnostic test when billing Medicare for a test that is performed by another provider. In other words, the billing physician could not charge Medicare more than the amount he or she paid to the provider that actually performed the test. This rule would apply when the billing physician purchased the test from the provider who performed it, and when the provider that

---

[a] Mitchell, JM. 2007. "The prevalence of physician self-referral arrangements after Stark II: Evidence from advanced diagnostic imaging." *Health Affairs* web exclusive, p. w415-w424. April 17.

[b] Armstrong, D. 2005. "Prosecutors investigate medical scan deals at Florida center." *Wall Street Journal.* July 28.

[c] Government Accountability Office. 1994. *Medicare: Referrals to physician-owned imaging facilities warrant HCFA's scrutiny*, no. GAO/HES-95-2. Washington, DC: GAO. October.

Herb B. Kuhn, Acting Deputy Administrator
Page 13

performed the test reassigned their right to bill to the billing physician. The Commission agrees
with CMS that allowing physicians to purchase or contract for the provision of diagnostic tests
and to realize a profit when billing Medicare could lead to overuse of services and higher
program costs. Therefore, we support this proposed change.

*In-office ancillary services exception*

CMS seeks comments on which in-office ancillary services should continue to be considered
designated health services and excluded from self-referral rules, specifically mentioning therapy
services that are not furnished as incident to a physician service, pathology services, and
expensive imaging services. At this point in time, MedPAC is not ready to identify which
services should continue to be excluded from the self-referral rules but we plan to examine this
issue this year. For example, we will consider whether therapy services fit the logic and original
intent of the exceptions given the amount of physician involvement in some therapy services
furnished as part of physician practices.

*Unit-of-service (per click) payments in space and equipment leases*

In the phase I final rule to the Stark self-referral law, CMS permitted physicians to own entities
that provide services and equipment to providers of designated health services (DHS), such as a
hospital or imaging center, and to refer Medicare or Medicaid patients to the providers, as long
as the physicians do not own the actual entity submitting claims to Medicare or Medicaid.  For
example, physicians could lease an MRI machine to an imaging center for an amount that is fair
market value. Further, CMS allowed physicians to lease equipment or space to providers on a
per-use (or per-click) basis; the physician could receive additional payments each time he or she
referred a patient to the provider for a service that involved the use of the equipment.

The Commission believes that the financial incentives created by these arrangements could lead
to overuse of imaging services (MedPAC, *Report to the Congress: Medicare payment policy*,
March 2005). We recommended that the Secretary prohibit these arrangements by expanding the
definition of physician ownership to include interests in an entity that derives a substantial
proportion of its revenue from a provider of designated health services (MedPAC, March 2005).
This recommendation would prevent physicians from referring patients to a hospital, imaging
center, or other provider if they also owned equipment or space that was leased primarily to the
provider.

CMS now proposes to prohibit space and equipment leases between physicians and providers of
DHS that include per-click payments when the physician refers patients to the provider. CMS
believes that such arrangements are susceptible to abuse because the physician who owns the
space or equipment has a financial incentive to refer more patients to the provider. Under CMS's
proposal, however, physicians would still be allowed to lease equipment or space primarily to a
separate provider for a fixed amount set in advance (e.g., a fixed amount per day or per week).
Even though the physician's revenue would not increase directly through the referral of
additional patients to the provider (as it would under a per-click agreement), the physician still
has a financial incentive to refer patients to the provider in exchange for the fixed payment. For

Herb B. Kuhn, Acting Deputy Administrator
Page 14

example, a physician could agree to lease an imaging machine to a hospital for an amount at the high end of the range of fair market value, with an implicit understanding that the physician will refer patients to the hospital for services that require the machine.

The Commission's March 2005 recommendation (described above) would prohibit all types of leasing arrangements (including on a per-click and fixed amount basis) when the physician-owner refers patients to the provider *and* a substantial portion of the revenue for the equipment or space is received from the provider to which the physician refers patients. We emphasize that our concern relates to physician ownership of entities that derive most of their revenue from leasing space or equipment or furnishing other services to providers of DHS, rather than ownership of entities that primarily provide such services to non-DHS providers. Thus, the Commission urges CMS to substitute our March 2005 recommendation for its proposal in this section.

*Services furnished "under arrangements"*

CMS allows providers, such as hospitals and skilled nursing facilities, to contract with other entities to serve the provider's patients. For example, a hospital may contract with a physician practice to furnish imaging services "under arrangements" to the hospital's patients; the hospital bills Medicare and pays the practice a fee. This model was originally used by hospitals to provide certain services to their patients that were not available at the hospital because they were required infrequently.

In this proposed rule, CMS explains that "under arrangements" deals between referring physicians and hospitals have proliferated. The agency cites anecdotal reports of hospital and physician joint ventures that provide imaging services to the hospital's patients; previously, these services were provided directly by the hospital. The sole purpose of these arrangements appears to be to allow physicians to profit from referring patients to the hospital, which may lead to overuse of services. A hospital may engage in these arrangements to secure physician loyalty to the hospital.

CMS proposes to prohibit physician investment in entities (e.g., an imaging center) that provide services under arrangements with a hospital when they refer patients for the services provided by the entity. The agency would accomplish this by expanding the definition of an entity that provides designated health services to include entities that actually perform the services as well as entities that bill Medicare (currently, the definition only includes entities that bill Medicare). Thus, a physician would no longer be allowed to refer patients to a hospital for imaging services if the physician also invested in the entity that provided imaging services under arrangements to the hospital's patients.

We share CMS's concern with the growth of services provided under arrangements to hospitals by physician-owned entities, and their proposal is an effective way to address this issue. In our March 2005 Report to the Congress, the Commission recommended an alternative path to restrict these arrangements. We recommended that the Secretary expand the definition of physician ownership to include interests in an entity that derives a substantial proportion of its revenue

Herb B. Kuhn, Acting Deputy Administrator
Page 15

from a provider of designated health services. This change would prohibit an "under arrangements" model in which the physician-owned entity received most of its revenue from the hospital or other DHS entities. For example, it would prohibit physicians from referring patients to a hospital if they also owned an entity that provided outpatient surgery, imaging, or other services primarily to the hospital's patients. In contrast to CMS's proposal, however, the Commission's recommendation would permit physician referrals to the hospital if the physician-owned entity received less than a substantial share of its revenue from the hospital.

### *TRHCA—Section 101(d): PAQI and Section 101(b): PQRI*

The Tax Relief and Health Care Act of 2006 (TRHCA) establishes the Physician Assistance and Quality Initiative Fund—totaling $1.35 billion. By statute, the Secretary may use the fund for "physician payment and quality improvement initiatives, which may include application of an adjustment to the update of the conversion factor." The statute further specifies that the fund be used for payment of physician services furnished during 2008.

In our March 2007 report to Congress, MedPAC recommended a payment rate increase for physician services in 2008. Thus, the Commission reasons that this fund should be used towards financing the 2008 physician update, which, under current law, will be substantially negative. Although TRHCA explicitly allows for the fund to be used towards the 2008 physician update, CMS notes legal and operational problems with doing so. While we are aware of CMS's concerns, MedPAC urges CMS to re-examine ways that the fund could be directed toward the 2008 update for physician services.

The Commission has recommended that the Congress begin implementing P4P programs across many provider sectors, including physician services. An essential component of P4P programs is that they include rewards and penalties that are based on the *content* of the data reported—and thus the provider's performance. Medicare should reward providers who improve care and meet or exceed specified benchmarks.

The process of selecting an appropriate set of measures is a critical element of any P4P initiative. The measure set should be vetted by a credible, independent entity. In addition to examining measures for statistical validity and reliability, this entity could also consider each measure's relative usefulness toward improving beneficiary care (i.e., the impact of potential improvement on beneficiary care, relative to other measures).  This consideration will encourage specialty societies to devote resources toward bringing the most meaningful and effective measures to the table for review.

Constructing this measure set must also balance the need for validity and accuracy with speed and comprehensiveness. In our March 2007 Report to the Congress, we stated that P4P programs might, in the short-term, prioritize some P4P measures over others.  Initial focus on high-cost, widespread, chronic conditions may be a prudent short-term goal. Although some specialties may have more P4P measures than others, a targeted approach for measure selection would maximize benefits to the Medicare program and to beneficiaries. Ultimately, as measures for less

Herb B. Kuhn, Acting Deputy Administrator
Page 16

prevalent or less costly conditions become well-established, they can be incorporated into P4P programs in the long-term.

Finally, the ideal measure set would include process measures that focus on services that are both highly-valued and under-provided. To *improve* care, the Commission does not find it a worthy effort to reward physicians for providing marginally effective care or care that is already routinely furnished. Indeed, such measures could diminish the overall effectiveness of quality initiatives, especially in their early stages.

### Therapy standards and requirements

The Commission is concerned that therapy services continue to be one of the key drivers of spending growth for part B services. We have not examined whether the current controls—the physician review requirements, the therapy caps and exceptions process, the local medical review and systems edits, and educational materials—have controlled volume. That said, this proposal would result in less review of therapy that lasts beyond 30 days, and we would generally support greater rather than less review. We believe that CMS needs effective mechanisms in place to help ensure that beneficiaries get appropriate services and the program does not pay for medically unnecessary services. We encourage CMS to develop approaches to paying for therapy services that creates financial incentives for providers to furnish medically necessary care efficiently, such as paying for bundles or episodes of services.

### Conclusion

MedPAC appreciates the opportunity to comment on the important policy proposals crafted by the Secretary and CMS. The Commission also values the ongoing cooperation and collaboration between CMS and MedPAC staff on technical policy issues. We look forward to continuing this productive relationship.

If you have any questions, or require clarification of our comments, please feel free to contact Mark Miller, MedPAC's Executive Director.

Sincerely,

Glenn M. Hackbarth, J.D.
Chairman

GMH/kh/cw

# EXHIBIT 6

# California Medical Association
## *Established 1856*

**150 years**
Physicians dedicated to the health of Californians
CMA

August 31, 2007

Leslie Norwalk, Esq.
Acting Director
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-1385-P "GEOGRAPHIC PRACTICE COST INDICES (GPCIs)
P.O. Box 8018
Baltimore, MD 21244-8018

RE:    CMS-1385-P Medicare Program;
       Proposed Revisions to Payment Policies Under the Physician Fee Schedule for
       Calendar Year 2008
       "GEOGRAPHIC PRACTICE COST INDICES (GPCIs)"

Dear Ms. Norwalk:

On behalf of the California Medical Association, I am writing to provide comment on the
proposed rules regarding the Medicare physician payment localities (72FR38122) and
Geographic Practice Cost Indices (GPCIs). We appreciate the opportunity to provide our
views on the three proposed California options.

