1  JEFFREY S. BUCHOLTZ
   Acting Assistant Attorney General
2
   SCOTT N. SCHOOLS
3  United States Attorney

4  SHEILA M. LIEBER
   Deputy Director
5  Federal Programs Branch

6  PETER ROBBINS
   U.S. Department of Justice
7  20 Massachusetts Ave, NW, Room 7142
   Washington, DC  20530
8  Telephone:    (202) 514-3953
   Facsimile:    (202) 616-8470
9  Email:  peter.robbins@usdoj.gov

10 Attorneys for Defendant

11

                IN THE UNITED STATES DISTRICT COURT
12             FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14 COUNTY OF SANTA CRUZ, et al.        )    Case No. C 07-2888 MJJ
                                       )
15        Plaintiffs,                  )    **DEFENDANT'S REPLY**
                                       )    **IN SUPPORT OF HIS**
16   v.                                )    **MOTION TO DISMISS**
                                       )
17 MICHAEL O. LEAVITT,                 )    Date:   January 15, 2008
                                       )    Time:  9:30 a.m.
18        Defendant.                   )    Place: Courtroom 11, 19th Floor
                                       )
19

20

21

22

23

24

25

26

27

28

**Table of Contents**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   1.  The Nature of Defendant's Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   2.  Standard of Review under Rule 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   3.  Standard of Review under Rule 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  I.  FEE SCHEDULE AREAS ARE NOT JUDICIALLY REVIEWABLE UNDER
      42 U.S.C. § 1395w-4(i)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.  Fee Schedule Areas Are a Necessary Component of the Establishment of
         Geographic Adjustment Factors under 42 U.S.C. § 1395w-4(e). . . . . . . . . . . . . 6

     B.  The Legislative History of 42 U.S.C. § 1395w-4(i)(1)(D) Does Not Support
         the Conclusion that Fee Schedule Areas Are Reviewable. . . . . . . . . . . . . . . . . 9

     C.  The Secretary Has Never Taken the Position that Fee Schedule Areas Are
         Reviewable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  II.  EVEN IF JUDICIAL REVIEW WERE NOT PRECLUDED BY 42 U.S.C.
      § 1395w-4(i)(1)(D), PLAINTIFFS' CLAIMS WOULD HAVE TO BE
      CHANNELED THROUGH THE MEDICARE CLAIMS REVIEW PROCESS. . . . . . . 12

  III.  THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE
       THERE IS NO LAW TO APPLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     A.  No Statute or Regulation Establishes Any Judicially Manageable
         Standards for Determining Whether, When or How the Secretary
         Must Change the Configuration of Fee Schedule Areas. . . . . . . . . . . . . . . . . . 17

     B.  The 1996 Reconfiguration Did Not Establish a Binding Policy that
         Directs Future Revisions in Fee Schedule Areas. . . . . . . . . . . . . . . . . . . . . . . 18

     C.  No Law to Apply Exists Anywhere Else Plaintiffs Attempt to Locate It. . . . . . 22

  IV.  PLAINTIFFS' STATUTORY AND APA CLAIMS LACK LEGAL MERIT. . . . . . . . 24

  V.  PLAINTIFFS' CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED FOR
      FAILURE TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  VII.  PLAINTIFFS CANNOT USE THE APA TO REOPEN BILLIONS OF DOLLARS
       IN STALE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  VIII.  PLAINTIFFS' "ADDITIONAL ISSUES" ADD NOTHING TO THE CASE. . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# Table of Authorities

**Cases**

Alcaraz v. INS,
384 F.3d 1150 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Altmann v. Austria,
142 F. Supp. 2d 1187 (C.D. Cal. 2001) (subsequent history omitted). . . . . . . . . . . . . . . . . . . . . 26

AMA v. Thompson,
2001 WL 619510 (N.D. Ill. May 29, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Am. Acad. of Dermatology v. HHS,
118 F.3d 1495 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Am. Soc'y of Anesthesiologists v. Shalala,
90 F. Supp. 2d 973 (N.D. Ill. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

Am. Soc'y of Cataract & Refractive Surgery v. Thompson,
279 F.3d 447 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Am. Soc'y of Dermatology v. Shalala,
962 F. Supp. 141 (D.D.C. 1996), aff'd, 116 F.3d 941 (D.C. Cir. 1997). . . . . . . . . . . . . . . 6, 7, 28

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Bethesda Hosp. Ass'n v. Bowen,
485 U.S. 399 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Bd. of Natural Res. v. Brown,
992 F.2d 937 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bowen v. City of New York,
476 U.S. 467 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bowen v. Massachusetts,
487 U.S. 879 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Califano v. Sanders,
430 U.S. 99 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Ctr. for Auto Safety v. FHA,
956 F.2d 309 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Circuit City Stores, Inc. v. Adams,
532 U.S. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

City of Sault Ste. Marie v. Andrus,
532 F. Supp. 157 (D.D.C. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conley v. Gibson,
355 U.S. 41 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Creek v. Village of Westhaven,
1987 WL 5429 (N.D. Ill. Jan. 15, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

De La Cruz v. Tormey,
582 F.2d 45, (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Dreier v. United States,
106 F.3d 844 (9th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Ekimian v. INS,
303 F.3d 1153 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

FCC v. Beach Commc'ns,
508 U.S. 307 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fields v. Legacy Health Sys.,
413 F.3d 943 (9th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Florida Power & Light Co. v. EPA,
145 F.3d 1414 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Furlong v. Shalala,
1996 WL 393526 (S.D.N.Y. July 12, 1996),
aff'd in part, rev'd in part on other grounds, 156 F.3d 384 (2d Cir. 1998). . . . . . . . . . . . . 8, 22, 26

Hal Roach Studios, Inc. v. Richard Feiner & Co.,
896 F.2d 142 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Heckler v. Ringer,
466 U.S. 602 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 28

In re Late Fee and Over-Limit Fee Litig.,
2007 WL 4106353 (N.D. Cal. Nov. 16, 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

INS v. Yang,
519 U.S. 26 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Kahawaiolaa v. Norton,
386 F.3d 1271 (9th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Knievel v. ESPN,
393 F.3d 1068 (9th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Land v. Dollar,
330 U.S. 731 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Maricopa County v. Valley Nat'l Bank,
318 U.S. 357 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1

2

Martin v. Shalala,
63 F.3d 497 (7th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

3

McCarthy v. United States,
850 F.2d 558 (9th Cir. 1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4

5

McNary v. Haitian Refugee Ctr.,
498 U.S. 479 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6

Nat'l Wildlife Fed'n v. EPA,
286 F.3d 554 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7

8

Painter v. Shalala,
97 F.3d 1351 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 26

9

Palisades Gen. Hosp. v. Leavitt,
426 F.3d 400 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10

Papasan v. Allain,
478 U.S. 265 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11

Port of Seattle v. FERC,
499 F.3d 1016 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

12

13

Ratzlaf v. United States,
510 U.S. 135 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14

Skagit County Pub. Hosp. v. Shalala,
80 F.3d 379 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

15

16

South Carolina v. Katzenbach,
383 U.S. 301 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

17

Sprewell v. Golden State Warriors,
266 F.3d 979 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18

19

Steckman v. Hart Brewing, Inc.,
143 F.3d 1293 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

20

Trentacosta v. Frontier PAC Aircraft Indus., Inc.,
813 F.2d 1553 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21

22

United Black Fund, Inc. v. Hampton,
352 F. Supp. 898 (D.D.C. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

23

United States v. Gonzales,
520 U.S. 1 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24

25

United States v. Ritchie,
342 F.3d 903 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26

Warren v. Fox Family Worldwide, Inc.,
328 F.3d 1136 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

27

28

Weinberger v. Salfi,
422 U.S. 749 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Wright v. Oregon Metallurgical Corp.,
360 F.3d 1090 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

**Constitution**

U.S. Const. amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

**Statutes**

5 U.S.C. § 701(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 701(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

5 U.S.C. § 706(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8 U.S.C. § 1329. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

38 U.S.C. § 211(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 405(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 42 U.S.C. § 405(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1395l(u)(4)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395l(u)(4)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 42 U.S.C. § 1395l(u)(4)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395l(u)(4)(D)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395u(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

42 U.S.C. § 1395w-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(e)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1395w-4(e)(1)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1395w-4(e)(1)(A)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1395w-4(i)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 17

42 U.S.C. § 1395w-4(i)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 1395w-4(i)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

42 U.S.C. § 1395w-4(i)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395w-4(j)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395ff(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395ff(a)(3)(B)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395ff(a)(3)(C)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395ff(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1395ff(d)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395ff(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395ii. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1395oo(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1395oo(a)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1395oo(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1395oo(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Legislative Materials

H.R. Rep. No. 108-636 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

H.R. Rep. No. 101-386 (Conf. Rep.) (1989), reprinted in 1989 U.S.C.C.A.N. 3018. . . . . . . . 9, 10

135 Cong. Rec. S13,911 (daily ed. Oct. 24, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

135 Cong. Rec. H5984 (daily ed. Sept. 27, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Judicial Rules

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

## Administrative Rules

42 C.F.R. § 405.502(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

42 C.F.R. § 405.505 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24, 25

42 C.F.R. § 405.904(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 405.904(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 405.926. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 C.F.R. § 405.926(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

42 C.F.R. § 405.942(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 405.962(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 405.1002(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 405.1102(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 414.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 C.F.R. § 414.4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 C.F.R. Part 424 Subpart C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 424.44. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 424.32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 C.F.R. § 424.32(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Federal Register Notices**

72 Fed. Reg. 66,222 (Nov. 27, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

72 Fed. Reg. 38,122 (July 12, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

71 Fed. Reg. 69,624 (Dec. 1, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

71 Fed. Reg. 48,982 (Aug. 22, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

70 Fed. Reg. 70,116 (Nov. 21, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

70 Fed. Reg. 45,764 (Aug. 8, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

70 Fed. Reg. 11,420 (Mar. 8, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

69 Fed. Reg. 66,236 (Nov. 15, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

69 Fed. Reg. 47,488 (Aug. 5, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

68 Fed. Reg. 63,196 (Nov. 7, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

68 Fed. Reg. 49,030 (Aug. 15, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

61 Fed. Reg. 59,490 (Nov. 22, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 20, 21

1

61 Fed. Reg. 34,614 (July 2, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2

59 Fed. Reg. 63,410 (Dec. 8, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 19

3

58 Fed. Reg. 63,626 (Dec. 2, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

4

56 Fed. Reg. 25,792 (June 5, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5

56 Fed. Reg. 59,502 (Nov. 25, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

As defendant explained in his opening memorandum, plaintiffs here are asking this Court to assume subject-matter jurisdiction it does not have in order to force the Secretary of Health and Human Services to do something – reconfigure Medicare physician fee schedule areas nationwide – that he is not legally required to do at all, let alone do at any particular time, in any particular manner, or in response to any particular set of economic or demographic circumstances. To prevail on his motion to dismiss, defendant does not need to dispute any material <u>fact</u> – as opposed to legal characterization – alleged in plaintiffs' lengthy and brief-like complaint. All defendant asks this Court to do is to apply the law.