## I.  Statement of the Problem

## A.  California
The intent of current Medicare law is to reimburse physicians according to the cost of
providing services and to make adjustments for geographic differences in those costs.
Since 1999, CMA has contended that the geographic boundaries of some Medicare
physician payment localities in California and across the nation do not accurately address
variations in the cost of operating a medical practice and therefore, Medicare is not
paying physicians accurately pursuant to federal law. Shifts in demographics and
economic conditions have created serious underpayment problems for physicians in 447
counties across the country.

In California there are several counties whose individual county geographic adjustment
factors exceed the locality factor by 5% or more and should qualify for an update.
Physicians in Santa Cruz are paid 10% less than they should be paid (according to
Medicare's own geographic cost calculations) and these physicians are paid 21% less
than physicians across the border in Santa Clara County with similar practice costs. Each
of these California counties have become more urban and costly to practice medicine  and

despite Medicare's own data that shows their geographic practice costs rising, CMS has failed to update the locality groupings to more accurately pay these physicians.

The problem continues to compound because CMS has not updated the payment localities in nearly a decade and the last revision in 1997 was based on carrier-defined localities established more than 30 years ago in 1966. Further, the revisions were not uniformly applied in 1997. High cost counties are grouped with low cost counties resulting in a serious payment inaccuracies in these localities. These payment issues are addressed in detail in the CMA Medicare Geographic Payment Locality Report, January 2006.

**B. Access To Care Problems in California's Underpaid GPCI Counties**
Many seniors in these areas of California are experiencing problems accessing physicians. While physician shortages are a chronic problem across California, the underpaid GPCI counties have experienced substantial difficulty attracting and retaining physicians. As you are aware, California has one of the highest Medicare beneficiary populations in the country so these problems affect a greater number of seniors. The Medicare underpayment problem compounds for physicians because most of the private payers in California base their rates on Medicare.

o As mentioned above, no medical groups in Santa Cruz County are accepting new Medicare patients because of the low reimbursement.

o Sonoma County is experiencing a 30% primary care physician turn-over rate. Physicians are attracted to the quality of life in Sonoma County but after two years of practice are forced to leave because the reimbursements do not cover their high practice costs. Moreover, the largest number of physician group bankruptcies per capita have occurred in Sonoma County. The number of active physicians has declined by roughly 10% - 10.2% for specialist physicians and 9.2% for primary care specialties (not adjusted for population).

o Because of the low reimbursement rates and difficult practice environment, Sacramento County has experienced a nearly 20% decline in the number of physicians. More than a third of that loss occurred in the primary care specialties.

o 30% of physicians in San Diego County reported difficulty attracting new physicians to join their physician practices and medical groups. 33% reported to CMA that they planned to move out of state, retire early or change professions.

o A "slow water torture" is how a California board-certified internist recently described the practice of medicine in California when being interviewed by U.S. News and World Reports for its article, *Doctors Vanish from View*. This article details the phenomenon of California physicians limiting or leaving their practices altogether because of administrative hassles and declining reimbursements from insurers and the corresponding inability to devote themselves to the provision of continuous, quality patient care.

o The University of California Office of Health Affairs commissioned a report on California's physician workforce conducted by the University of Albany's Center for Health Workforce Studies. The report concludes that "growth in physician demand is likely to outpace growth in _(California)_ physician supply by between 4.7% and 15.9%." The population of California is growing rapidly, which will place great strains on the health-care delivery system and the physician workforce.

o More than one quarter of the state's practicing physicians were over the age of 55 in 2000.

o Without appropriate access to physicians, patients seek care in California's emergency departments. California's ERs are already operating at critical capacity, and risk jeopardizing quality of care. Unfortunately, due to financial difficulties, more than 70 emergency departments have closed in the past decade.

o In a CMA Medicare survey more than 60% of California physician respondents said they cannot sustain future Medicare payment cuts and continue to accept new Medicare patients.

## C. The Government Accountability Office (GAO) Report, June 2007

The Government Accountability Office (GAO) recently published a report entitled, "Medicare: Geographic Areas Used to Adjust Physician Payments for Variation in Practice Costs Should be Revised, June 2007" that substantiates the CMA concerns with the geographic payment problems around the country. The GAO was asked to examine how CMS has revised the localities; the extent to which they accurately reflect variations in physician's costs and alternative approaches to constructing the localities. The GAO reported the following:

> *"...more than half of the current physician payment localities had at least one county within them with a large payment difference – that is, there was a payment difference of 5% or more between physicians' cost and Medicare's geographic adjustment for an area."*

> *" Overall, there were 447 counties with large payment differences – representing 14% of all counties. These counties were located across the U.S., but a disproportionate number were located in five states. Specifically, 60% of counties with large payment differences were located in California, Georgia, Minnesota, Ohio and Virginia.*

> *"...although substantial population growth has occurred in certain geographic areas, potentially leading to increased costs, CMS has not revised the payment localities to reflect these changes."*

*These findings led the GAO to recommend that CMS "…(1) examine and revise the payment localities using an approach that is uniformly applied to all states and based on the most current data and (2) update the payment localities on a periodic basis…"*

CMA strongly concurs with the GAO findings that the localities need to be revised using a uniform methodology and updated on a timely basis.

## D.  Past Petitions to Update Physician Payment Localities

As you know, CMA submitted a payment locality update proposal to CMS in 2004 during the public comment period on the CY 2005 Physician Fee Schedule rule.  While the proposal was budget neutral on a statewide basis, CMS determined that it was not consistent with the law and did not adopt the plan.  At CMS' suggestion, CMA re-submitted the budget neutral proposal to be implemented as a demonstration project.  However, in 2005 CMS again responded that the approach was not feasible because it would not be subject to public comment through the normal rule-making process.

For the CY 2006 Physician Fee Schedule, CMS proposed to remove two counties, Santa Cruz and Sonoma, from the Rest of California, Locality 99.  While the proposal would have provided payment accuracy for Santa Cruz and Sonoma and significantly helped physicians in those areas, it would have imposed a payment reduction on the counties remaining in Locality 99, including counties that also qualified for an increase.  For this reason, CMA could not take a position on the proposal and provide the support that CMS required.  Moreover, the proposal appeared to be a one-time only approach for helping only two counties.  At the time, we believed there were 10 counties in California and nearly 200 across the country that qualified for an update.  CMA asked CMS to adopt a long-term plan for updating the payment localities with a defined, uniform methodology that can be applied into the future on a periodic basis.

We appreciate CMS attempting to work with CMA over the years to address this problem but it remains unresolved and the payment discrepancies are getting much worse.  It is time for CMS to act to keep payments current with geographically changing practice costs without imposing significant payment reductions on other physicians.  We believe that any notable payment reductions that would be imposed on physicians are a direct result of CMS' unwillingness to update payment localities in over 10 years.  Therefore, we believe it is paramount that CMS seek to minimize payment reductions to the fullest extent possible when considering locality revisions.

## II.  CMA Requests For GPCI Source Data Denied by CMS

CMA must express its great frustration that for the first time in eight years, CMS has refused to provide CMA the GPCI source data so that CMA could validate the CMS proposals and model alternatives to determine the impact on California physicians. This lack of data has completely crippled CMA's ability to comment appropriately on the three proposed California GPCI options in the 2008 physician payment rule.  CMA would have preferred to model alternatives to the three proposed GPCI options to present

to CMS in the spirit of finding a mutually acceptable solution.  However, without the information, CMA cannot develop alternatives and determine their true impact on California physicians.  Without knowing the impact on payments, our physicians cannot vote on a proposal.  The three proposed California options will have an enormous impact on physician payments in California.  Therefore, we urge you to make the information available and transparent.

Information is Necessary to Verify CMS Calculations
There is a high probability that calculation errors are occurring that effect payments and may effect locality revisions. Errors are expected considering the nearly 20,000 figures (three GPCIs and three corresponding RVUs for each of the greater than 3000 counties) used to determine locality payments. Those errors could be minimized if the data used for the calculations were available to interested parties. Errors in GPCIs to the third decimal point can affect payment in millions of dollars to an area. For instance, in 2004, CMA found errors in the GAF calculations for Los Angeles County.  The error would have imposed a half percent payment reduction on physicians in Los Angeles.  The underpayment amount would have exceeded $50 million between 2005-2007. CMA contacted CMS and CMS immediately corrected the error.  CMS working collaboratively with CMA, effectively and prospectively prevented that error from occurring.

Furthermore, there are many errors and typos in the current 2008 proposed options. In fact, in our efforts to replicate the methodology for Option #3, CMA discovered that CMS did not uniformly follow the methodology described in the rule.  Therefore, proposed option #3 significantly misrepresents the true impact of the methodology on California physician payments in ten counties.  Moreover, there would only be five payment localities instead of six.

Using HUD data provided to us by other entities, we believe that the proposed 9.2% reduction in payments to Santa Clara County are not the result of the most recent rent reductions but a correction of an error that CMS' contractor made in 2004.  This kind of information should also be disclosed to all parties.

Because of the impact on physician payments, it is appropriate and essential that CMS make this information as transparent as possible. We urge CMS to make all data used to develop GPCIs and GAFs available to interested parties.

Information is Necessary to Model Potential Alternative Solutions
It is also important to establish the long-standing history of collaboration between CMA and CMS to share county GPCI and RVU data.  Every year, CMS either performed the calculations or made the county GPCI, county RVU, and most recent HUD data available to CMA almost immediately upon CMA's request.

In 1999, (after the 1997 payment locality revision), CMA began contacting CMS to advocate for more appropriate payment locality groupings.  From 1999 to 2003, CMA submitted requests to CMS staff to model different CMA-proposed solutions so that

CMA could determine the impact on California physicians. At CMA's request, CMS staff routinely performed geographic adjustment factor calculations. As CMA intensified its efforts to find a solution, this process became extremely burdensome and time-consuming for CMS staff. Therefore, in 2003 CMS began sharing all of the county GPCI and county RVU data with CMA so that CMA could make the necessary calculations to develop potential solutions. Using the CMS data in 2004, CMA developed a proposal that was budget neutral on a statewide basis. Because CMA had the appropriate data, physicians in California could determine the impact upon their practice. This proposal had the support of the vast majority of physicians within the CMA. CMA used the most recent data again in 2005 and 2006 to develop a major white paper that outlined several alternatives for updating the payment localities on a national basis.