**STANDARD OF REVIEW**

**1. The Nature of Defendant's Motion to Dismiss**

Plaintiffs' opening discussion of the "deficiencies" they purport to see in the motion to dismiss, Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Pl. Opp.") at 1 (Doc. 40), unwittingly highlights some significant misconceptions of their own. At the outset, it is hardly "impossible," <u>id.</u> at 2, to identify which parts of defendant's motion seek dismissal, under Fed. R. Civ. P. 12(b)(1), for lack of subject-matter jurisdiction, and which parts seek dismissal, under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Defendant's first argument is that fee schedule areas are a necessary component of "the establishment of geographic adjustment factors under subsection (e)" of 42 U.S.C. § 1395w-4, and therefore judicial review of their configuration is foreclosed under 42 U.S.C. § 1395w-4(i)(1)(D). <u>See</u> Defendant's Motion and Notice Of Motion to Dismiss and Memorandum in Support Thereof ("Def. Mem.") at 14-15 (Doc. 28). For the same reason, "statutes preclude judicial review" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(1). <u>See</u> Def. Mem. at 18. In the alternative, if administrative and judicial review were deemed to be available notwithstanding 42 U.S.C. § 1395w-4(i)(1)(D), then plaintiffs would have to have satisfied the jurisdictional prerequisites in 42 U.S.C. § 1395ff(b)(1)(A) for judicial review of Medicare Part B claims. <u>See</u> Def. Mem. at 16-18. These arguments challenge subject-matter jurisdiction.

1    Even if jurisdiction over plaintiffs' claims could be alternatively founded on 28 U.S.C.

2  § 1331, judicial review would be foreclosed because the configuration of fee schedule areas –

3  and the timing of any re-configurations – is committed to agency discretion by law.  5 U.S.C.

4  § 701(a)(2).  This argument also is jurisdictional.[1]  If there is no law to apply, it goes without

5  saying that there cannot possibly be any substantive merit, as a matter of law, in plaintiffs' claims

6  that the existing configuration of fee schedule areas violates any provision of the Medicare

7  statutes, that any legally-mandated re-configuration has been unreasonably delayed, or that the

8  Secretary's failure to reconfigure fee schedule areas in the particular manner desired by plaintiffs

9  is arbitrary and capricious.  These claims should therefore be dismissed under Rule 12(b)(6) for

10  failure to state a claim.  See Def. Mem. at 20-22.  Plaintiffs' constitutional theories likewise

11  should be dismissed for failure to state a claim, albeit for different reasons.  Id. at 22-24.  Finally,

12  defendant argued that plaintiffs' claim for backward-looking damages should be dismissed

13  because the federal government has not waived sovereign immunity, id. at 24, and he challenged

14  the standing of certain plaintiff counties.  Id. at 25.  These are both jurisdictional issues.

15  **2.   Standard of Review under Rule 12(b)(1)**

16    "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

17  pleadings or by presenting extrinsic evidence."  Warren v. Fox Family Worldwide, Inc., 328 F.3d

18  1136, 1139 (9th Cir. 2003).  In the former case, "all of the plaintiffs' factual allegations" must be

19  accepted "as true."  Dreier v. United States, 106 F.3d 844, 847 (9th Cir. 1996) (citation omitted).

20  In the latter case,"the district court is not restricted to the face of the pleadings, but may review

21  any evidence, such as affidavits and testimony."  McCarthy v. United States, 850 F.2d 558, 560

22  (9th Cir. 1988) (citing Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)).  Although reliance on

23  material outside the pleadings does not convert the jurisdictional motion into one for summary

24  judgment, id. (citation omitted), "disputes of fact" at the motion stage must be resolved "in favor

25  of the non-movant," Dreier, 106 F.3d at 847, using "the standard applicable to a motion for

26

27    [1] See, e.g., Port of Seattle v. FERC, 499 F.3d 1016, 1026-27 (9th Cir. 2007); Alcaraz v. INS,

28  384 F.3d 1150, 1161 (9th Cir. 2004).

1    summary judgment." <u>Trentacosta v. Frontier PAC Aircraft Indus, Inc.</u>, 813 F.2d 1553, 1558 (9th

2    Cir. 1987). In this case, the only evidentiary material submitted by defendant relates to a

3    standing issue raised as to some of the plaintiff counties. <u>See</u> Def. Mem. at 25. In light of

4    plaintiffs' evidentiary proffer, defendant withdraws his motion to dismiss those counties for lack

5    of standing. The only other evidentiary material necessary to resolution of any jurisdictional

6    issue is the letter of a Medicare contractor, which is attached to plaintiffs' complaint as Exhibit 9,

7    the contents of which speak for themselves. Plaintiffs cannot survive a motion to dismiss merely

8    by insisting that this document says something it does not say, <u>see</u> Pl. Opp. at 17, and demanding

9    that their characterization be treated as a fact. <u>Id</u>. at 15; <u>see</u> <u>Wright v. Oregon Metallurgical</u>

10   <u>Corp.</u>, 360 F.3d 1090, 1096 (9th Cir. 2004) (quoting <u>Steckman v. Hart Brewing, Inc.</u>, 143 F.3d

11   1293, 1295-96 (9th Cir. 1998)) (court is "not required to accept as true conclusory allegations

12   which are contradicted by documents referred to in the complaint").

### 3.  Standard of Review under Rule 12(b)(6)

14        To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint

15   must be "well-pleaded," <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007) (citation

16   omitted), in that it alleges "enough facts to state a claim to relief that is plausible on its face," <u>id</u>.

17   at 1974, and rises "above the speculative level." <u>Id</u>. at 1965. That is, the allegations in the

18   complaint must "possess enough heft," <u>id</u>. at 1966, to create more than a "suspicion" that

19   plaintiffs have alleged "a legally cognizable right of action." <u>Id</u>. at 1965 (citation omitted).[2] In

20   this connection, "courts 'are not bound to accept as true a legal conclusion couched as a factual

21   allegation,'" <u>id</u>. (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)), and may similarly

22   disregard mere "labels and conclusions." <u>Id</u>.; <u>see also</u> <u>In re Late Fee and Over-Limit Fee Litig.</u>,

23

24        [2] What plaintiffs characterize as the "accepted rule" that "a complaint should not be dismissed

25   for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

26   facts in support of his claim that would entitle him to relief," Pl. Opp. at 2 (quoting <u>De La Cruz</u>

27   <u>v. Tormey</u>, 582 F.2d 45, 48 (9th Cir. 1978), quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46

     (1957)), was abrogated in <u>Bell Atlantic</u>, as an "incomplete" and "best forgotten" gloss "on [the]

28   accepted pleading standard" that, "once a claim has been stated adequately, it may be supported

     by showing any set of facts consistent with the allegations in the complaint." 127 S. Ct. at 1969.

1    2007 WL 4106353 at *2 (N.D. Cal. Nov. 16, 2007) (citing <u>Fields v. Legacy Health Sys.</u>, 413

2    F.3d 943, 950 n.5 (9th Cir. 2005), and <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th

3    Cir. 2001) ( "conclusory allegations of law, unwarranted deductions of fact, or unreasonable

4    inferences are insufficient to defeat a motion to dismiss.").

5         Much of plaintiffs' opposition memorandum fails to recognize the difference between a well-

6    pleaded fact, which must be taken as true here, and a legal characterization, which need not.  For

7    instance, it is a fact that, in 1991, the Secretary created physician fee schedule areas.  56 Fed.

8    Reg. 59,502, 59,514 (Nov. 25, 1991); <u>see</u> Compl. at ¶¶ 62, 71.  It is a fact that, between 1992 and

9    1996, the Secretary converted multiple-intrastate fee schedule areas into single-statewide fee

10   schedule areas in six states.  59 Fed. Reg. 63,410, 63,416 (Dec. 8, 1994); 58 Fed. Reg. 63,626,

11   63,637-38 (Dec. 2, 1993); 56 Fed. Reg. at 59,514; <u>see</u> Compl. at ¶¶ 76, 103, 112.  It is a fact that,

12   in 1996, the Secretary undertook a nationwide reconfiguration of fee schedule areas in response

13   to physician complaints that "changing economic and demographic conditions warrant[ed] a

14   comprehensive review and revision of payment localities."  61 Fed. Reg. 59,490, 59,494 (Nov.

15   22, 1996); <u>see</u> Compl. at ¶¶ 125-136.  It is a fact that, at that time, the Secretary identified

16   "simplicity, reducing boundary payment differences, and maintaining accuracy in tracking area

17   cost differences" as some of the goals he sought to balance in this endeavor.  61 Fed. Reg. at

18   59,497; <u>see also id</u>. at 59,496 ("we generally favor statewide payment areas as they result in

19   greater simplicity and ease of administration and reduce urban/rural payment differentials").  It is

20   also a fact that, at that time, the Secretary indicated that he did not plan to "routinely revise

21   payment areas" in the future, <u>id</u>., but that he would "review" – but not necessarily revise – the fee

22   schedule areas in states with multiple localities, "if the newer [geographic practice cost index]

23   data indicate[d] dramatic relative cost changes among areas."  <u>Id</u>. at 59,497.  It is a fact that the

24   Secretary has since been considering whether the fee schedule areas should be revised again.[3]  It

25

26   _____

     [3] 72 Fed. Reg. 66,222, 66,245-48 (Nov. 27, 2007); 72 Fed. Reg. 38,122, 38,139 (July 12,
27   2007); 71 Fed. Reg. 69,624, 69,655 (Dec. 1, 2006); 71 Fed. Reg. 48,982, 48,993 (Aug. 22, 2006);
     70 Fed. Reg. 70,116, 70,152-53 (Nov. 21, 2005); 70 Fed. Reg. 45,764, 45,783-84 (Aug. 8, 2005);
28   69 Fed. Reg. 66,236, 66,263 (Nov. 15, 2004); 69 Fed. Reg. 47,488, 47,504 (Aug. 5, 2004); 68

is a fact that, in so doing, he has recognized that "there are alternative methodologies that can be used to consider reconfigurations to locality structures," 72 Fed. Reg. at 66,247, that "there are trade-offs involved in making any changes to localities," id., and that it is important to try "to achieve a reasonable balance among competing priorities." Id.  It is a fact that he has stated that he has not yet been able to "establish a policy and criteria that would satisfactorily apply to all situations." 69 Fed. Reg. at 66,263.  But it is not a fact that these published notices and events can be construed as establishing some sort of legally binding "policy," Pl. Opp. at 1, complete with "regulatory thresholds," id., which compel the Secretary to reconfigure fee schedule areas at any particular time or in response to any particular set of economic and demographic conditions.  Those are precisely the kinds of "conclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences" that "are insufficient to defeat a motion to dismiss." Late Fee, 2007 WL 4106353 at *2 (citations omitted).  As will be shown below, however, that is all plaintiffs have to work with.