The CMA is extremely frustrated that CMS refused to share the county GPCI data and the county RVU data for the first time in nearly a decade. After multiple requests, CMA was forced to file an expedited request for this data under the Freedom of Information Act. CMS never responded to any of our repeated requests. Therefore, we cannot provide alternative approaches to CMS that may have been more acceptable to our physician members.

### III. **Errors and Discrepancies**

Before commenting on the three options, we would like to comment on discrepancies in the tables and text of Options 1-3.

In Column 3 of Table 7 Option 1 (72FR38140), the "New CY 2009 GAF, no locality change" for the Rest of California Locality and Counties is listed at 1.017. We calculate (from the 2009 GPCI's listed in Addendum E) the CY 2009 Rest of California Locality GAF is 1.012. Therefore, the "New CY 2009 GAF, with locality change" in column 4 of the same table for Rest of California is incorrectly listed as 1.012. This error is also present in Table 8, Option 2. We estimate that the correct Rest of California GAF for CY2009 with Option 1 or 2 Locality change is 1.006-1.007.

TABLE 7--OPTION 1--Apply 5 Percent Threshold To Remove Counties From Their Current Payment Localities, California Impact---(revised by CMA)

| Locality Name | County Name | New CY 2009 GAF, no locality change | New CY 2009 GAF, with locality change | Percent change, due to locality change |
|---|---|---|---|---|
| Santa Cruz | Santa Cruz | 1.012 | 1.100 | 8.70% |
| Monterey | Monterey | 1.012 | 1.080 | 6.72% |
| Sonoma | Sonoma | 1.012 | 1.076 | 6.32% |
| Marin | Marin | 1.112 | 1.173 | 5.49% |
| Napa/Solano | Solano | 1.112 | 1.066 | -4.14% |
| Napa/Solano | Napa | 1.112 | 1.066 | -4.14% |
| Rest of California | Rest of California | 1.012 | 1.006-1.007 | -0.49% |

CMA has the capability to calculate locality GAFs from GPCI data, assess the impact of locality revision, and calculate payment accuracy that is not provided in the proposal. However, without the new GPCI and RVU data for California Counties, we cannot perform the calculations necessary to accurately evaluate the impact of Option 1 and 2.

In addition, we observed that the NEW CY 2009 GAF with locality change for the single counties listed in Table 7 (column 4) and Table 8 (column 3) differ from the Current county GAF (column 3) in Table 9, Option 3 for the same counties.

County GAF differences Table 7, 8 & 9

| Locality Name | County Name | Table 7 & 8 New CY 2009 GAF, with locality change | Table 9 County 2009 GAF |
|---|---|---|---|
| Santa Cruz | Santa Cruz | 1.100 | 1.098 |
| Monterey | Monterey | 1.080 | 1.077 |
| Napa | Napa | 1.080 | 1.077 |
| Solano | Solano | 1.053 | 1.051 |
| Sonoma | Sonoma | 1.076 | 1.074 |
| Marin | Marin | 1.173 | 1.170 |

**These discrepancies lead us to question the accuracy of the impact of the three options listed in Tables 7, 8, and 9 and the accuracy of the locality configurations.**

A significant discrepancy is present in Option 3. The text describes methodology similar to the County-based GAF range option studied in the GAO report (GAO-07-466) applying a "top-down" approach. After counties are sorted by descending GAFs, all counties within a 5% range of the highest GAF County are combined in the same locality. The process is repeated with the next highest GAF County outside of the 5% range, until all counties are assigned a locality. In Table 9, Option 3 (72FR38141-2) San Mateo County (GAF 1.204) is listed as the highest GAF County. 5% of GAF 1.204 is .062. Therefore, applying the methodology according to the text, Santa Clara County (GAF 1.148 or .058 difference) should be included in Locality 1. However, the table lists Santa Clara County as the highest GAF County in Locality 2 rather than the lowest GAF County in Locality 1. The methodology used to create the new localities listed in Table 9 appears to use a 0.05 GAF difference rather than a 5% difference. The methodology described in the text is not the methodology that was applied in the calculations.

| Option 3--.05 vs 5% difference | | | |
|---|---|---|---|
| County | County 2009 GAF | .05 difference | 5% difference |
| | | CMS Published | CMS Corrected |
| San Mateo | 1.204 | | **1.1438** |
| San Francisco | 1.201 | **Locality 1** | **=5% floor** |
| Marin | 1.17 | | |
| Santa Clara | 1.148 | **error** | |
| Contra Costa | 1.134 | | **1.0773** |
| Alameda | 1.129 | | **=5% floor** |
| Orange | 1.128 | **Locality 2** | |
| Ventura | 1.121 | | |
| Los Angeles | 1.112 | | |
| Santa Cruz | 1.098 | **error** | |
| Napa | 1.077 | | **1.0232** |
| Monterey | 1.077 | | **=5% floor** |
| Sonoma | 1.074 | **Locality 3** | |
| Santa Barbara | 1.053 | | |
| San Diego | 1.053 | | |
| Solano | 1.051 | | |
| Sacramento | 1.047 | | |
| El Dorado | 1.033 | | |
| San Bernardino | 1.023 | | |
| Placer | 1.021 | | |
| Riverside | 1.017 | | |
| San Luis Obispo | 1.015 | | |
| San Joaquin | 1.006 | **error** | |
| Yolo | 0.995 | **error** | |
| Stanislaus | 0.979 | **error** | |
| Mono | 0.977 | **error** | |
| Nevada | 0.975 | | **0.9263** |
| Kern | 0.973 | | **=5% floor** |
| San Benito | 0.971 | | |
| Sierra | 0.967 | | |
| Amador | 0.967 | | |
| Fresno | 0.963 | | |
| Mendocino | 0.960 | | |
| Madera | 0.960 | **Locality 5** | |
| Tuolumne | 0.959 | | |
| Alpine | 0.957 | | |

| | | |
|---|---|---|
| Mariposa | 0.956 | |
| Tulare | 0.950 | |
| Butte | 0.950 | |
| Calaveras | 0.949 | |
| Merced | 0.949 | |
| Humboldt | 0.947 | |
| Lake | 0.947 | |
| Imperial | 0.945 | |
| Plumas | 0.945 | error |
| Lassen | 0.944 | error |
| Sutter | 0.942 | error |
| Yuba | 0.942 | error |
| Colusa | 0.940 | error |
| Del Norte | 0.940 | error |
| Modoc | 0.938 | error |
| Shasta | 0.937 | error |
| Kings | 0.935 | error |
| Inyo | 0.935 | error |
| Siskiyou | 0.934 | error |
| Trinity | 0.933 | error |
| Tehama | 0.932 | error |
| Glenn | 0.930 | error |

Santa Cruz County (GAF 1.098 in Table 9, GAF 1.100 in Table 7 & 8) appears to be within both the 5% and 0.05 thresholds of Locality 2 (Santa Clara County GAF 1.148 used for comparison), but is listed, instead, as the highest GAF County in Locality 3. Imperial and Plumas Counties have Current County GAFs listed as 0.945, yet Imperial is listed in Proposed Medicare Locality 5 and Plumas County is listed in Locality 6. We do not believe this is due to rounding effects. Including County GAFs to four digits might elucidate these apparent discrepancies.

Please also see the more detailed discussion below (V. Specific Comments on the General GPCI Update (72FR38136)) related to San Benito County. Based on the work of the GAO, we believe that CMS used the wrong MSA data for San Benito County. San Benito County is in the San Jose MSA, not the California Non Metropoitan Area. Applying the correct MSA data to San Benito County would move San Benito to Locality 2 and increase payments by 9.8% -- an appropriate classification given the dramatically rising costs in that community.

We urge CMS to correct these errors and discrepancies and reissue the proposals for public comment so that physicians may comment on the correct application of the methodologies described in Options #1-3.

**IV. Specific Comments on Options 1-3**
To assist CMS in the evaluation of Options #1-3, CMA provides the following specific comments on each option.

Option 1 & 2

CMA has extensively studied payment localities and advocated that the 5% iterative methodology be applied (as described in GAO-07-466 County-based iterative option and Option 1 5%i (61FR34618)). Unlike the GAO and HCFA application, however, we advocate the methodology be applied to existing localities. The iterative methodology compares the highest GAF County to the weighted average (GAF) of the remaining counties of the locality. The 5% (non iterative) methodology proposed in Option 1 and 2 compares the highest GAF County to its Locality GAF. The highest GAF County is, therefore, included in the calculation of the Locality GAF to which it is being compared. As described by HCFA in 1996 (61FR34618) the 5% iterative methodology is preferred because mid sized areas in large states and large areas in small states with considerably higher input prices have difficulty meeting the threshold (see description p34618 Federal Register July 2, 1996).

For example, San Diego County in Rest of California Locality has considerably higher input prices than the Rest of California (72FR38141-2). San Diego County contributes about 20% to the calculation of the Rest of California's GAF. As San Diego County's GAF increases to the threshold, the Rest of California's GAF also increases disproportionately, raising the payment error for all counties. San Diego County is not included in Option 1 or 2, we believe, because the 5% iterative methodology was not applied. If the same methodology is applied more broadly in other states, areas exist where a county is so heavily weighted in the locality average that the threshold can never be met, unless they are compared separately (refer to CMS US County GPCI data).

CMA strongly prefers the 5% iterative methodology to the non-iterative methodology applied in Option 1 and Option 2 of the CMS Locality proposal. Our comparison of the three options shows greater payment accuracy with the 5% iterative option. Administration could be simplified by consolidating single county localities with similar GAF's or Metropolitan Statistical Areas (MSA's) into Localities. Furthermore, there is greater payment accuracy than the 5% iterative county-based option reported by the GAO because the methodology is applied to existing localities rather than states. Such an application creates less disruption among existing localities with high payment accuracy.