## ARGUMENT

### I.  FEE SCHEDULE AREAS ARE NOT JUDICIALLY REVIEWABLE UNDER 42 U.S.C. § 1395w-4(i)(1)(D).

It is not necessary to consider any factual allegations, of course, to conclude that the plain language of 42 U.S.C. § 1395w-4(i)(1)(D) forecloses judicial review of the fee schedule areas that are a necessary component of "the establishment of geographic adjustment factors under subsection (e)" of 42 U.S.C. § 1395w-4.  As defendant demonstrated in his opening memorandum, Def. Mem. at 14-15, the "strong presumption" in favor of judicial review of agency action, Am. Soc'y of Cataract & Refractive Surgery v. Thompson, 279 F.3d 447, 452 (7th Cir. 2002), has not prevented courts from construing the preclusive language in 42 U.S.C. § 1395w-4(i) with the breadth that Congress placed in it.  Cataract, 279 F.3d at 452-54; Painter v. Shalala, 97 F.3d 1351, 1355-58 (10th Cir. 1996); AMA v. Thompson, 2001 WL 619510 at *3-7

---

Fed. Reg. 63,196, 63,214 (Nov. 7, 2003); 68 Fed. Reg. 49,030, 49,044 (Aug. 15, 2003); see Compl. ¶¶ 171-183, 186-202; Declaration of Dario de Ghetaldi in Support of Plaintiffs' Opposition to Motion to Dismiss Complaint ("de Ghetaldi Dec.") at ¶¶ 5(C), 5(G) (Doc. 41).

1    (N.D. Ill. May 29, 2001); <u>Am. Soc'y of Anesthesiologists v. Shalala</u>, 90 F. Supp. 2d 973, 974-76

2    (N.D. Ill. 2000); <u>Am. Soc'y of Dermatology v. Shalala</u>, 962 F. Supp. 141, 146 (D.D.C. 1996),

3    <u>aff'd</u>, 116 F.3d 941 (D.C. Cir. 1997).  Indeed, plaintiffs do not dispute that § 1395w-4(i)(1) must

4    be read so as to prevent litigants from challenging "specific items" that are "integral to and

5    essential components of the congressional-protected determinations."  Pl. Opp. at 11 (quoting

6    <u>Anesthesiologists</u>, 90 F. Supp. 2d at 976).  But that is precisely what they are attempting here.

**A.    Fee Schedule Areas Are a Necessary Component of the Establishment of
Geographic Adjustment Factors under 42 U.S.C. § 1395w-4(e).**

7
8        As courts have repeatedly stressed, the analysis of 42 U.S.C. § 1395w-4(i) begins with the

9    proposition that "Congress plainly intended to allow the Secretary to implement the fee schedule

10   without having to defend herself in litigation," <u>Dermatology</u>, 962 F. Supp. at 145, and therefore

11   enacted a "clear and comprehensive" preclusion on judicial review of "the three core components

12   of the overall formula" and each of their "various sub-components."  <u>AMA</u>, 2001 WL 619510

13   at *4.  The centerpiece of plaintiffs' argument – that "the establishment of fee schedule areas," Pl.

14   Opp. at 8, is some sort of academic exercise that has nothing to do with "the establishment of

15   geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-4(i)(1)(D) – strains

16   credulity.  To be sure, there is no <u>separate</u> provision in 42 U.S.C. § 1395w-4 that requires the

17   creation of fee schedule areas, and there is no correspondingly <u>separate</u> subsection of 42 U.S.C.

18   § 1395w-4(i)(1) that precludes review of fee schedule areas.  But that is only because the

19   occasion to create fee schedule areas springs from the need to use them to establish geographic

20   adjustment factors under 42 U.S.C. § 1395w-4(e).  Congress, in turn, expressly precluded judicial

21   review of "the establishment of geographic adjustment factors under subsection (e)," 42 U.S.C.

22   § 1395w-4(i)(1)(D), which necessarily precludes review of all agency actions necessary to carry

23   out this task.  The analysis is as simple as that.

24       Every court that has addressed a similar issue has declined to follow the path urged by

25   plaintiffs here.  In <u>Cataract</u>, the Court of Appeals for the Seventh Circuit declined to fracture the

26   statutorily unreviewable determination of "relative value units under subsection (c)," 42 U.S.C.

27   § 1395w-4(i)(1)(B), into reviewable "subcomponents," <u>id.</u> at 449, finding that "it would be

28

difficult for Congress to have written" a statute that "in clearer terms" precluded review of all elements that go into the relative value units. Id. at 453. The same analysis controlled in Anesthesiologists, 90 F. Supp. 2d at 976, and Dermatology, 962 F. Supp. at 145-46. In Painter, the Court of Appeals for the Tenth Circuit likewise held that a sub-element of the statutorily unreviewable "determination of conversion factors under subsection (d)," 42 U.S.C. § 1395w-4(i)(1)(C), which mandated that the conversion factor result "in the same aggregate amount of payments" for physician services as in 1991, 42 U.S.C. § 1395w-4(d)(1)(B), could not be separated from the overall conversion factor for purposes of construing the meaning of the non-reviewability statute. Once again, the court concluded that "[w]e can think of little that Congress could have said" to make it more "plain and unambiguous" that implementation of every element of the conversion factor was not subject to judicial review. 97 F.3d at 1356.[4]

In the decision perhaps most directly on point, AMA v. Thompson, the court construed the preclusion on review of "the determination of conversion factors under subsection (d)," 42 U.S.C. § 1395w-4(i)(1)(C), to encompass calculation of a "sustainable growth rate" ("SGR") under subsection (f) of § 1395w-4, even though subsection (f) is not among the subsections listed in the preclusion statute itself. It was enough, the Court held, that the SGR was incorporated by reference in subsection (d):

> The SGR is thus a sub-component of the larger conversion factor. It has no other function beyond aiding in that calculation. Although the "no review" provision of subsection (i)(1)(C) refers to subsection (d), it also refers to the 'determination of' the conversion factor. Simply stated, it would strain common sense to say that the SGR calculation is not a part of the "determination of" the conversion factor. As the Secretary points out, if plaintiffs really are not challenging the conversion factor, then their lawsuit would have no real impact because it is only from the SGR's impact on the conversion factor that the physician fee schedule is adjusted.

2001 WL 619510 at *4. Moreover, the court stated, there is no reason "why Congress would have wanted to exclude the SGR calculation from the 'no review' provision of subsection (i)," id.,

---

[4] In Skagit County Public Hospital v. Shalala, 80 F.3d 379 (9th Cir. 1996), the Court of Appeals for this Circuit applied similar reasoning when it declined to break up a non-reviewable "geographic reclassification" decision in another portion of the Medicare statutes into reviewable subcomponents. Id. at 385; accord Palisades Gen. Hosp. v. Leavitt, 426 F.3d 400, 403-05 (D.C. Cir. 2005).

1    and "[a]ny concerns over the delegation of this task to the Secretary are tempered by the fact that

2    this area is subject to intense oversight and frequent review by Congress." Id. at *5.  Because the

3    SGR calculation is merely a "strand of the conversion factor," the court concluded that it was just

4    as unreviewable as the rest of the conversion factor.  Id.

5        Exactly the same analysis applies to the "fee schedule areas" that must exist before the

6    Secretary can finish "the establishment of geographic adjustment factors under subsection (e)."

7    42 U.S.C. § 1395w-4(i)(1)(D).  Configuration of fee schedule areas is one of the "integral" and

8    "essential" components, Anesthesiologists, 90 F. Supp. 2d at 976, that must be in place before

9    any geographic adjustment factors can be established.  In this setting, "it simply will not do" for

10   plaintiffs "to say, '"Oh, we're only challenging the Secretary's decisions that must be made

11   before"'" the geographic adjustment factors are established.  Id. (emphasis in original; internal

12   quotation marks omitted).[5]  In addition, as plaintiffs' own complaint emphasizes, fee schedule

13   areas have been the subject of considerable congressional oversight.  Compl. at ¶¶ 263-64; see

14   also 72 Fed. Reg. at 66,246 (discussing report to Congress on fee schedule areas by Government

15   Accountability Office); H.R. Rep. No. 108-636 at 126 (2004) (expressing concern about the

16   situation in certain California counties).  Fee schedule areas therefore must be considered one of

17   the elements of "the establishment of geographic adjustment factors under subsection (e)" of 42

18

19

20

21       [5] Because the configuration of fee schedule areas cannot plausibly be characterized as

22   something "ancillary" that is done "only after" the indexes have "been determined," Cataract, 279
     F.3d at 453 (quoting and distinguishing Furlong v. Shalala, 1996 WL 393526 at *8 (S.D.N.Y.

23   July 12, 1996), aff'd in part, rev'd in part on other grounds, 156 F.3d 384 (2d Cir. 1998)),
     plaintiffs' reliance on Furlong is inapposite.  Plaintiffs' attempt to rely on McNary v. Haitian

24   Refugee Center, 498 U.S. 479 (1991), is even more strained.  In that case, the Supreme Court
     held that a statute that barred judicial review "of a determination respecting an application" for

25   special immigrant-worker status did not bar a "collateral" challenge to the constitutionality of the
     procedures used in the administrative process.  Id. at 492 (emphasis in original) (citation

26   omitted).  Because the challenge here is to the substantive implementation of a necessary

27   component of the establishment of geographic adjustment factors, the McNary analysis is simply
     not relevant.  See Cataract, 279 F.3d at 453; Skagit, 80 F.3d at 385.

28

1    U.S.C. § 1395w-4 that Congress intended to insulate from review under the plain language of 42

2    U.S.C. § 1395w-4(i)(1)(D).[6]

3          **B.    The Legislative History of 42 U.S.C. § 1395w-4(i)(1)(D) Does Not Support the
               Conclusion that Fee Schedule Areas Are Reviewable.**

4          Plaintiffs' reliance on legislative history to urge a contrary conclusion, Pl. Opp. at 8-10, is

5    misplaced.  At the outset, "there is no need to resort to legislative history" to determine the

6    meaning of a "straightforward" statute.  <u>United States v. Gonzales,</u> 520 U.S. 1, 6 (1997) (citation

7    omitted); <u>see also</u> <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 119 (2001) (quoting <u>Ratzlaf</u>

8    <u>v. United States</u>, 510 U.S. 135, 145-48 (1994) (courts "do not resort to legislative history to cloud

9    a statutory text that is clear.").  In any event, however, the <u>relevant</u> legislative history supports,

10   rather than undermines, the conclusion that every element that goes into "the establishment of

11   geographic adjustment factors under subsection(e)" of 42 U.S.C. § 1395w-4 was intended to be

12   unreviewable under 42 U.S.C. § 1395w-4(i)(1)(D).