We are also troubled that the methodology consolidating counties in Option 2 (after the threshold is applied) is not clearly stated. Combining the Counties into one locality has less payment accuracy than Option 1. The three Counties are not geographically contiguous and reside in separate MSAs. It is not clear how such a consolidation would occur on a more broad application. CMS should clearly define the methodology (threshold) used to consolidate counties with similar cost structures into one new locality. We oppose an arbitrary consolidation of counties for administrative simplification at the expense of payment accuracy.

CMA cannot support Options 1 and 2 for the reasons listed above but most notably because the iterative methodology was not employed. An iterative methodology would recognize and corrects the underpayment problems in many additional counties. Moreover, an iterative methodology in Options 1 and 2 would impose the least disruption

on counties in California that are not experiencing problems and that have high payment accuracy. However, we are also concerned with the proposed payment reductions, particularly the 4.3% payment reductions in Napa and Solano Counties. In general, we refer you to the GAO report findings on the county-based iterative approaches. Most important, CMA is seeking a long term solution to the problem. Options 1 and 2 only update three counties on a one-time basis. The non-iterative methodology is flawed and is silent on future updates. We urge CMS to adopt a methodology that can uniformly be applied and updated every three years.

Option 3
Option 3 provides the greatest payment accuracy overall. In California, it creates fewer payment areas which is less burdensome for CMS. However, it creates payment error in localities that have high payment accuracy. Six of the nine payment areas in California have 100% payment accuracy (costs, as measured by county GAF, are the same as locality payment). Option 3 creates payment errors in these six localities. Option 3 creates localities with counties that are not geographically contiguous. The locality border difference is higher in Option 3 than the 5% iterative county-based methodology as reported by GAO. However, improving payment accuracy overall could reduce problematic boundary differences.

In addition, counties of the same MSA (and similar cost indices) are assigned different localities. Methodology used to create Option 3 would be difficult to apply for future revision without potentially disrupting all payment localities. While an MSA approach is attractive because the source cost indices are similar, CMA is also compelled by the GAO findings that it creates unacceptable ranges and higher overpayments within localities in other states.

Our greatest concern with Option 3 is the negative impact to low cost rural "Rest of California" – Locality 99 counties. These counties would receive 4.9% to 7.3% payment reductions in an environment of rising costs, no payment updates for five years and a 9.9% conversion factor reduction. Moreover, these rural counties have historically suffered from physician shortages and access problems. In our opinion, such a payment reduction would unquestionably affect access to care for Medicare beneficiaries in these areas.

## V.  Specific Comments on the General GPCI Update (72FR38136)

In past years, budget neutrality adjusting factors were described in the proposed update (69FR47504). Changes observed in the physician work GPCI update for 2009 were due to minor changes in utilization and budget neutrality factors (72FR38138). However, these factors were not specified in the proposed 2008 rule. In the interest of transparency, we recommend that this adjustment factor be published. We also recommend that all data used to calculate GPCIs be available to interested parties.

San Benito County

It is reported that "the geographic adjustment factors (GAF's) for more than 90 percent of counties are developed using proxies based on larger geographic areas" (72FR38139). Using the same census data as CMS, the GAO was able to calculate individual work and practice expense GPCIs for 1091 counties that were part of a metropolitan statistical area (MSA)(GAO-07-466 p46). This represents a third of all counties. We noted a significant discrepancy in the GAF for San Benito County, California between the GAF reported by GAO and GAF published by CMS (GAO San Benito GAF-1.081 on p.54, CMS San Benito GAF-.971 p.38142) that could not be explained by differences in rent indices and Malpractice GPCIs. We believe this might be explained by an error in MSA derived census data by CMS. We believe the wrong MSA data was applied to San Benito County by CMS. San Benito County resides in the San Jose MSA not the California Non Metropolitan Area as suggested by the CMS GAF.

If the correct San Jose MSA data is applied, we believe San Benito would more appropriately be placed in Locality 2 under CMS proposed Option #3 and receive a 9.8% payment increase instead of the proposed -4.9% reduction. This MSA application is of major importance to San Benito County which is experiencing an exodus of physicians from the County. We request that this be reviewed along with the accuracy of the Census data used to develop the Work and PE GPCIs for all California Counties, like San Benito, where the County data is derived from MSA data.

Santa Clara County

We are extremely troubled by the 2009 Practice Expense (PE) GPCI for Santa Clara County. Since the PE GPCI is derived from wage census data and rent indices, and the wage census data has not changed since the last revision, the difference between the 2007 and 2009 PE GPCI can only be accounted for by changes in the rent indices. Santa Clara County had a 29% reduction in HUD FMR rent indices between 2004 and 2007 (the years used to determine 2006 and 2009 PE GPCIs). San Francisco County and San Mateo County had a 27% reduction in HUD rent indices between 2004 and 2007. Yet Santa Clara County's 2009 PE GPCI fell 16% while San Francisco and San Mateo County's 2009 PE GPCI only fell by 7%. We have been told that the Santa Clara County 2009 PE GPCI has been recalculated and is accurate (personal communication with CMS). We can only conclude, therefore, that an error was made in the calculation of the 2007 PE GPCI for Santa Clara County that has been corrected with the 2009 revision.

We urge CMS to investigate the Santa Clara calculation because Santa Clara physicians are facing a disproportionate payment reduction of 9.2% versus a 4.3% reduction for the neighboring bay area counties. Moreover, if the 2009 Santa Clara GAF represents a correction of an earlier mistake, it should be fully disclosed to the public. A 30% reduction in rent should not equate to a nearly 10% payment decrease.

CMA believes that the CMS contractor has made errors over the past several years that CMS has not been made aware. CMA suggests that CMS provide closer oversight of the contractor making the GPCI calculations. Moreover, if the contractor is making

adjustments in the 2008-2009 proposed rule to account for errors made in previous years, those errors should be disclosed to the public.

<u>San Diego County</u>
We observed that San Diego County's GAF listed in Table 9 (1.053) is .02 less than what we calculated their GAF to be from previous 2006 GPCIs (1.072). San Diego County's 2007 HUD FMR is higher than their 2004 HUD FMR (used to determine the rent indices for PE GPCI). Therefore, the 2009 PE GPCI for San Diego County should be no lower than the 2006 PE GPCI. The 2009 Work GPCI should not be significantly different than the 2006 Work GPCI. The Malpractice GPCI contributes less than 4% of the GAF calculation. The .02 drop in San Diego GAF cannot be explained by the Malpractice GPCI alone. Since the San Diego County GAF is important in determining locality configurations for all three proposed options and contributes to 20% of Rest of California GPCIs if none of the options are finalized, we request that San Diego County's cost indices be reviewed.

## VI.  **HUD Data Problems**

There is considerable volatility in the HUD FMR data (used to generate rent indices for the PE GPCI) which makes us question its validity as a proxy for office rents. We do not believe that Santa Clara physicians experienced a 29% reduction in office rent relative to the national average. The GAO recommended in its 2005 report on GPCIs that CMS "consider the feasibility of replacing the practice expense GPCIs current rent index with a commercial rent index; if using a commercial rent index is not feasible, consider a residential rent index directly based on ACS data"(GAO-05-119). If the HUD FMR data is still considered the best proxy for office rents, we recommend that it be modified to adjust for the volatility in rental units that physicians are not seeing in their practice overhead.

## VII.  **CMA Position**

The California Medical Association cannot support any of the three GPCI options as proposed by CMS at this time for the reasons stated above.  Of most concern are the significant reductions on physicians practicing in rural areas of California. Unfortunately, because CMS refused to provide the source data to CMA, we were unable to craft amendments to these three options that would have made them more consistent with our policy.

**Therefore, the CMA urges CMS to adopt a payment locality update option that is consistent with the following policy that was unanimously adopted by the CMA House of Delegates in the Fall of 2006.**

**Resolution 102-06:  MEDICARE LOCALITY REVISION**

RESOLVED:    **That CMA apply the following principles in supporting revised Medicare Geographic Payment Localities:**
**(1) methodology for revision is applied consistently;**
**(2) payment accuracy within the locality is improved;**
**(3) there is a mechanism for future revision of localities that is formula driven;**
**(4) implementation of the revision minimizes payment reduction in each payment locality; and**
**(5) evaluation of any revision is based on accurate data gathered by CMA which shows that the revision minimizes any negative effect on access to care in California.**

**We also want to emphasize that we agree with the GAO recommendations that CMS needs to adopt a methodology and update payment localities on a timely basis rather than only considering locality issues when concerns are raised by interested parties.  Medicare should pay as accurately as possible and appropriately account for geographic variation in practice costs.**

CMS also requested specific comments related to administrative burden.  We do not believe that any of the proposed options impose an undue administrative burden on CMS or physicians.  The goal of paying physicians accurately outweighs any one-time administrative cost concerns.

Finally, we would like to summarize our specific recommendations related to the discrepancies in the three California options and the General GPCI update:
1. The data used to develop the GPCIs and the GAFs should be transparent and made available to all interested parties.
2. CMS should correct the GAF errors listed in Options 1-3.
3. CMS should correct the GPCIs of San Benito, San Diego and all California Counties with indices derived from the wrong multi-county MSAs.
4. CMS should investigate the Santa Clara HUD indices discrepancies and provide an explanation for the disproportionate 9.2% payment reduction.
5. CMS should correctly apply the methodology described in Option #3.
6. CMS should consider alternative methods to develop indices for office rent.
7. CMA urges CMS to resubmit options for locality revision for public comment once the errors and discrepancies have been fixed.

The CMA appreciates the opportunity to comment.  We appreciate CMS' attempt to resolve the payment locality problem in California.  We hope CMS will continue to work to equitably improve payment accuracy in California without imposing unreasonable payment reductions on physicians practicing in California's already underserved rural areas.

Sincerely,

Anmol S. Mahal, MD
President

# EXHIBIT 7



## COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI LLP

*Attorneys at Law*

George R. Corey
Stevan N. Luzaich
Dario de Ghetaldi
Jerry E. Nastari
Amanda L. Riddle
Edward A. Daniels
Janet M. Li

700 EL CAMINO REAL, P.O. BOX 669
MILLBRAE, CALIFORNIA 94030
(650) 871-5666 • FAX (650) 871-4144
*www.coreylaw.com*

Hon. Edward W. Pliska
(1935-2006)
Xenophon Tragoutsis (Ret.)