13         The conference committee report states that the language in the non-review provision

14   "includes" the Senate version "with amendments."  H.R. Rep. No. 101-386 at 761 (1989) (Conf.

15   Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3364.  The Senate version, in turn, forbade

16   administrative and judicial review of "the establishment of values in the geographic cost practice

17   index, the values in the geographic overhead index, and the values in the geographic malpractice

18   index under subsection (e)."  135 Cong. Rec. S13,911, S13,928-29 (daily ed. Oct. 24, 1989): <u>see</u>

19

20

21         [6] Plaintiffs' reliance on the canon of construction known as <u>expressio unis est exclusio alterius</u>
     for the proposition that fee schedule areas are not among the judicially unreviewable agency

22   actions listed in 42 U.S.C. § 1395w-4(i), Pl. Opp. at 8, is pointless.  The "establishment of
     geographic adjustment factors under subsection (e)" is unarguably on the list of non-reviewable

23   actions, 42 U.S.C. § 1395w-4(i)(1)(D), and fee schedule areas are a necessary component of that
     listed item.  It is equally irrelevant that § 1395w-4 directs the Secretary, on various timetables, to

24   review and, if he deems it appropriate, revise, other components of the establishment of
     geographic adjustment factors or the determination of relative value units, <u>see</u> Pl. Opp. at 12 &

25   n.5, and that it is possible to revise these components "<u>without ever once modifying a single fee</u>
     <u>schedule area</u>.."  <u>Id</u>. at 13 (emphasis in original).  That Congress did not establish a time frame

26   for reviewing fee schedule areas for possible revision does not make it any less essential that fee
     schedule areas <u>exist</u> before "the establishment of geographic adjustment factors under subsection

27   (e)" can be achieved.  42 U.S.C. § 1395w-4(i)(1)(D).

28

     DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS
     C 07-2888 MJJ                                    -9-

1    also H.R. Rep. No. 101-386 at 753, reprinted in 1989 U.S.C.C.A.N. at 3356; 135 Cong. Rec.

2    H5984, H6023 (daily ed. Sept. 27, 1989).  The amendments made to this language by the

3    conference committee are not otherwise described in its report, but the language of the statute

4    broadened the preclusion on administrative and judicial review to include the entire

5    "establishment of geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-

6    4(i)(1)(D), not just the "establishment of values" in the various indexes contained within those

7    factors.  The Senate language, even if left unamended, would already have precluded review of

8    fee schedule areas because it is necessary to determine fee schedule areas to determine the values

9    of the relevant indexes.  But if the conferees thought that something more needed to be said to

10   encompass the full range of administrative action that comprised "the establishment of

11   geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-4(i)(1)(D), it is hard to

12   see what that "something more" could have been other than the fee schedule areas referenced

13   throughout subsection (e).  Thus, contrary to plaintiffs' contention, it may reasonably be

14   concluded that Congress did not find it necessary to explicitly reference "fee schedule areas"

15   because fee schedule areas were an integral part of "the establishment of geographic adjustment

16   factors under subsection (e)."  42 U.S.C. § 1395w-4(i)(1)(D).

17       Plaintiffs' attempt to draw an inference from the conference committee's rejection of

18   alternative language passed by the House misunderstands what actually happened in the

19   conference committee.  The House version of the legislation provided that:

20       Beginning in 1992, fee schedule areas are to be comprised of either (1) each State in its
         entirety, or (2) each metropolitan statistical area (or New England County Metropolitan
21       area or comparable area recognized by the Secretary) and each portion of each State
         which is outside such area.  The Secretary is to report to Congress by July 1, 1991 on
22       which of these approaches should be used.

23   Id. at 743, reprinted in 1989 U.S.C.C.A.N. at 3346; see also 135 Cong. Rec. at H6022.  It was

24   that selection between fee schedule areas defined by statewide boundaries and fee schedule areas

25   defined by metropolitan statistical areas that comprised the "selection of fee schedule areas" that

26   the House bill expressly made unreviewable.  Id. at 753, reprinted in 1989 U.S.C.C.A.N. at

27

28

1   3356.[7]  When the portion of the bill mandating this particular selection of statewide areas versus

2   metropolitan statistical areas did not make it into the final legislation, any need to make that

3   selection unreviewable disappeared, as well.  Thus, the only thing this part of the legislative

4   history "conclusively establishes," Pl. Opp. at 8, is that there was no need for Congress to make

5   unreviewable a selection of fee schedule area configurations that it decided was, in the end,

6   unnecessary.[8]

### C.  The Secretary Has Never Taken the Position that Fee Schedule Areas Are Reviewable.

Finally, plaintiffs' attempt to glean support for their position from statements of the Secretary

himself, Pl. Opp. at 12, is disingenuous.  The preamble discussion on which plaintiffs rely does

not in any way suggest that an operational definition of the term "fee schedule area," 42 U.S.C.

§ 1395w-4(j)(2), is not an "'integral'" element, Pl. Opp. at 12, of "the establishment of geographic

adjustment factors," 42 U.S.C. § 1395w-4(i)(1)(D), under subsection (e) of 42 U.S.C. § 1395w-4.

The discussion responds to comments by some physicians complaining that geographic practice

cost indexes used to compute their fee schedule amounts were lower than those physicians

---

[7] Indeed, there is some ambiguity as to what the portion of the House language on which plaintiffs rely, Pl. Opp. at 9, was ever intended to mean.  The bill provided that "the selection of fee schedule areas under subsection (c)(3)(B)" was to be unreviewable, 135 Cong. Rec. at H6023, but subsection (c)(3)(B) referred to "anesthesia services."  Id. at H6022.  The intended cross-reference was presumably to subsection (c)(3)(C), which defined "fee schedule areas."  Id.

[8] Plaintiffs' attempt to compare 42 U.S.C. § 1395w-4(i)(1)(D) with other statutory schemes that have a preclusion on judicial review, Pl. Opp. at 8, similarly proves nothing.  The provision on which they primarily rely merely requires the Secretary to identify "those counties and areas" with "the lowest primary care ratios," 42 U.S.C. § 1395l(u)(4)(A)(i) and those "counties and areas" with "lowest specialist care ratios," 42 U.S.C. § 1395l(u)(4)(A)(ii); and the issue-preclusion section states that "[t]here shall be no administrative or judicial review," 42 U.S.C. § 1395l(u)(4)(D), of, among other things, "the identification of a county or area."  42 U.S.C. § 1395l(u)(4)(D)(i).  Thus, everything that goes into the identification of the counties is unreviewable, just as everything that goes into "the establishment of geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-4(i)(1)(D), is unreviewable.  The statute at 8 U.S.C. § 1329, to which plaintiffs point as an example of a clear issue-preclusion provision merely states that "[n]othing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers."  There is no statute at 38 U.S.C. § 211(a).

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS
C 07-2888 MJJ                                -11-

thought they should have been because lower-cost rural areas were included within the statewide fee schedule areas in which they practiced. 59 Fed. Reg. at 63,415. The Secretary simply replied that the issue they were raising could not properly be addressed by arbitrarily increasing the numbers in the geographic practice cost indexes for the two statewide localities, as the commenters urged, but rather could be addressed only, if at all, by fracturing the statewide fee schedule areas into smaller fee schedule areas. He added that the possibility of "reviewing the existing payment locality configuration for possible changes sometime after 1996" had been discussed earlier in the same preamble. Id. The Secretary was certainly not saying that fee schedule areas were not essential to "the establishment of geographic adjustment factors under subsection (e)." 42 U.S.C. § 1395w-4(i)(1)(D). Plaintiffs are merely clutching at straws to suggest that this discussion was intended to define limits on the Secretary's understanding of the non-reviewability provision in 42 U.S.C. § 1395w-4(i)(1)(D), which is not even mentioned in the passage.

At the bottom line, the question of whether fee schedule areas are unreviewable parts of "the establishment of geographic adjustment factors under subsection (e)," 42 U.S.C. § 1395w-4(i)(1)(D), can be answered by one simple inquiry: is it possible to establish geographic adjustment factors without first knowing what the fee schedule areas will be? Since the answer is no, fee schedule areas are an integral component of "the establishment of geographic adjustment factors," and therefore are not subject to judicial review.

## II.  EVEN IF JUDICIAL REVIEW WERE NOT PRECLUDED BY 42 U.S.C. § 1395w-4(i)(1)(D), PLAINTIFFS' CLAIMS WOULD HAVE TO BE CHANNELED THROUGH THE MEDICARE CLAIMS REVIEW PROCESS.

To the extent that administrative and judicial review are deemed to be available, however, plaintiffs' complaint should be dismissed for failure to meet the jurisdictional requirements necessary to obtain review of Part B claims under 42 U.S.C. § 1395ff(b)(1)(A). Plaintiffs' arguments to the contrary are unpersuasive.

At the outset, plaintiffs' contention that "presentment" can be satisfied merely by writing a letter or position paper unconnected to a discrete claim for Part B benefits, Pl. Opp. at 14-15, is

1  simply incorrect.  The purpose of presentment is to give "the Secretary 'an opportunity to rule on

2  a concrete claim for reimbursement,'" Am. Acad. of Dermatology v. HHS, 118 F.3d 1495, 1499

3  (11th Cir. 1997) (quoting Heckler v. Ringer, 466 U.S. 602, 622 (1984)) (emphasis added), not a

4  nebulous opportunity to rule on a disembodied legal issue.  The requirements for presentment of

5  a Part B claim are set forth in 42 C.F.R. Part 424 Subpart C.  Each claim must be mailed or

6  delivered within certain specified time frames from the date the services were furnished, 42

7  C.F.R. § 424.44, the claim must be signed, 42 C.F.R. § 424.32(a)(3), and the claim must be on

8  prescribed forms or in accordance with set instructions.  42 C.F.R. § 424.32.  Only then does the

9  Medicare contractor make an initial determination on the claim.  42 U.S.C. § 1395ff(a)(1)(B); 42

10  C.F.R. §§ 405.904(a)(2), (b).

11    The requirements for exhaustion are equally plain.  If a claimant wishes to challenge the

12  contractor's initial determination, he must pursue a multi-step process of administrative review.

13  Failure to meet the express time requirements of any portion of this process renders the decision

14  at the preceding level final and unappealable,[9] unless reopening is requested within prescribed

15  time limits.  42 C.F.R. § 405.980.  After exhaustion of this administrative process, the claimant

16  has sixty days within which to appeal the "final decision" of the Secretary to federal court.  42

17  U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. § 405(g)).  This appeals process is the

18  exclusive avenue available for challenging determinations regarding Part B claims.