August 29, 2007

*Via Electronic Submission*

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–1385–P
Mail Stop C4–26–05
7500 Security Boulevard
Baltimore, MD 21244–1850

Re:    Comments on CMS-1385-P
       "GEOGRAPHIC PRACTICE COST INDICES (GPCIs)"

To Whom It May Concern:

This office represents the following counties in the State of California: County of Santa Cruz, County of Sonoma, County of San Diego, County of Marin, County of Santa Barbara, and County of San Luis Obispo. Each of our clients is a "supplier" of medical services as that term is defined in 42 U.S.C. § 1395x (d). The following responses are submitted on behalf of each of those California counties.

## I.    General Comments

Generally speaking, the proposed rule does too little, too late. There have been no updates to the geographic localities used to calculate payments under the physician fee schedule since 1997 and this has resulted in significant underpayments being made to our clients as well as to numerous other suppliers in over 440 counties nationwide. (*See* Geographic Areas Used to Adjust Physician Payments for Variation in Practice Costs Should Be Revised, GAO-07-466, June 2007 ["GAO Report"], p. 5.)

There is currently a significant need for a uniform revision of the locality structure and that revision should be applied to all states, not just to California. Suppliers in more urbanized counties across the country are not the only ones being affected by Medicare's failure to revise the locality structure. Beneficiaries in urban counties that are part of large multi-county localities have seen their access to health care reduced as suppliers increasingly eliminate Medicare patients from their practices. In addition, beneficiaries and/or their supplemental

Department of Health and Human Services
August 29, 2007
Page 2

insurance carriers in rural counties that are part of large multi-county localities are paying more than they should because the payment levels in their localities are artificially inflated by the inclusion of urban counties (and their higher county GAFs) in those localities.

Perhaps the most significant defect of the Proposed Rule is the failure to provide for periodic revisions of the locality structure using defined criteria. This was a central recommendation of the Government Accountability Office in its recent report which was specifically addressed to the issue of the adjustment of localities:

> "Regarding our second recommendation – that CMS examine and, if necessary, update the payment localities on a periodic basis – the agency stated that it considers payment locality issues when concerns are raised by interested parties and based on its own initiative, an approach that it believes is more flexible and efficient than examining the payment localities every 10 years. Reviewing payment localities in response to concerns raised by interested parties, however, could result in CMS examining only selected physician payment localities, rather than examining all payment localities using a uniform approach. Updating the payment localities at least every 10 years when new decennial census data become available would ensure that Medicare appropriately accounts for chances in the geographic distribution of physicians' costs of operating a private medical practice." (*See* GAO Report, p. 41.)

Medicare has not demonstrated any ability to modify payment localities consistently with significant demographic changes over the last eleven years. In the 1996 Final Rule, Medicare stated a position similar to its response to the GAO's recommendation on updating localities:

> "While we do not plan to routinely revise payment areas as we implement new GPCIs, we will review the areas in multiple locality States if the newer GPCI data indicates dramatic relative cost changes among areas." (Final Rule, 11/22/1996, 61 FR 59497.)

Rather than addressing the significant demographic changes that it recognizes have occurred in the years since 1996, Medicare has repeatedly refused to implement any locality changes at all. (Proposed Rule, 8/15/2003, 68 FR 49044; Final Rule, 11/7/2003, 68 FR 63214; Proposed Rule, 8/5/2004, 69 FR 47504; Final Rule, 11/15/2004, 69 FR 66263; Proposed Rule, 8/8/2005, 70 FR 45784; Final Rule, 11/21/2005, 70 FR 70152-70153; Proposed Rule, 8/22/2006, 71 FR 48994; Final Rule, 12/1/2006, 71 FR 69655.)

Medicare's demonstrated inability to implement needed locality modifications on its own initiative underscores the absolute necessity of adopting a rule under which Medicare is required to update localities based on uniform criteria at specific intervals of time. It is our clients'

Department of Health and Human Services
August 29, 2007
Page 3

position that the 10-year period proposed by the GAO is too long and would suggest that a 3-year period would be more appropriate.  That would make the updating of localities under Part B consistent with the period for updating localities under Part A.

## II.    Discussion of Specific Issues

### A.    Errors in the Data Tables Make Them Unreliable

We find ourselves unable to effectively comment on any of the three options presented in the Proposed Rule (72 FR 38137-38142) primarily because the data contained in the explanatory tables in unreliable in the following ways:

(a) the tables for Options 1-3 contain inaccurate calculations of percent change due to locality changes;

(b) the tables for Options 1-3 show inconsistent values for county GAFs for 6 counties;

(c) the tables for Options 1-2 appear to have been derived from methodologies that are inconsistent with prior practice;

(d) the table for Option 3 appears to have been derived from a methodology that is inconsistent with the methodology laid out in the descriptive text for Option 3; and

(e) the table for Option 3 appears to contain incorrect GAFs for San Diego County, Santa Clara County, San Benito County, and perhaps other counties.

These inconsistencies and apparent errors call all of the data shown in the tables into question.  On July 17, 2007, we submitted a FOIA request for, *inter alia*, data underlying each of the GAFs and GPCIs shown on the tables.  Our FOIA request included a request to expedite the response so that we would be able "to submit a timely and complete response to the Proposed Rule published by CMS in 72 FR 38122."  To date, we have not received a response to that request and are therefore unable to submit a complete response to the Proposed Rule.

Following are descriptions of the specific statistical deficiencies that are apparent on the face of the Proposed Rule.

Given the number and magnitude of the statistical errors, we request that the Proposed Rule be republished, the comment period reopened, and all requested underlying data be made available to allow the public to make full and informed comments.

Department of Health and Human Services
August 29, 2007
Page 4

### 1.    Inaccurate Percentage Change Figures

As shown on the attached Exhibits A through C, each of the percentage change figures shown on Tables 7 through 9 are incorrect.

All but one of the percent change figures on Tables 7 and 8 are off by less than one percent and such differences may admittedly be due to rounding of data in the tables.

However, the difference between the percent change shown for Rest of California in Table 8 (-0.049%) and the actual percent change (-0.49%) cannot be so explained.  Similarly, the errors in the percent differences in Table 9 range from -11.9% to 10.23%, and differences of such magnitude cannot be explained by rounding.  The source of these errors is not apparent and may result from data errors, data entry errors, or formulaic errors.

Given the magnitude of the errors, we believe that the Proposed Rule should be republished with the errors corrected, the data we requested should be provided, and the comment period reopened.

### 2.    Inconsistent Values for County GAFs

As shown on the attached Exhibit C, the 2009 County GAFs for six counties (Santa Cruz, Monterey, Sonoma, Marin, Solano, and Napa) are not consistently shown on Tables 7 through 8.

The reason for the inconsistencies is not apparent.  Given the magnitude of those inconsistencies, we believe that the Proposed Rule should be republished with the inconsistencies resolved, the data we requested should be provided, and the comment period reopened.

### 3.    Incorrect Use of the 5% Iterative Method in Options 1 & 2

Although Options 1 and 2 purport to use the 5% iterative method used by Medicare in redefining the localities in 1996, the method described in the Proposed Rule is considerably different from that used in 1996 and was expressly rejected by Medicare in 1996.

In 1996, Medicare described the 5% iterative method it adopted ("Option 1i") as follows:

"Under this [rule], current localities are used as building blocks.  The 22 existing statewide localities remain statewide localities.  [The rule] sets new localities in the remaining 28 States by comparing the area cost differences as represented by the locality GAFs within a State.  An area's GAF is a weighted composite of the area's work, practice expense, and malpractice GPCIs and allows a comparison of

Department of Health and Human Services
August 29, 2007
Page 5

overall costs among areas.  Briefly, a State's localities are ranked from the highest
to the lowest GAF.  ***The GAF of the highest price locality is compared to the
weighted average GAF of all lower-price localities.***  If the percentage difference
exceeds 5-percent, the highest-price locality remains a distinct locality.  If not, the
State becomes a statewide locality.  If the highest-price locality remains a distinct
locality, the process is repeated for the second highest-price locality.  Its GAF is
compared to the statewide average excluding the two highest-price localities.  If
this difference exceeds 5-percent, the second highest price locality remains a
distinct locality.  This logic is repeated, moving down the ranking of localities by
costliness, until the highest-price locality does not exceed the combined GAFs of
all less costly localities by 5-percent and does not remain a distinct locality.  No
further comparisons are made, and the remaining localities become a residual
rest-of-State locality.  ***The GAF of a locality always is compared to the average
GAF of all lower-price localities.***  This ensures that the statewide or residual
State locality has relatively homogeneous resource costs.  [Emphases added.]"
(Final Rule, 11/22/1996, 61 FR 59494.)

The GAO used a similar methodology to develop the "county-based iterative" and
"MSA-based iterative" options it described in its recent report.  (*See* GAO Report, p. 24.)

In contrast, Options 1 and 2 of the current Proposed Rule compares a county's GAF to its
locality's GAF.  This methodology (referred to in 1996 as "Option 1") was expressly rejected by
Medicare in 1996 for two reasons:

"First, some mid-sized metropolitan areas in large States such as California and
Texas do not remain distinct FSAs despite their considerably higher input prices
than in the rural and small city areas of their States with which they would be
combined into a single residual area.  Second, some large metropolitan areas in
small States, such as Baltimore, Maryland, do not remain distinct FSAs.  This is
because the State GAF to which all locality GAFs are compared contains the high
cost area GAFs. This makes it difficult for the mid-sized areas in large States to
exceed the State GAF, even though their own GAFs may substantially exceed the
GAF of all other localities in the residual area to which they would be assigned
under Option 1.  In large States with a wide range of GAFs, the mid-sized cities
and metropolitan areas tend to be combined with the residual rest-of-State area.
Their GAFs are sharply reduced, lessening the accuracy of input price tracking
and creating large boundary differences in GAFs between large and mid-sized
cities and at rural State boundaries that are not reflective of true input price
differences." (Proposed Rule, 7/2/1996, 61 FR 34618.)

Department of Health and Human Services
August 29, 2007
Page 6

We believe, but cannot state with certainty because Medicare has not provided us with the underlying data, that using the methodology it had previously rejected accounts for the fact that certain counties (including San Diego, Santa Barbara, San Luis Obispo, Sacramento, El Dorado, and Placer Counties, among others) were not – but should have been – included in the list of new localities in Options 1 and 2.