19  Federal-question jurisdiction under 28 U.S.C. § 1331 is precluded.  42 U.S.C. § 1395ii

20

21

22    [9] See 42 U.S.C. § 1395ff(a)(3)(B)(i) (no initial determination may be reconsidered or appealed

23  unless a redetermination has been made); 42 U.S.C. § 1395ff(a)(3)(C)(i) and 42 C.F.R.
    § 405.942(a) (claimant must generally request redetermination within 120 days of receiving

24  initial determination); 42 U.S.C. § 1395ff(b)(1)(A) and 42 C.F.R. § 405.962(a) and 42 C.F.R.

25  § 405.978 (claimant may request reconsideration by independent contractor within 180 days of
    redetermination, barring which the reconsideration is final); 42 U.S.C. § 1395ff(d)(1)(A) and 42

26  C.F.R. § 405.1002(a)(1) (claimant may request administrative law judge review of
    reconsideration within 60 days); 42 U.S.C. § 1395ff(d)(2) and 42 C.F.R. § 405.1102(a)(1)

27  (claimant may request review Medicare Appeals Council review of administrative law judge

28  decision within 60 days).

1    (incorporating 42 U.S.C. § 405(h)).  The claimant cannot simply come into court years after the

2    fact and demand that a different amount should have been paid.[10]

3    Plaintiffs' arguments in favor of waiving exhaustion were rejected in Martin v. Shalala, 63

4    F.3d 497 (7th Cir. 1995), in a case similar to this one in which beneficiaries and physicians, who

5    were then subject to the former reasonable-charges regime, sought to challenge "the methodology

6    for establishing locality classification" that had been used by their Medicare contractor in making

7    their Part B payments, id. at 500, without first channeling the argument through the

8    administrative process in the context of a discrete claim for reimbursement.  The court held that

9    the plaintiffs' claim, though couched in terms of methodology, "was part and parcel of their claim

10    for benefits," id. at 504, and therefore was not exempt from the exhaustion prerequisites of 42

11

12    _____

    [10] Plaintiffs' reliance on Bethesda Hospital Association v. Bowen, 485 U.S. 399 (1988), is

13    puzzling.  In the first place, Bethesda deals with hospital reimbursement on the basis of annual
    cost reports appealable under 42 U.S.C. § 1395oo(a), not with appeals of individual claims

14    appealable under 42 U.S.C. § 1395ff(b)(1)(A).  In any event, the hospitals in that case, unlike
    plaintiffs here, did file and pursue a timely appeal of the specific Medicare reimbursement

15    decision they challenged.  The Medicare statutes that governed payment for the type of costs at
    issue in that case provided that a hospital that was "dissatisfied" with a "final determination" as

16    to the "amount of total program reimbursement" found to be due it for the period covered by a
    cost report, 42 U.S.C. § 1395oo(a)(1)(A)(i), was entitled to appeal to a Provider Reimbursement

17    Review Board if it met certain dollar-amount thresholds, 42 U.S.C. § 1395oo(a)(2), and "such
    provider files a request for a hearing within 180 days" after the contractor's initial determination.

18    42 U.S.C. § 1395oo(a)(3).  The question raised in Bethesda was whether the hospitals could be
    considered to be "dissatisfied" with a payment calculated pursuant to their own request – albeit in

19    compliance with a regulation that they thought was unlawful.  485 U.S. at 401.  The Supreme
    Court held that, under this statutory scheme, a timely administrative appeal was not

20    jurisdictionally defective merely because the provider did not express dissatisfaction with the
    challenged regulation at the time the cost report was first submitted to the contractor, so long as

21    its dissatisfaction with the amount of its total program reimbursement was expressed in a timely-
    submitted administrative appeal.  Id. at 404.  That proposition is of no relevance, however,

22    where, as here, the providers "bypass a clearly prescribed exhaustion requirement," id. at 405, by
    not timely submitting (and thereafter timely pursuing) any appeal at all of the challenged

23    payment amount.  Nothing in Bethesda supports the proposition that a Part B supplier or
    beneficiary need not timely file – and thereafter exhaust – an appeal of any specific Medicare

24    payment determination it wishes to challenge; and Bethesda certainly does not support the
    proposition that a Part B supplier can simply wait six years and file a position paper containing "a

25    broad challenge to the validity of rules, regulations, and policies," Pl. Opp. at 15, that is entirely
    untethered to the timely appeal of any specific claims for payment.

26

27

28

1  U.S.C. § 1395ff(b)(1)(A).  "[W]hen a complaint asserts that the plaintiffs have not received 'the

2  full Part B Medicare benefits' and seeks damages for lost benefits," the court held, "we cannot

3  consider it as anything other than a claim for higher benefits."  Id.  Such a claim, the court stated,

4  "is in no way collateral to an amounts determination."  Id.  The court went on to hold that

5  exhaustion could not be excused on the ground of futility merely because the plaintiffs in that

6  case misunderstood the contractor's determination letter to foreclose further review, id. at 504-05,

7  or on the ground of irreparable injury.  Id. at 505.

8      Exhaustion cannot be excused here for exactly the same reasons.  As in Martin, plaintiffs'

9  claims cannot be construed as anything other than a "challenge to a number of specific

10  determinations with respect to the amount of compensation due under a number of specific

11  requests for payment."  Pl. Opp. at 15.  Plaintiffs' demand for billions of dollars in

12  "underpayments from March 14, 2001, to the present made to them by Medicare for the provision

13  of medical and other health services" under Part B, id. at 6, is, like the demand in Martin, "in no

14  way collateral to" correct determination of the amount of their Part B payments.  64 F.3d at 504.

15  As in Martin, plaintiffs cannot show irreparable injury.  And, as in Martin, plaintiffs cannot

16  establish futility merely by misinterpreting the contractor's denial of their ostensible request for a

17  redetermination of unidentified claims.[11]  If fee schedule areas were deemed to fall outside the

[11] The letter, which is attached to plaintiffs' own complaint as Exhibit 9, states that the
contractor "has reviewed your March 14, 2007 submission to determine whether it constitutes a
request for redetermination of an initial payment determination under Medicare Part B," Letter of
NHIC, Corp. dated May 11, 2007 at 1, and concluded that "your submission does not constitute a
request for redetermination because it omits claims identifying information required in Medical
[sic] Claims Processing Manual, IOM Publication 100-04, Chapter 29, section 310.1B.2.b."  Id.
It cannot be read to say anything else about why the submission was defective, since a document
"attached to a complaint" is incorporated in it, Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir.
2005) (citing Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir.
1990)), and a court "may assume that its contents are true for purposes of a motion to dismiss."
United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  The court "is not required to accept
as true conclusory allegations which are contradicted by documents referred to in the complaint."
Wright, 360 F.3d at 1096 (quoting Steckman, 143 F.3d at 1295-96.  Any allegation in plaintiffs'
complaint that misconstrues the contractor's letter as addressing whether the issue raised by
plaintiffs is reviewable at all cannot be taken as true if it is not supported by the text of the letter.

1    preclusion from review in 42 U.S.C. § 1395w-4(i)(1)(D), therefore, exhaustion could not

2    otherwise be excused.[12]

3          Finally, plaintiffs' contention that, in the context of an initial payment determination made by

4    a Medicare Part B contractor, administrative review of fee schedule areas is precluded by

5    regulation, Pl. Opp. at 18, proves too much.  The regulation on which plaintiffs attempt to rely

6    provides that "[a]ctions that are not initial determinations and are not appealable under this

7    subpart include, but are not limited to," 42 C.F.R. § 405.926:

8          Any issue regarding the computation of the payment amount of program reimbursement
           of general applicability for which [the agency] or a carrier has sole responsibility under
9          Part B such as the establishment of a fee schedule set forth in part 414 of this chapter, or
           an inherent reasonableness adjustment pursuant to § 405.502(g), and any issue regarding
10         the cost report settlement process under Part  A.

11   42 C.F.R. § 405.926(c).  As the Secretary explained in the accompanying preamble, this language

12   was not intended to be read to preclude administrative review any more broadly than such review

13   is precluded under 42 U.S.C. § 1395w-4(i)(1).  See 70 Fed. Reg. 11,420, 11,433 (Mar. 8, 2005)

14   ("under section 1848(i) of the Act, [42 U.S.C. § 1395w-4(i)], the values used to calculate

15   allowable amounts under the physician fee schedule may not be the subject of an administrative

16   appeal").[13]  Thus, if fee schedule areas were deemed to fall outside the preclusion on

17   "administrative or judicial review" in 42 U.S.C. § 1395w-4(i)(1), then the regulation at 42 C.F.R.

18   § 405.926(c) would not apply to fee schedule areas, as well.  If plaintiffs wish to be heard to

19   concede that the regulation prohibits review of fee schedule areas in accordance with the

20   statutory mandate, defendant will not stand in their way.[14]

21

22   [12] The decision in Bowen v. City of New York, 476 U.S. 467 (1986), is inapposite because that
23   case dealt with a challenge to the procedures used in certain Social Security adjudications, not the
     merits of the determinations themselves.  Id. at 482-86.

24   [13] See also id.("where the coinsurance amount was not computed by the contractor, but rather,
25   was an amount prescribed by regulation (for example outpatient services), the issue of the
     appropriateness of the coinsurance amount was not appealable since it was an automatically
26   calculated amount based directly on a fee schedule exempt from review.").

27   [14] Later in the same preamble, in response to a comment asking for clarification on the intended
28   scope of the "inherent reasonableness" reference in 42 C.F.R. § 405.926(c), the Secretary

**III. THIS COURT LACKS SUBJECT-MATTER JURISDICTION BECAUSE THERE IS NO LAW TO APPLY.**

Even if plaintiffs' complaint could survive to this point, their claim that this Court should enforce some "regulatory thresholds" purportedly established by the Secretary "for modifying 'fee schedule areas,'" Pl. Opp. at 1, founders on their complete inability to identify such putative thresholds without resort to their own "conclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences." <u>Late Fee</u>, 2007 WL 4106353 at *2 (citations omitted). Plaintiffs' opposition memorandum identifies no statute, regulation or administrative adjudication in which these purported thresholds were even articulated, let alone adopted as a legal standard binding future conduct. Plaintiffs have simply made up a "policy," Pl. Opp. at 1, that they believe should exist and demanded that their hypothetical policy be deemed to exist in fact for purposes of a motion to dismiss. This is nonsense.

    **A.   No Statute or Regulation Establishes Any Judicially Manageable Standards for Determining Whether, When or How the Secretary Must Change the Configuration of Fee Schedule Areas.**

Plaintiffs begin their analysis by admitting that, "[u]nfortunately," the term "fee schedule area" is "left undefined" by the statute "itself," Pl. Opp. at 20, except insofar as it instructs the Secretary to use, as his 1992 starting point, the "locality" configuration that had theretofore existed as a result of ad-hoc judgments about local conditions made by Medicare contractors for purposes of the former reasonable-charges regime. 42 U.S.C. § 1395w-4(j)(2). Inasmuch as contractors, under the reasonable-charges regime, were given standardless discretion under 42 U.S.C.