Given the unexplained use of a methodology that Medicare had previously rejected, we believe that the Proposed Rule should be republished with the proper methodology employed in Options 1 and 2, the data we requested should be provided, and the comment period reopened.

4.     **Conflict Between the Value for the County GAF for San Benito County Shown in Proposed Rule and the Value Shown by GAO**

There is a significant difference between the value for the county GAF for San Benito County shown in the Table 9 (0.971) and the value shown by the GAO (1.081).  (*Compare* 72 FR 38142 with GAO Report, p. 54.)

We believe the difference must lie in the census and/or housing data used by Medicare and the GAO.  The magnitude of the difference calls all data in Tables 7 through 9 into question.  Therefore, we believe that the tables in the Proposed Rule should be checked for error, the Proposed Rule should then be republished, the data we requested should be provided, and the comment period reopened.

5.     **Conflicts Between Table 9 and Option 3 Description**

There are discrepancies between description of Option 3 and the locality configuration shown in Table 9 resulting from the failure to correctly employ the methodology as described.

The methodology for Option 3 is described as follows:

"[W]e sorted the counties by descending GAFs and compared the highest county to the second highest.  If the difference is less than 5 percent, the counties were included in the same locality. The third highest is then compared to the highest county GAF.  This iterative process continues until a county has a GAF difference that is more than 5 percent. When this occurs, that county becomes the highest county in a new payment locality and the process is repeated for all counties in the State."  (72 FR 38141.)

In contrast, the groupings of the five proposed localities shown in Table 9 appear to have been defined at times by an absolute differential of 0.05 and at times by a relative 5% differential.

Department of Health and Human Services
August 29, 2007
Page 7

If a 5% differential is uniformly employed as described in the text of the Proposed Rule, six localities would result, not five as shown in the table.

The attached Exhibit E shows the localities created by the use of a relative 5% differential.  Exhibit E assumes that most of the "Current County GAFs" shown in Table 9 are correct, a fact which, as discussed above, is open to question.  As noted on Exhibit E, the county GAF for San Benito as calculated by the GAO Report is used, and the county GAFs shown in Table 8 for Marin, Napa, Solano, Santa Cruz, Sonoma, and Monterey Counties are used as we tentatively believe those values to be more accurate than those shown in Table 9.

For these reasons, we believe that the proposed localities shown in Table 9 need to be corrected, the Proposed Rule needs to be republished, the data we requested needs to be provided, and the comment period needs to be reopened.

**B.    The Declines in Certain County GAFs Are Not Supported by Changes in HUD Rental Data**

The Proposed Rule states: "Rent data produce the most significant changes because they are based on annual changes in HUD rents and are therefore more volatile than the wage (Census) data."  (72 FR 38138.)

In our FOIA Request of July 17, 2007, we asked to be provided with:

"The source file for Practice Expense GPCIs for the years 1999 to 2009, including documents sufficient to show: (a) the rent data, wage data, and other expense data used for all counties and localities; (b) the methodology used to modify any HUD rent data employed in the calculations, including which percentile and type (number of bedrooms) used; and (c) the actual calculation used for all counties and localities in order to arrive at the peGPCI for each (this should include all components of the peGPCI)."

As previously noted, we requested that the response be expedited so that we could effectively respond to the Proposed Rule, but no response was forthcoming.

We made the request after noting that several counties, including San Diego and Santa Clara, show declines in their county GAFs between 2006 and 2009 that do not appear to be supported by changes in the most volatile component of the GAF formula – fair market rental ("FMR") data supplied by HUD.

The attached Exhibit F illustrates the issue with respect to San Diego County.  Between 2006 and 2009, the GAF for San Diego County will decline by 1.83%.  In contrast, the FMR for

Department of Health and Human Services
August 29, 2007
Page 8

2-bedroom units is set to increase by 21.40%. The fact that the GAF is declining when the FMR is increasing and the magnitude of the FMR increase when compared to the GAF decrease leads us to believe that the 2009 county GAF for San Diego County shown in Table 9 is incorrect. The data we sought in our FOIA request would have confirmed or negated that belief.

  The attached Exhibit G illustrates the issue with respect to Santa Clara County. Santa Clara County dropped from No. 1 nationally (with highest rate of repayment by Medicare to physicians) to No. 3 between 2007 and 2008. The significant percentage changes as between Santa Clara, San Mateo, and San Francisco Counties in their respective repayment rates, or Geographic Adjustment Factors ("GAF") cannot be explained by the respective changes in the factors that most affect the formulaic outcome -- namely, FMR data and the Practice Expense Geographic Practice Cost Index ("peGPCI").

  Between 2007 and 2009, the county GAF for Santa Clara County is set to decline by 9.25%. In contrast, the FMR for 2-bedroom units is set to increase by 0.70%. The contrasts between changes in the county GAF and the FMR for Santa Clara County leads us to believe that the 2009 county GAF for Santa Clara County shown in Table 9 is incorrect.

  Additional information was available for Santa Clara County that we lacked for San Diego County, and that additional information gives additional support to our belief that the county GAF for Santa Clara County is incorrect. The attached Exhibit G contrasts the changes in the county GAF, peGPCI, and FMR data for Santa Clara, San Mateo, and San Francisco Counties between 2005-2007 and 2007-2009. The changes between San Mateo and San Francisco Counties are highly correlated – probably because they are part of the same MSA and share many of the same data that are used to calculate the peGPCI. In contrast, there is a complete of a direct correlation between the changes in the county GAF, peGPCI, and FMR data for Santa Clara County between 2005-2007 and 2007-2009 when contrasted with the same changes for San Mateo and San Francisco Counties. These contrasts lead us to believe that some or all of the 2009 county GAFs for Santa Clara, San Mateo, and/or San Francisco Counties may be incorrect.

  For these reasons, we believe that the proposed localities shown in Table 9 need to be corrected, the Proposed Rule needs to be republished, the data we requested needs to be provided, and the comment period needs to be reopened.

### C. Vital Importance of Medicare Providing Underlying Data

  The multitude of errors and inconsistencies contained in the Proposed Rule underscore the vital importance of Medicare producing the data we requested in our FOIA Request of July 17, 2007. Having this data will allow us to cross-check Medicare's data and provide support for modeling of alternative methods of configuring localities now and in the future.

Department of Health and Human Services
August 29, 2007
Page 9

**D.    The Proposed Rule Makes Use of Unauthorized Adjustments to Impose Statewide Budget Neutrality**

Options 1 and 2 contain GAFs that are based on GPCIs that have been modified in an unspecified manner in order to result in aggregate payments to California remaining the same. (72 FR 38139.)  According to the Proposed Rule, "changes to GPCIs must be applied in a budget neutral manner (and under the current locality system, BN results in aggregate payments within each State remaining the same), there are significant redistributive effects to any change."  (72 FR 38139.)

It is our belief that there is no statutory authority for modifying the payment formula to impose statewide budget neutrality for the following reasons:

(1)  Such a modification would not allow accurate an accurate comparison to be made between costs in the different fee schedule areas and the national average of costs as required by 42 U.S.C. § 1395w-4(e).

(2)  Nothing in the statutory scheme allows for modification of the physician fee schedule to create statewide budget neutrality following locality changes.  (*Compare* 42 U.S.C. § 1395w-4(c)(2)(B)(ii).)

(3)  Medicare's own statement of the payment formula under Part B does not include a statewide budget neutral adjuster: "Payment = [($RVU_{work} \times GPCI_{work}$) + ($RVU_{practice\ expense} \times GPCI_{practice\ expense}$) + ($RVU_{malpractice} \times GPCI_{malpractice}$) $\times$ CF]."  (*See* Proposed Rule, 8/22/2006, 71 FR 48985.)

(4)  Medicare has expressly (and correctly) stated in the past that the physician fee schedule is budget-neutral on a national basis and not on a statewide basis:  "The physician fee schedule is budget-neutral on a national basis.  If a State with multiple payment areas converts to a statewide payment area using population-weighted State GPCIs after the physician fee schedule became effective, the change may not be budget neutral within the State. . . .  There is no statutory requirement that the physician fee schedule be budget neutral within a State."  (Proposed Rule, 7/14/1993, 58 FR 38002.)

In addition, under Options 1 and 2, the imposition of a statewide budget neutrality requirement, one which is not statutorily authorized, will inequitably affect California physicians and beneficiaries in counties outside the ones which will be made part of the new localities described in those options.  The redistributive effects of the locality changes must, by statute, be spread across the entire Medicare system and not localized in the State of California.

Department of Health and Human Services
August 29, 2007
Page 10

We request the CMS justify its belief that statewide budget neutrality is authorized by statute, regulation, or rule by identifying the source of its belief. Failing that, we request that the Proposed Rule be corrected to remove the effects of any statewide budget-neutral adjustments that have been made to the data, the Proposed Rule be republished, and the comment period reopened.

**E.      The Proposed Rule Does Not Discuss Promised Efforts to Work With Other Agencies to Study and Develop Alternative Options**

In December 2006, CMS stated that it intended to work with MedPAC and the GAO "to study our current methodology and develop alternative options [for locality changes]." (Final Rule, 12/1/2006, 71 FR 69655.)

The Proposed Rule does not contain any discussion of any such efforts. The Proposed Rule should be modified to identify the nature and extent of any efforts CMS undertook to work with MedPAC and the GAO, the results (if any) of those efforts, the Proposed Rule should be republished, and the comment period should be reopened.

**F.      The Proposed Rule Fails to Give Due Consideration to an Option Based on MSAs**

The Proposed Rule fails to give due consideration to a fourth option, one based on MSAs. The GAO Report concluded that an MSA-based locality structure was one of three alternatives that would improve payment accuracy (i.e., reduce overpayments and underpayments to physicians) without a significant increase in administrative expense. (GAO Report, pp. 23-44.)

The GAO's conclusions appear to be supported by statements CMS has made on the issue. In the past, CMS has recognized the need for a "national classification system built on clear, objective standards." (Proposed Rule, 8/8/2005, 70 FR 45794.) In addition, CMS has concluded that "the MSA system (developed by OMB) is the only one that meets the requirements for use as a classification system in a national payment program." (Proposed Rule, 8/8/2005, 70 FR 45794.) As such, CMS uses the MSA system for purposes of, *inter alia*, classifying hospital payment areas, and establishing local wage and rental data for purposes of calculating payments to both hospitals and physicians. Further, CMS admitted to the GAO that "they did not anticipate that significant modifications to the payment localities would require a substantial amount of additional ongoing administrative burden." (GAO Report, p. 37.)