_____

suggested an even narrower purpose for this regulation. Under 42 C.F.R. § 405.502(g), the agency or the carrier may issue national or local determinations that certain payment amounts for certain categories of items or services are inherently unreasonable. The Secretary explained that, although such a broad-based determination is not itself "considered an appealable initial determination under this subpart," 70 Fed. Reg. at 11,436, "where the amount of payment on a claim was determined based on an inherent reasonableness policy, this would result in an initial determination that is appealable." <u>Id.</u> at 11,435-36. Applying this approach to the rest of 42 C.F.R. § 405.926(c), establishment of a published fee schedule would not, in and of itself, constitute an initial determination subject to administrative appeal. Thus, fee schedules or inherent reasonableness policies could be appealed only if, when, and to the extent that, they are applied to determine the payment amount on a claim (and then, as to fee schedules, only to the extent that such review is not precluded by 42 U.S.C. § 1395w-4(i)(1)).

§ 1395u(b) to "delineate 'localities' on the basis of their knowledge of local conditions," 42 C.F.R. § 405.505 (1991), the only reasonable inference is that Congress intended for this same discretion to carry over into the era of fee schedules. Certainly nothing in the statute establishes any legal standard for determining <u>if</u> any subsequent changes in the inherited configuration should be made, <u>when</u> any such hypothetical changes should be made, or <u>how</u> any such hypothetical changes should be made. This is the paradigm setting where agency action must be deemed to be unreviewable because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

If, as plaintiffs claim, there were "regulatory thresholds" that mandate the reconfiguration of fee schedule areas in response to particular economic or demographic conditions, Pl. Opp. at 1, one would expect to find them where regulatory thresholds usually appear: in regulations. But the only regulation dealing with fee schedule areas merely "establishes physician fee schedule areas that generally conform to the geographic localities in existence before January 1, 1992," 42 C.F.R. § 414.4(a), and broadly authorizes subsequent "changes" after notice and comment. 42 C.F.R. § 414.4(b). Nothing in this language imposes any standard for determining if, when or how to reconfigure fee schedule areas. The only requirement is to publish a notice with opportunity for comment. This Court's analysis of whether there exist any regulatory thresholds of the kind imagined by plaintiffs can end here.

### B. The 1996 Reconfiguration Did Not Establish a Binding Policy that Directs Future Revisions in Fee Schedule Areas.

Plaintiffs' reliance on <u>INS v. Yang</u>, 519 U.S. 26 (1996), for the proposition that, "[t]hough the agency's discretion is unfettered at the outset," law to apply may be deemed to exist if the agency "<u>announces</u> and <u>follows</u> – by <u>rule</u> or settled course of <u>adjudication</u> – a general policy by which its exercise of discretion will be governed," <u>id</u>. at 32 (emphasis added), is misplaced for three reasons.[15] First, plaintiffs have not identified any rule or adjudication where the policy they imagine to exist appears. Second, they identify no publication of any kind where the policy for

---

[15] The other decisions on which plaintiffs rely, Pl. Opp. at 22-23, are inapposite because, in each case, there were standards set forth in statutes or regulations and the agencies changed their position as to what the standards meant.

1    which they appear to contend has ever been announced.  Third, they cite to no instance where such

2    a policy has ever <u>once</u> been followed, let alone followed repeatedly as a matter of settled course.

3        Although less than a model of precision, plaintiffs' filings in this case appear to contend that

4    the Secretary has somewhere established a policy under which (a) fee schedule areas will be

5    reviewed county-by-county nationwide[16] and (b), where physician reimbursement under the fee

6    schedule in any county in a multi-county fee schedule area is estimated to vary, by some margin,

7    from an estimate of physician costs in that county when compared to an estimate of national

8    average costs, the Secretary will automatically fracture the fee schedule area that contains the

9    county into a smaller, more homogeneous, fee schedule area.[17]  But, in fact, between 1992 and

10   1996, the Secretary did exactly the opposite:  he converted multiple-intrastate fee schedule areas

11   into fewer, larger, single-statewide fee schedule areas in six states.  59 Fed. Reg. at 63,416; 58

12   Fed. Reg. at 63,637-38; 56 Fed. Reg. at 59,514.  In 1996, the Secretary did reconfigure <u>some</u>

13   states on the basis of a 5-percent iterative method, but he started with existing fee schedule areas,

14   rather than counties,[18] and undertook no review of fee schedule  areas that were already statewide.

15

16   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

        [16] <u>See, e.g.</u>, Compl. at ¶ 137 (one of the goals of the 1996 restructuring was to create a

17   "uniform, county-based fee schedule system that can be introduced nationwide"); <u>id</u>. at ¶¶ 310,
     315, 328, 333, 338, 345, 354, 359, 367 (claiming that damages will continue to accrue until

18   Medicare restructures fee schedule areas "on a uniform county-by-county basis nationwide").

        [17] <u>See generally</u> Pl. Opp. at 5, 23, 29-30.  Remarkably, plaintiffs locate this putative policy not

19   in any statement of the Secretary, but in a private contractor's report that contained
     "suggestions"for "variations on the[] options" the Secretary was considering in 1996.  61 Fed.

20   Reg. 34,614, 34,617 (July 2, 1996); <u>see also</u> 61 Fed. Reg. at 59,494.  <u>See, e.g.</u>, Compl. at ¶¶ 137,
     210, 218 (citing "HER Report, Vol. I").  Plaintiffs thereby implicitly concede that the Secretary

21   has never espoused this goal as settled policy.  Their complaint explicitly acknowledges,
     moreover, that the Secretary has never, in fact, implemented such a policy as a settled guide to

22   action.  <u>See</u> Compl. at ¶¶ 137 ("Medicare did not implement a uniform, county-based fee
     schedule system in 1996."); 218 (same); 224 (same).

23

24       [18] The Secretary used "counties as the basic locality structure" only in eleven states that still

25   contained "subcounty localities," that is, localities smaller than a county.  61 Fed. Reg. at 59,494.
     Although imprecise language in the preamble states that the Secretary used "counties as the basic

26   locality unit," <u>id</u>., what he actually <u>did</u> was use "current localities" as the "building blocks" for
     the reconfigured fee schedule areas, <u>except when</u> the current localities were <u>smaller</u> than a

27   county.  <u>Id</u>.  Only in the eleven states where existing localities were smaller than a county did he

28

61 Fed. Reg. at 59,494.  The result of the effort was <u>never</u> to fracture multi-locality states into even more fee schedule areas, but rather to <u>reduce</u> the number of fee schedule areas nationwide from 210 to 89.  <u>Id.</u>  This was consistent with the <u>Secretary's</u> stated view that "we generally favor statewide payment areas as they result in greater simplicity and ease of administration and reduce urban/rural payment differentials," 61 Fed. Reg. 59,496, and inconsistent with <u>plaintiffs'</u> apparent view that county-by-county differences in payment amounts within a state are the be-all and end-all of regulatory concern.  <u>See, e.g.</u>, Pl. Opp. at 5 (the "payment discrepancies" plaintiffs seek to have rectified "stem from Medicare's method of combining counties into single localities.").  Neither what the Secretary did in 1996, nor why he said he was doing it, is consistent with what plaintiffs want this Court to require him to do here.  That is a curious regulatory threshold, indeed.

Plaintiffs' reliance on the Secretary's response to a comment in the 1996 notice for the proposition that it establishes "regulatory thresholds" mandating reconfigurations in the future, Pl. Opp. at 28, <u>see also id</u>. at 5, 23, 24, is patently without merit.  The passage on which plaintiffs rely states, in its entirety, as follows:

> *Comment:*  While understanding and generally agreeing with our statistical methodology, some commenters asked if we planned to change localities on a periodic basis to recognize future cost changes.  Others requested that we commit to such future change as we update the GPCIs [geographic practice cost indexes].

> *Response:*  There have been no comprehensive studies and revisions of physician payment localities in 30 years.  We agreed with physicians that such a study and revision was necessary, especially since we changed from the local carrier pricing system to a national fee schedule.  We have stated on numerous occasions that we favor statewide localities because of their understandability, simplicity, and ease of administration, and because they reduce urban/rural payment differences.  <u>We do not plan to break up statewide payment areas in the future.  We also do not generally favor fragmenting existing payment areas into smaller areas.</u>  While we do not plan to routinely revise payment areas as we implement new GPCIs, we will review the areas in multiple locality States if the newer GPCI data indicates dramatic relative cost changes among areas.

---

use counties as a basic locality structure, and then only to <u>increase</u> fee schedule areas to county size, because the "use of subcounty localities creates unnecessary complexity and administrative burden."  <u>Id</u>.

61 Fed. Reg. at 59,497 (emphasis added). At the outset, statements made by preamble in the Federal Register generally do not, by themselves, establish legally binding standards as a matter of law.[19] This one certainly does not.

Plaintiffs' contention that the passage creates "an established set of criteria . . . that set thresholds for determining when payment differences within and between localities were significant enough to warrant a national reconfiguration," Pl. Opp. at 28, – let alone a reconfiguration that (contrary to the explicit expectations set forth by the Secretary in the very same passage) would "break up statewide payment areas" and would result in "fragmenting existing payment areas into smaller areas," 61 Fed. Reg. at 59,497,– strains credulity.

The only "assurance" made by the Secretary in 1996, Pl. Opp. at 5, that might have given plaintiffs a glimmer of hope is his statement that "we will review the areas in multiple locality States" if "newer . . data indicates dramatic relative cost changes among areas." 61 Fed. Reg. at 59,497 (emphasis added). But, the Secretary's bare statement of future intentions does not create a legally binding standard. See, e.g., Ekimian v. INS, 303 F.3d 1153, 1159 (9th Cir. 2002) ("acknowledgment" that an agency might "reopen proceedings, and a statement that it will do so under 'exceptional situations,' without more," does not create law to apply). In any event, nothing in this passage "gave assurances" that the Secretary "would revise those localities," Pl. Opp. at 5 (emphasis added), in response to changes in economic conditions, demographic patterns, or anything else. And the Secretary has certainly reviewed the localities issue repeatedly. See n.3, supra. Indeed, in his most recent analysis of the subject, the Secretary reviewed three possible options for reconfiguration of fee schedule areas, 72 Fed. Reg. at 66,245-48, but concluded that "the issue requires further study and analysis." Id. at 66,248. No more than that could even

---

[19] See, e.g., Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 569 (D.C. Cir. 2002) (preamble not "binding"); Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1418 (D.C. Cir. 1998) (preamble statement creates no law where agency "never characterized the challenged statements as final or applied them as binding"); Ctr. for Auto Safety v. FHA, 956 F.2d 309, 313 (D.C. Cir. 1992) (where regulation "says absolutely nothing" on time limits for inspections, preamble statement that routine inspection at no less than four-year intervals "is suggested" does not establish a "maximum" time limit).

arguably be said to have been promised in 1996. Plaintiffs cannot seriously believe that a review process in which the Secretary has repeatedly "considered alternatives," but been unable to "establish a policy and criteria that would satisfactorily apply to all situations," 69 Fed. Reg. at 66,263, has resulted in a course of rulemaking or adjudication that requires reconfiguration where certain "regulatory thresholds" come into existence. Pl. Opp. at 1.[20]

### C. No Law to Apply Exists Anywhere Else Plaintiffs Attempt to Locate It.

The rest of plaintiffs' attempt to impose "regulatory thresholds" on the Secretary, Pl. Opp. at 1, only drives their argument deeper into a "murky muddle of a regulatory no-man's land." Furlong v. Shalala, 156 F.3d 384, 386 (2d Cir. 1998). The remaining paragraphs of the complaint to which plaintiffs point – whether taken singly or as a group – do not plausibly add up to the conclusion that the Secretary has established any legally binding thresholds for undertaking fee schedule area reconfigurations, let alone fee schedule area reconfigurations on a national basis that would result in more and smaller fee schedule areas, rather than fewer and larger ones. And no matter how many additional paragraphs plaintiffs might add by amendment, see de Ghetaldi Dec. at ¶ 5, the mandatory policies that plaintiffs want to exist simply are not there.