Currently, CMS uses an MSA-based locality structure to make payments to hospitals under Part A. The following table shows the effects of the disparate methods employed by Medicare in defining geographic payment localities as between Part A and Part B:

Department of Health and Human Services
August 29, 2007
Page 11

| HOSPITALS (*Under "Part A"*) | SUPPLIERS (*Under "Part B"*) |
|---|---|
| Annual Payments Appr. $150 Billion | Annual Payments Appr. $60 Billion |
| Payment Schedule Updated Every Year | Payment Schedule Updated Every 3 Years |
| Geographic Localities Based on Metropolitan Statistical Areas ("MSAs") Usually Revised Every 3 Years by OMB | Geographic Localities Established in 1966 by Insurance Companies and Revised Only Once by Medicare in 1996 |
| Medicare Does Not Administer Boundaries of Geographic Localities | In 1991, Medicare Assumed the Responsibility to Administer Boundaries of Geographic Localities But Has Not Made Revisions Since 1996 |
| 433 Geographic Localities Based on Demographically Homogeneous MSAs | 89 Geographic Localities Based Primarily on Counties and Combinations of Counties Which Are Often Demographically Diverse |
| Geographic localities understandable and fair | Geographic localities poorly understood and inequitable |
| Comprehensive Regulatory Provisions for Reclassification of Hospitals into Different Geographic Localities for Reimbursement Purposes | No Regulatory Provisions for Reclassification of Suppliers into Different Geographic Localities for Reimbursement Purposes |
| Payment System Accurately Reflects Costs Within Small, Well-Defined, Homogeneous Geographic Localities | Payment System Does Not Accurately Reflect Costs Within Demographically Diverse Multi-County Geographic Localities |

Given these facts, it is simply inconceivable that CMS did not include a study of an MSA-based locality structure in the Proposed Rule.  We recommend that CMS republish the Proposed Rule including a study of an MSA-based locality structure, and reopen the comment period.

Department of Health and Human Services
August 29, 2007
Page 12

### G.    CMS Should Identify and Quantify Additional Administrative Burdens When Analyzing Modifications to the Locality Structure

No attempt was made to identify or quantify additional administrative burdens that might result from the implementation of any of the three proposed options on a single-state or national level.

In the past, CMS has justified the reduction in the number of localities under Part B to 89 based on reduction in administrative burdens.  In contrast, as shown in the above table, Medicare bases its payments to hospitals under Part A using an MSA-based locality system in which there are 433 localities.  Clearly, the administrative costs of using the MSA-based locality system under Part A (with almost five times the number of localities as used for Part B) must be justified or else CMS would not have implemented it.

If administrative costs are to be considered as a significant factor in choosing one locality proposal over the other, generalized conclusions that one alternative might somehow prove more expensive or burdensome are not sufficient.  Instead, in order for the public to make informed comments on proposed locality changes under Part B, Medicare needs to identify and quantify the comparative administrative costs of each alternative.

We recommend that CMS republish the Proposed Rule including a study of the nature and extent of additional administrative burdens resulting from any proposed option, and reopen the comment period.

## III.    Conclusion

For all of the foregoing reasons, we are unable to select a proposed alternative for modification of the locality structure under Part B.  We recommend that CMS: (a) republish the Proposed Rule with the inclusion of the corrections, additional information, and consideration of the other proposed alternatives we have requested; and (b) reopen the comment period.

Sincerely,

Dario de Ghetaldi

DEG/drj
Enc.

# EXHIBIT "A"

## OPTION 1 -- ERRORS IN CALCULATION OF PERCENTAGE CHANGE

| Figures as Shown in Table 7 -- Option 1 | | | | | | Actual Percent Change Due to Locality Change | Error |
|---|---|---|---|---|---|---|---|
| Locality Name | County Name | New CY 2009 GAF, No Locality Change | New CY 2009 GAF With Locality Change | Percent Change Due to Locality Change [sic] | | | |
| Santa Cruz | Santa Cruz | 1.017 | 1.100 | 7.59% | | 7.545% | -0.59% |
| Monterey | Monterey | 1.017 | 1.080 | 5.83% | | 5.833% | 0.06% |
| Sonoma | Sonoma | 1.017 | 1.076 | 5.51% | | 5.483% | -0.49% |
| Marin | Marin | 1.112 | 1.173 | 5.19% | | 5.200% | 0.20% |
| Napa/Solano | Solano | 1.112 | 1.066 | -4.33% | | -4.315% | -0.34% |
| Napa/Solano | Napa | 1.112 | 1.066 | -4.33% | | -4.315% | -0.34% |
| Rest of California | Rest of California | 1.017 | 1.012 | -0.49% | | -0.494% | 0.82% |

EXHIBIT "B"

**OPTION 2 -- ERRORS IN CALCULATION OF PERCENTAGE CHANGE**

| Figures as Shown in Table 8 -- Option 2 | | | | | | | Actual Percent Change Due to Locality Change | Error |
|---|---|---|---|---|---|---|---|---|
| Locality Name | County Name | CY 2009 County GAF | New CY 2009 GAF, No Locality Change | New CY 2009 GAF With Locality Change | Percent Change Due to Locality Change [sic] | | Actual Percent Change Due to Locality Change | Error |
| Marin | Marin | 1.173 | 1.112 | 1.173 | 5.19% | | 5.20% | 0.199% |
| Napa/Solano | Napa | 1.080 | 1.112 | 1.066 | -4.33% | | -4.32% | -0.343% |
| Napa/Solano | Solano | 1.053 | 1.112 | 1.066 | -4.33% | | -4.32% | -0.343% |
| Santa Cruz/Monterey/Sonoma | Santa Cruz | 1.100 | 1.017 | 1.082 | 6.03% | | 6.01% | -0.376% |
| Santa Cruz/Monterey/Sonoma | Sonoma | 1.076 | 1.017 | 1.082 | 6.03% | | 6.01% | -0.376% |
| Santa Cruz/Monterey/Sonoma | Monterey | 1.080 | 1.017 | 1.082 | 6.03% | | 6.01% | -0.376% |
| Rest of California | Rest of California | 1.017 | 1.017 | 1.012 | -0.049% | | -0.49% | 90.082% |

**EXHIBIT "C"**

**OPTION 3 -- ERRORS IN CALCULATION OF PERCENTAGE CHANGE**

| | | | | | | | Calculated | |
|---|---|---|---|---|---|---|---|---|
| | | Figures as Shown in Table 9 -- Option 3 | | | | | | |
| County | Current Medicare Locality | Current County GAF | Proposed Medicare Locality | Proposed Locality GAF | Current Locality GAF | Percent Difference | Percent Difference | Error |
| San Mateo | San Mateo, CA | 1.204 | 1 | 1.197 | 1.204 | -0.60% | -0.585% | -2.600% |
| San Francisco | San Francisco, CA | 1.201 | 1 | 1.197 | 1.201 | -0.30% | -0.334% | 10.225% |
| Marin | Marin/Napa/Solano, CA | 1.170 | 1 | 1.197 | 1.112 | 7.60% | 7.101% | -7.026% |
| Santa Clara | Santa Clara, CA | 1.148 | 2 | 1.119 | 1.148 | -2.50% | -2.592% | 3.534% |
| Contra Costa | Oakland/Berkeley, CA | 1.134 | 2 | 1.119 | 1.131 | -1.00% | -1.072% | 6.750% |
| Alameda | Oakland/Berkeley, CA | 1.129 | 2 | 1.119 | 1.131 | -1.00% | -1.072% | 6.750% |
| Orange | Anaheim/Santa Ana, CA | 1.128 | 2 | 1.119 | 1.128 | -0.80% | -0.804% | 0.533% |
| Ventura | Ventura, CA | 1.121 | 2 | 1.119 | 1.121 | -0.20% | -0.179% | -11.900% |
| Los Angeles | Los Angeles, CA | 1.112 | 2 | 1.119 | 1.112 | 0.60% | 0.626% | 4.086% |
| Santa Cruz | Rest of California | 1.098 | 3 | 1.061 | 1.012 | 4.90% | 4.618% | -6.100% |
| Napa | Marin/Napa/Solano, CA | 1.077 | 3 | 1.061 | 1.112 | -4.60% | -4.807% | 4.302% |
| Monterey | Rest of California | 1.077 | 3 | 1.061 | 1.012 | 4.90% | 4.618% | -6.100% |
| Sonoma | Rest of California | 1.074 | 3 | 1.061 | 1.012 | 4.90% | 4.618% | -6.100% |
| San Diego | Rest of California | 1.053 | 3 | 1.061 | 1.012 | 4.90% | 4.618% | -6.100% |
| Santa Barbara | Rest of California | 1.053 | 3 | 1.061 | 1.012 | 4.90% | 4.618% | -6.100% |
| Solano | Marin/Napa/Solano, CA | 1.051 | 3 | 1.061 | 1.112 | -4.60% | -4.807% | 4.302% |
| Sacramento | Rest of California | 1.047 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| El Dorado | Rest of California | 1.033 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| San Bernardino | Rest of California | 1.023 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| Placer. | Rest of California | 1.021 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| Riverside | Rest of California | 1.017 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| San Luis Obispo | Rest of California | 1.015 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| San Joaquin | Rest of California | 1.006 | 4 | 1.023 | 1.012 | 1.20% | 1.075% | -11.600% |
| Yolo | Rest of California | 0.995 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Stanislaus | Rest of California | 0.979 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Mono | Rest of California | 0.977 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Nevada | Rest of California | 0.975 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Kern | Rest of California | 0.973 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| San Benito | Rest of California | 0.971 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Sierra | Rest of California | 0.967 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Amador | Rest of California | 0.967 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Fresno | Rest of California | 0.963 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Mendocino | Rest of California | 0.960 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Madera | Rest of California | 0.960 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Tuolumne | Rest of California | 0.959 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Alpine | Rest of California | 0.957 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Mariposa | Rest of California | 0.956 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Tulare | Rest of California | 0.950 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Butte | Rest of California | 0.950 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Merced | Rest of California | 0.949 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Calaveras | Rest of California | 0.949 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Humboldt | Rest of California | 0.947 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Lake | Rest of California | 0.947 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Imperial | Rest of California | 0.945 | 5 | 0.962 | 1.012 | -4.90% | -5.198% | 5.724% |
| Plumas | Rest of California | 0.945 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Lassen | Rest of California | 0.944 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Sutter | Rest of California | 0.942 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Yuba | Rest of California | 0.942 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Colusa | Rest of California | 0.940 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Del Norte | Rest of California | 0.940 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Modoc | Rest of California | 0.938 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Shasta | Rest of California | 0.937 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Kings | Rest of California | 0.935 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Inyo | Rest of California | 0.935 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Siskiyou | Rest of California | 0.934 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Trinity | Rest of California | 0.933 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Tehama | Rest of California | 0.932 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |
| Glenn | Rest of California | 0.930 | 6 | 0.938 | 1.012 | -7.30% | -7.889% | 7.468% |