Paragraph 172 of plaintiffs' complaint reflects the Secretary's recognition of one of the arguments in favor of a broadly-based reconfiguration of fee schedule areas which has fueled his

---

[20] Where in the 1996 notice plaintiffs find a mandatory obligation to reconfigure fee schedule areas whenever something plaintiffs call a "3% error standard" is exceeded, Pl. Opp. at 23, is a mystery. As nearly as defendant can ascertain, plaintiffs purport to find this putative "error standard" not in any statement of the Secretary, but in a private contractor's report. See 61 Fed. Reg. at 34,617, 59,494. Somewhere in the contractor's three-volume report, plaintiffs purport to find that the contractor used a 3-percent error standard in its analysis, and, on the basis of that discovery, they assume that the Secretary not only officially adopted this standard for purposes of the 1996 reconfiguration, but also obligated himself to employ this same standard in the future. See Compl. at ¶¶ 137, 141-57. Because no such statement appears anywhere in the 1996 rulemaking, or subsequently, there is no legal basis for plaintiffs' conclusion. This inference is, however, contradicted by plaintiffs' own averment that the Secretary, "for reasons unknown," did not even apply this formula uniformly in 1996. Id. at ¶ 143. Once again, plaintiffs' resistance to defendant's motion to dismiss rests on nothing more than "conclusory allegations of law, unwarranted deductions of fact," and "unreasonable inferences." Late Fee, 2007 WL 4106353 at *2 (citations omitted).

1    ongoing consideration of possible approaches to the problem.  Recognition of a concern, however,

2    hardly establishes a legally binding threshold for action, nor does it negate the need to balance

3    other factors, such as administrative burdens and redistributive effects.  Paragraph 173 merely

4    asserts that agency staff engaged in meetings.  Paragraph 178 cites the following passage about fee

5    schedule areas in California from the Secretary's 2004 final fee schedule notice:

6        We also recognize the concerns expressed by the residents of Santa Cruz County about the
         impact of the current payment disparities upon physicians in their community.  Our
7        consistent position has been that we will be responsive to requests for locality changes
         when there is a demonstrated consensus within the State medical association for the
8        change.  Due to the redistributive impacts of these types of changes, we believe this
         approach helps ensure the appropriateness of any such change.
9
10   69 Fed. Reg. at 66,263.  Nothing in this passage indicates whether a reconfiguration will occur in

11   the future.  The most it promises is that the Secretary would be "responsive to requests" for

12   locality changes within a State when there is a demonstrated consensus in favor of it.  It does not

13   speak to the sort of nationwide reconfiguration of localities plaintiffs seek in their complaint.

14       Paragraph 188 cites the following passage from the Secretary's 2005 proposed physician fee

     schedule notice:

15       [W]e do recognize the potential impact of wide variations in the practice costs within a
16       single payment locality.  In last year's [physician fee schedule] final rule, we noted that we
         received many comments from physicians and individuals in Santa Cruz County
17       expressing the opinion that Santa Cruz County should be removed from the Rest of
         California payment locality and placed in its own payment locality.  The county-specific
18       GAF of Santa Cruz County is 10 percent higher than the Rest of California locality GAF.
         Santa Cruz County is adjacent to Santa Clara County and San Mateo County. Santa Clara
19       and San Mateo Counties have two of the highest GAFs in the nation.  The published 2006
         GAF for the Rest of California payment locality is 24 percent less than the GAFs of Santa
20       Clara and San Mateo.

21   70 Fed. Reg. at 45,784.  Nothing in this passage binds the Secretary to any future nationwide

22   reconfiguration.  Although the Secretary here proposed to create a separate locality for Santa

23   Cruz, Santa Clara and San Mateo counties, the Secretary ultimately rejected that proposal.  70

24   Fed. Reg. at 70,152.

25       Paragraph 200 selectively quotes from two passages in the final rulemaking in which the

26   Secretary rejected the California county proposal.  The first passage states, in its entirety:

27       We do not disagree with the view that a comprehensive evaluation of the current payment
         localities is due, and we look forward to working cooperatively with MedPAC in that
28

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS
C 07-2888 MJJ                    -23-

regard.  We are examining all viable options that will meet the general objectives
discussed above.  We would note, however, that our goals for this analysis are very similar
to those we expressed in 1996.

70 Fed. Reg. at 70,152-53.  The reference to working with MedPAC indicates that the question of

what standards should be used is still in a state of flux.  The second passage reads:

Because of the nearly complete lack of support for this proposal outside the two positively
impacted counties, we have decided to withdraw this proposal at this time.  As noted
above, we intend to work with MedPAC and other interested parties toward a more
comprehensive evaluation of potential refinements of the payment localities.

Id. at 70,153.  Nothing in either of these passages – or anywhere else – indicates whether a

reconfiguration will occur in the future or in what circumstances limited, or nationwide,

reconfigurations would be appropriate.  There is no "there" there.

**IV.  PLAINTIFFS' STATUTORY AND APA CLAIMS LACK LEGAL MERIT**.

The conclusion that Congress imposed no standards for determining how fee schedule areas

should be configured, and no standards for determining if, when or how they should be

reconfigured, also defeats plaintiffs' claims that the Secretary's failure to do things their way

violates the Medicare statutes or the APA.  As was shown above, 42 U.S.C. § 1395w-4(j)(2)

imposes no "mandatory duty" with respect to whether, when or how fee schedule areas should be

reconfigured.  Pl. Opp. at 20.  A would-be reconfiguration that the Secretary is never required to

undertake, let alone at any particular time or in response to any particular set of economic or

demographic events, cannot plausibly be characterized as being "unlawfully withheld or

unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

There is equally little merit in plaintiffs' contention that the Secretary's current approach to the

matter is arbitrary, capricious or otherwise not in accordance with law, within the meaning of

5 U.S.C. § 706(2)(A).  As was discussed earlier, the relevant statute merely defined fee schedule

areas by reference to the localities that had historically been used for purposes of the former

reasonable-charges regime, 42 U.S.C. § 1395w-4(j)(2), under 42 U.S.C. § 1395u(b).  Under that

statute, Medicare contractors had long been delegated the ability to "delineate 'localities' on the

basis of their knowledge of local conditions."  42 C.F.R. § 405.505 (1991).  Nothing under the

reasonable-charges regime required that localities be defined as "relatively homogeneous," Pl.

Opp. at 5, or that localities not "encompass[] an area where costs are disparate." Id. To the contrary, it was the Secretary's long-held view that localities "should include a cross section of the population with respect to economic and other characteristics" and that they "may differ in population density, economic level, and other major factors affecting charges for services." 42 C.F.R. § 405.505 (1991); see also id. ("distinctions between localities are not to be so finely made that a 'locality' includes only a very limited geographic area whose population has distinctly similar income characteristics (e.g., a very rich or a very poor neighborhood within a city)." Given the "lack of consistency" in the localities in use when Congress enacted 42 U.S.C. § 1395w-4(j)(2), 56 Fed. Reg. 25,792, 25,832 (June 5, 1991), Congress cannot possibly be deemed to have mandated any greater level of consistency in the fee schedule areas that followed them. What plaintiffs want here simply bears no rational relation to the legislation that Congress passed.

Moreover, the Secretary's current approach of continued study cannot be deemed per se unreasonable in light of the "potential impact of intralocality practice cost variations and the redistributive impacts that would result from any revisions to the localities," as well as "the considerable administrative issues in making locality changes." 72 Fed. Reg. at 66,246; see also id. ("changing localities requires reprogramming systems and extensive provider educations, both of which are expensive and burdensome administrative activities that can last for a significant period of time"). For the same reason, there is ample justification to be "cautious and evaluate the impacts" carefully, id., before undertaking a nationwide reconfiguration. Plaintiffs' statutory and APA claims should therefore be dismissed for failure to state a claim.[21]

## V.  PLAINTIFFS' CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Plaintiffs' constitutional claims warrant little additional discussion. At the outset, they cite no authority for the proposition that counties (in California or elsewhere) are persons within the meaning of the Fifth Amendment, and the question has not been resolved in this Circuit. See

---

[21] This argument does not require "the introduction of facts outside the complaint." Pl. Opp. at 3. Defendant's argument is that "each of plaintiffs' claims fails as a matter of law." Id. at 4.

Maricopa County v. Valley Nat'l Bank, 318 U.S. 357, 361 (1943) (declining to decide question);

Bd. of Natural Res. v. Brown, 992 F.2d 937, 943 (9th Cir. 1993) (same).  However, it has long

been settled that "[t]he 'word 'person' in the context of the Due Process Clause of the Fifth

Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the

States of the Union," South Carolina v. Katzenbach, 383 U.S. 301, 323 (1966), and it is, in turn,

"difficult to imagine how" a county of a state "can be a 'person' under the Fifth Amendment if its

progenitor, the state, cannot be." City of Sault Ste. Marie v. Andrus, 532 F. Supp. 157, 167

(D.D.C. 1980).  Thus, although counties may be considered "'persons' for most purposes," in the

particular context of the Fifth Amendment, "a state cannot confer a constitutional status" upon one

of its subdivisions "which the state itself does not enjoy."  Id. (emphasis added); accord Creek v.

Village of Westhaven, 1987 WL 5429 at *7 (N.D. Ill. Jan. 15, 1987).[22]

     In any event, every court that has ruled on the question has held that physicians and other

entities that accept assignments of Medicare Part B claims have no property right that could

potentially be protected by due process to payment in any amount that exceeds the published fee

schedule.  Cataract, 279 F.3d at 454-56; Painter, 97 F.3d at 1357-58; AMA, 2001 WL 619510

at *7.  The lone decision on which plaintiffs rely for a contrary proposition dealt with the property

interests of physicians or suppliers who did not take assignment of beneficiary claims, but were

nonetheless subjected to certain limits on the amount that they could charge Part B patients.