# EXHIBIT "D"

## INCONSISTENT COUNTY GAFs

| County Name | 2009 County GAFs | | |
| --- | --- | --- | --- |
| | Option 1: "New CY 2009 GAF With Locality Change" | Option 2: "CY 2009 County GAF" | Option 3: "Current County GAF" |
| Santa Cruz | 1.100 | 1.100 | 1.098 |
| Monterey | 1.080 | 1.080 | 1.077 |
| Sonoma | 1.076 | 1.076 | 1.074 |
| Marin | 1.173 | 1.173 | 1.170 |
| Solano | 1.066 | 1.053 | 1.051 |
| Napa | 1.066 | 1.080 | 1.077 |

## EXHIBIT "E"

### OPTION 3 USING CORRECTED COUNTY GAFS AND UNIFORM 5% DIFFERENCE

| County | Current Medicare Locality | Corrected Current County GAF | Locality 1 "Option 3" 5% Difference | Locality 2 "Option 3" 5% Difference | Locality 3 "Option 3" 5% Difference | Locality 4 "Option 3" 5% Difference | Locality 5 "Option 3" 5% Difference | Medicare's Proposed "Option 3" Locality |
|---|---|---|---|---|---|---|---|---|
| San Mateo | San Mateo, CA | 1.204 | 0.00% | | | | | 1 |
| San Francisco | San Francisco, CA | 1.201 | 0.25% | | | | | 1 |
| Marin | Marin/Napa/Solano, CA | 1.173 | 2.57% | | | | | 1 |
| Santa Clara | Santa Clara, CA | 1.148 | 4.65% | | | | | 2 |
| Contra Costa | Oakland/Berkeley, CA | 1.134 | 5.81% | 0.00% | | | | 2 |
| Alameda | Oakland/Berkeley, CA | 1.129 | | 0.44% | | | | 2 |
| Orange | Anaheim/Santa Ana, CA | 1.128 | | 0.53% | | | | 2 |
| Ventura | Ventura, CA | 1.121 | | 1.15% | | | | 2 |
| Los Angeles | Los Angeles, CA | 1.112 | | 1.94% | | | | 2 |
| Santa Cruz | Rest of California | 1.100 | | 3.00% | | | | 3 |
| San Benito | Rest of California | 1.081 | | 4.67% | | | | 5 |
| Monterey | Rest of California | 1.080 | | 4.76% | | | | 3 |
| Napa | Marin/Napa/Solano, CA | 1.080 | | 4.76% | | | | 3 |
| Sonoma | Rest of California | 1.076 | | 5.11% | 0.00% | | | 3 |
| Solano | Marin/Napa/Solano, CA | 1.053 | | | 2.14% | | | 3 |
| San Diego | Rest of California | 1.053 | | | 2.14% | | | 3 |
| Santa Barbara | Rest of California | 1.053 | | | 2.14% | | | 3 |
| Sacramento | Rest of California | 1.047 | | | 2.70% | | | 4 |
| El Dorado | Rest of California | 1.033 | | | 4.00% | | | 4 |
| San Bernardino | Rest of California | 1.023 | | | 4.93% | | | 4 |
| Placer. | Rest of California | 1.021 | | | 5.11% | 0.00% | | 4 |
| Riverside | Rest of California | 1.017 | | | | 0.39% | | 4 |
| San Luis Obispo | Rest of California | 1.015 | | | | 0.59% | | 4 |
| San Joaquin | Rest of California | 1.006 | | | | 1.47% | | 4 |
| Yolo | Rest of California | 0.995 | | | | 2.55% | | 5 |
| Stanislaus | Rest of California | 0.979 | | | | 4.11% | | 5 |
| Mono | Rest of California | 0.977 | | | | 4.31% | | 5 |
| Nevada | Rest of California | 0.975 | | | | 4.51% | | 5 |
| Kern | Rest of California | 0.973 | | | | 4.70% | | 5 |
| Sierra | Rest of California | 0.967 | | | | 5.29% | 0.00% | 5 |
| Amador | Rest of California | 0.967 | | | | | 0.00% | 5 |
| Fresno | Rest of California | 0.963 | | | | | 0.41% | 5 |
| Mendocino | Rest of California | 0.960 | | | | | 0.72% | 5 |
| Madera | Rest of California | 0.960 | | | | | 0.72% | 5 |
| Tuolumne | Rest of California | 0.959 | | | | | 0.83% | 5 |
| Alpine | Rest of California | 0.957 | | | | | 1.03% | 5 |
| Mariposa | Rest of California | 0.956 | | | | | 1.14% | 5 |
| Tulare | Rest of California | 0.950 | | | | | 1.76% | 5 |
| Butte | Rest of California | 0.950 | | | | | 1.76% | 5 |
| Merced | Rest of California | 0.949 | | | | | 1.86% | 5 |
| Calaveras | Rest of California | 0.949 | | | | | 1.86% | 5 |
| Humboldt | Rest of California | 0.947 | | | | | 2.07% | 5 |
| Lake | Rest of California | 0.947 | | | | | 2.07% | 5 |
| Imperial | Rest of California | 0.945 | | | | | 2.28% | 5 |
| Plumas | Rest of California | 0.945 | | | | | 2.28% | 6 |
| Lassen | Rest of California | 0.944 | | | | | 2.38% | 6 |
| Sutter | Rest of California | 0.942 | | | | | 2.59% | 6 |
| Yuba | Rest of California | 0.942 | | | | | 2.59% | 6 |
| Colusa | Rest of California | 0.940 | | | | | 2.79% | 6 |
| Del Norte | Rest of California | 0.940 | | | | | 2.79% | 6 |
| Modoc | Rest of California | 0.938 | | | | | 3.00% | 6 |
| Shasta | Rest of California | 0.937 | | | | | 3.10% | 6 |
| Kings | Rest of California | 0.935 | | | | | 3.31% | 6 |
| Inyo | Rest of California | 0.935 | | | | | 3.31% | 6 |
| Siskiyou | Rest of California | 0.934 | | | | | 3.41% | 6 |
| Trinity | Rest of California | 0.933 | | | | | 3.52% | 6 |
| Tehama | Rest of California | 0.932 | | | | | 3.62% | 6 |
| Glenn | Rest of California | 0.930 | | | | | 3.83% | 6 |

County GAFs Shown for Option 2
GAF for San Benito as Calculated by GAO ( compare:  0.971 per Medicare)
Localities Under Option 3 Using Uniform 5% Thresholds
Localities Shown by CMS Under Option 3

# EXHIBIT "F"

## THE SAN DIEGO COUNTY GAF ISSUE

|      | GAF     | Change |  | Prior Year FMR* | Change  |
|------|---------|--------|--|-----------------|---------|
| 2005 | 1.07825 |        |  | $1,183          |         |
| 2006 | 1.07225 | -0.56% |  | $1,065          | -11.08% |
| 2009 | 1.05300 | -1.83% |  | $1,355          | 21.40%  |

*HUD FMR data from the prior year is used to calculate the current year peGPCI.  The rental figures shown are for 2-bedroom units.

## EXHIBIT "G"

### THE SANTA CLARA COUNTY GAF ISSUE

| | Santa Clara | | | San Mateo | | | San Francisco | | |
|---|---|---|---|---|---|---|---|---|---|
| | GAF | National Rank | Year-Year Change | GAF | National Rank | Year-Year Change | GAF | National Rank | Year-Year Change |
| 2003 | 1.184 | 3 | | 1.119 | 2 | | 1.221 | 1 | |
| 2004 | 1.184 | 3 | 0.00% | 1.201 | 2 | 7.33% | 1.223 | 1 | 0.16% |
| 2005 | 1.224 | 3 | 3.38% | 1.230 | 2 | 2.41% | 1.239 | 1 | 1.31% |
| 2006 | 1.265 | 1 | 3.35% | 1.259 | 2 | 2.36% | 1.256 | 3 | 1.37% |
| 2007 | 1.265 | 1 | 0.00% | 1.259 | 2 | 0.00% | 1.256 | 3 | 0.00% |
| 2008 | 1.206 | 3 | -4.66% | 1.231 | 1 | -2.22% | 1.228 | 2 | -2.23% |
| 2009 | 1.148 | | -4.81% | 1.204 | | -2.19% | 1.201 | | -2.20% |
| | 2005- 2007 Delta | | 3.24% | 2005- 2007 Delta | | 2.30% | 2005- 2007 Delta | | 1.35% |
| | 2007- 2009 Delta | | -9.25% | 2007- 2009 Delta | | -4.37% | 2007- 2009 Delta | | -4.38% |

| | Santa Clara | | San Mateo | | San Francisco | |
|---|---|---|---|---|---|---|
| | peGPCI | Delta | peGPCI | Delta | peGPCI | Delta |
| 2005 | 1.551 | | 1.547 | | 1.554 | |
| 2007 | 1.543 | -0.52% | 1.539 | -0.52% | 1.546 | -0.51% |
| 2009 | 1.292 | -16.27% | 1.431 | -7.02% | 1.439 | -6.92% |

| | HUD FMR* | Delta | HUD FMR* | Delta | HUD FMR* | Delta |
|---|---|---|---|---|---|---|
| 2004 | $1,821 | | $1,775 | | $1,775 | |
| 2006 | $1,284 | -29.49% | $1,536 | -13.46% | $1,536 | -13.46% |
| 2008 | $1,293 | 0.70% | $1,592 | 3.65% | $1,592 | 3.65% |

*HUD FMR data from the prior year is used to calculate the current year peGPCI.
The rental figures shown are for 2-bedroom units.