Furlong v. Shalala, 156 F.3d at 394-96.  That decision is not relevant to the expectations of

physicians and suppliers who choose to take assignments and choose to accept fee-schedule limits

on Part B reimbursement.  Cataract, 279 F.3d at 455 (distinguishing Furlong); AMA, 2001 WL

619510 at *7 (same).

     With respect to equal protection, it remains unclear what classification is even being

challenged.  Plaintiffs have identified specific counties that they claim are advantaged, and

---

[22] See also Altmann v. Austria, 142 F. Supp. 2d 1187, 1207 (C.D. Cal. 2001) ("Several courts have held that the federal government, state governments, political subdivisions and municipalities within the United States are not 'persons' within the meaning of the Due Process Clause.") (citing cases) (subsequent history omitted).

specific counties that they claim are disadvantaged, but not what constitutes the advantaged and disadvantaged <u>classes</u>. To the extent plaintiffs are merely claiming that suppliers in specific counties have not received enough in Part B payments, their equal protection argument has no substantive content distinct from their statutory claim. Plaintiffs concede as much when they assert that their equal protection claim is "not based" on "an assertion of a right to equal payment," but rather on an alleged "violation of their statutory rights." Pl. Opp. at 30. Nothing in the Fifth Amendment guarantees anything in the way of ideal Medicare payment.[23]

In any event, it cannot seriously be argued that the Secretary's current policy lacks a rational basis.

> On rational-basis review, a classification in a statute . . . comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it. Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.

<u>FCC v. Beach Commc'ns</u>, 508 U.S. 307, 314-15 (1993) (citations omitted). The same standard applies to regulations. <u>Kahawaiolaa v. Norton</u>, 386 F.3d 1271, 1280 (9th Cir. 2004). As was discussed above, the "potential impact of intralocality practice cost variations and the redistributive impact that would result from any revisions to the localities," coupled with "the considerable administrative issues in making locality changes," counsel in favor of a "cautious" approach that is careful to "evaluate the impacts" before making changes nationwide in scope. 72 Fed. Reg. at 66,246.

Finally, plaintiffs' "non-delegation" theory warrants little further discussion. As plaintiffs themselves concede, no unlawful delegation of administrative responsibility can be alleged to occur where Secretary retains ultimate authority over the decision. Pl. Opp. at 31 (citing <u>United</u>

---

[23] Plaintiffs' reference to the rate of payment received by hospitals under Medicare Part A, Pl. Opp. at 30, 38 (citing Compl. at ¶¶ 279-281), is difficult to comprehend. Hospital reimbursement under Part A is an entirely separate payment system from physician reimbursement under Part B. Plaintiffs appear to be asserting that, to be constitutional, the different Medicare reimbursement regimes would have to meet what they conceive to be a nationwide test of relative fairness, not only within, but across, payment regimes. This cannot be, and is not, the law.

1  Black Fund, Inc. v. Hampton, 352 F. Supp. 898, 904 (D.D.C. 1972)).  As defendant explained in

2  his opening memorandum, the Secretary does not delegate authority to state medical associations

3  merely by giving their opinions weight in deciding whether to make changes in the administration

4  of the fee schedule.  See Dermatology, 962 F. Supp. at 146 & n.3.

5  **VII.  PLAINTIFFS CANNOT USE THE APA TO REOPEN BILLIONS OF DOLLARS
        IN STALE CLAIMS.**

6       Plaintiffs concede that there is no waiver of sovereign immunity that would support a claim

7  for billions of dollars in damages.  Plaintiffs' reliance on Bowen v. Massachusetts, 487 U.S. 878

8  (1989), for the proposition that a claim for injunctive relief under the APA can indirectly

9  implicate money, Pl. Opp. at 34, ignores that decision's admonition that "Congress did not intend

10  a general grant of review in the APA to duplicate existing procedures for review of agency

11  action."  Bowen, 487 U.S. at 903.  As was discussed earlier, to the extent fee schedule areas are

12  subject to review at all, that review must be "channeled" through the Medicare Part B claims

13  process.  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 12 (2000) (citing Your

14  Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 456 (1999); Ringer, 466 U.S. at 614;

15  Weinberger v. Salfi, 422 U.S. 749, 761-62 (1975); Califano v. Sanders, 430 U.S. 99, 103-04

16  (1977).  If plaintiffs wish to seek a reopening of claims determinations that they failed to appeal,

17  the Medicare regulatory scheme affords them (within specified time frames) that opportunity.  42

18  C.F.R. § 405.980.  They cannot simply come into Court years later and claim billions of dollars

19  for stale claims.

20  **VIII.  PLAINTIFFS' "ADDITIONAL ISSUES" ADD NOTHING TO THE CASE.**

21       Defendant does not interpret any of the "additional issues" discussed at the end of plaintiffs'

22  opposition memorandum, Pl. Opp. at 35-40, to be a separate claim for relief.  But, even if they

23  were, the claims should be dismissed for lack of subject matter jurisdiction and failure to state a

24  claim for the reasons stated above.

25       In any event, plaintiffs' concern about budget neutrality appears to arise in connection with the

26  Secretary's rejection of a proposal by the California Medical Association ("CMA") to divide

27  California into more localities and then inflate geographic practice cost indexes in remaining

28

California fee schedule areas.  69 Fed. Reg. at 66,263.  Nothing in 42 U.S.C. § 1395w-4 gives the Secretary any "authority" to artificially inflate geographic practice cost indexes in this manner.  69 Fed. Reg. at 66,236; see 42 U.S.C. §§ 1395w-4(e)(1)(A)(i)-(iii) (geographic cost indexes should reflect the "relative costs" of certain expenses and the "relative values" of certain physician work effort in the different fee schedule areas "compared to the national average").[24]

Plaintiffs' contention that the Secretary made "misrepresentations" in a 2005 Federal Register notice when he decided not to implement certain locality changes in California, Pl. Opp. at 38, does not state a claim for relief.  In any event, plaintiffs do not dispute that CMA opposed the proposed changes, as did "numerous providers and medical associations in the current Rest of California payment locality" and several members of Congress.  70 Fed. Reg. at 70,152.  Because of the seriously "negative payment impact" posed to physicians and suppliers in the Rest-of-California locality and "the nearly complete lack of support for this proposal outside the two positively impacted counties," the Secretary withdrew it.  Id.  Whether the letter-writing campaign of the two positively-impacted counties produced 5,000 letters or 50,000, see Pl. Opp. at 38, is irrelevant.  Plaintiffs' objection to the disparate treatment of hospital reimbursement under Part A and payment of Part B claims, id. at 18-39, was discussed earlier in this memorandum.  See n.23, supra.  Finally, plaintiffs lack standing to complain about events in Texas.  Id. at 39-40.

---

[24] In the converse situation, where multiple localities are being consolidated into a single statewide fee schedule area, no such arbitrary inflation of geographic practice cost indexes occurs.  The Secretary merely recalculates these indexes for the new statewide area to approximate the weighted costs of the new area vis-a-vis the national average.  This is what the Secretary, perhaps somewhat imprecisely, has referred to as statewide "budget neutrality," and it is consistent with the Secretary's authority to establish indexes that "reflect" "relative costs" and "relative values."  Thus, there is no inconsistency between the Secretary's consolidation of certain multiple-locality states into single-locality states and the Secretary's rejection of the California scheme.  See Pl. Opp. at 35-37.

1

## CONCLUSION

2

   For the reasons stated, plaintiffs' complaint should be dismissed.

3
                                        Respectfully submitted,

4
OF COUNSEL:
DANIEL MERON                            JEFFREY S. BUCHOLTZ

5
General Counsel                         Acting Assistant Attorney General

6
CAROL J. BENNETT                        SCOTT N. SCHOOLS
Acting Associate General Counsel        United States Attorney

7

MARK D. POLSTON

8
Deputy Associate                        /s/ Peter Robbins
General Counsel for Litigation          SHEILA M. LIEBER

9
                                        PETER ROBBINS

GIOCONDA MOLINARI                       Department of Justice

10
H. ANTONY LIM                           20 Massachusetts Avenue, N.W., Room 7142
LAWRENCE J. HARDER                      Washington, D.C.  20530

11
Attorneys                               Tel:  (202) 514-3953
U.S. Department of Health

12
and Human Services                      Attorneys for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          Pursuant to 28 U.S.C. § 1746, I hereby certify that, this 28th day of December, 2007, I caused

3   copies of the foregoing document to be served electronically on the following persons at the

4   following electronic addresses:

5                    Dario DeGhetaldi
                     deg@coreylaw.com
6
                     Colleen Duffy Smith
7                    cduffysmith@mfmlaw.com,spuumala@mfmlaw.com

8                    Patrick Key Faulkner
                     pfaulkner@co.marin.ca.us,jmichaels@co.marin.ca.us
9
                     Jack F. Govi
10                   jgovi@co.marin.ca.us,pjackson@co.marin.ca.us

11                   William Merrill Litt
                     littwm@co.monterey.ca.us, littw@co.monterey.ca.us
12
                     Dana Maureen McRae
13                   dana.mcrae@co.santa-cruz.ca.us

14                   Jerry E. Nastari
                     jen@coreylaw.com,deg@coreylaw.com
15
                     Michael Gannon Reedy
16                   mreedy@mfmlaw.com,smaes@mfmlaw.com

17                   Amanda L. Riddle
                     alr@coreylaw.com
18
                     Mari-Ann Gibbs Rivers
19                   mrivers@co.marin.ca.us,adooley@co.marin.ca.us

20   and by first class mail, postage prepaid, on:

21                   Celeste E. Andersen
                     Office of the County Counsel
22                   105 East Anapamu, Suite 201
                     Santa Barbara, CA 93101
23
                     Patricia Gomez
24                   Office County Counsel
                     1055 Monterey St #D320
25                   San Luis Obispo, CA 93408

26                   James Lindholm
                     Office of the County Counsel
27                   1055 Monterey Street, Suite D320
                     San Luis Obispo, CA 93408
28

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS
C 07-2888 MJJ

1

2    Charles Joseph McKee
     Office of the County Counsel
3    County of Monterey
     168 West Alisal Street
4    Third Floor
     Salinas, CA 93901

5    John James Sansone
     Office of the County Counsel
6    1600 Pacific Highway, Room 355
     San Diego, CA 92101

7

8    Stephen Shane Stark
     Office of the County Counsel
9    105 E Anapamu St Suite 201
     Santa Barbara, CA 93101-2000

10   Steven Michael Woodside
     County of Sonoma
11   575 Administration Dr. Rm. 105
     Santa Rosa, CA 95403-2815

12

13   December 28, 2007             /s/ Peter Robbins
                                   PETER ROBBINS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28